**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com
Email: dglass@zlk.com

*Lead Counsel for Plaintiffs and the Class*

[*additional counsel on signature page*]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| RHONDA BAYLOR, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiff,*<br><br>v.<br><br>HONDA MOTOR CO., LTD. and AMERICAN HONDA MOTOR COMPANY, INC.,<br><br>*Defendants.* | Case No. 2:23-cv-00794-GW-AGR<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff Brian Clark and Named Plaintiff Marilyn Gund (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Honda Motor Co., Ltd. ("Honda" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Honda American Depository Shares ("ADSs") between June 20, 2018 and September 28, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Honda and its North American subsidiary, American Honda Motor Company, Inc. ("American Honda").

2. Honda is a multinational conglomerate manufacturer of automobiles, motorcycles and power equipment. The Company conducts its U.S.-based operations through American Honda.

3. Certain of Honda's vehicles—including the 2018-2020MY Honda Odyssey, 2016-2020MY Honda Pilot, 2019-2020MY Honda Passport, 2015-2020MY Acura TLX, and 2015-2020MY Acura MDX—include a so-called "Idle Stop" engine feature, purportedly to enhance fuel efficiency.

4. In marketing these vehicles, Honda and/or its subsidiaries highlighted the Idle Stop system's purported capacity to automatically shut off a vehicle's engine to save fuel when the vehicle brakes to a stop for at least two seconds—for example, at a traffic light—and to automatically restart the engine when the driver releases the vehicle's brake pedal.

5. Unbeknownst to the market, however, the Idle Stop feature had a defect, *i.e.*, sudden, and unexpected failure. Specifically, although Defendants touted the Idle Stop feature as automatically activating and shutting down the vehicles' engine when the brake pedal is fully applied and the vehicle is at idle, there have been hundreds of complaints dating back as early as 2015, illustrating that Idle Stop feature does not, in fact, automatically restart the engine when the driver releases the brake pedal. Instead, the vehicle will suddenly cease to operate altogether, creating a situations of grave danger for drivers suddenly unable to drive their vehicles after stopping at red lights, stop signs, pausing to make left hand turns in the middle of an intersection, or when on the entrance ramp to a highway.

6. Indeed, going back to 2015, owners of Honda vehicles equipped with the defective Idle Stop feature have filed with the National Highway Traffic Safety Administration ("NHTSA"), or posted online, hundreds of complaints regarding Idle Stop Defect documenting both the dangers posed by the defect and Defendants' failure to remediate the defect despite their awareness of the mounting complaints.

7. American Honda acknowledged the existence of the defect in several models, spanning years, in numerous technical service bulletins it issued to Honda dealerships throughout the Class Period.

8. Nevertheless, despite knowledge of the pervasive defect based on numerous consumer complaints, warranty claims and customer complaints submitted by dealers, pre-sale testing, NHTSA complaints, and its own internal records, Honda continued to market vehicles with the Idle Stop feature touting those vehicles' safety, with no mention of the defect or the safety issues posed by its vehicles as a result, nor did Defendants reveal their failure to remediate the defect.

9. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies in press kits, press releases, and SEC filings. Specifically, Defendants made false and misleading statements and/or failed to disclose that: (i) they had overstated the safety and reliability of Honda vehicles equipped with Idle Stop; (ii) the defective Idle Stop engine feature did not function as marketed, leaving drivers unable to operate their vehicles following an "idle stop"; (iii) as a result of the foregoing deficiencies, Honda failed to prevent American Honda from marketing and selling thousands of vehicles that contained a defective Idle Stop feature; (iv) the foregoing conduct subjected the Company and/or its subsidiaries to a heightened risk of litigation, as well as financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading and/or omitted material facts at all relevant times.

10. On June 3, 2022, the NHTSA's Office of Defects Investigations ("ODI") announced an investigation into Honda's Idle Stop feature due to 221 complaints received as well as "several field reports" that the engine fails to restart on its own from a complete stop at a traffic light or road intersection with the Auto Start/Stop function engaged in 2016-2019MY Honda Pilot. ODI further indicated that Honda admitted that the issue extended beyond the Pilot to other Honda vehicles with a 3.5L engine and 9 speed automatic transmission, such as Honda Odyssey,

Acura TLX, and Acura MDX. Following the announcement of the investigation, Honda securities fell $0.88 per share, or 3.41%, to close at $24.96 on June 3, 2022.

11. Then, on September 28, 2022, a putative class action was filed against American Honda alleging that it had sold thousands of vehicles—including the 2018-2020 Honda Odyssey, 2016-2020 Honda Pilot, 2019-2020 Honda Passport, 2015-2020 Acura TLX, and 2015-2020 Acura MDX (*i.e.*, not just the vehicles covered in the ODI investigation)—equipped with a flawed Idle Stop feature.[1] Per the allegations in the Consumer Class Action, after initially shutting off a vehicle's engine, the Idle Stop system in the affected vehicles routinely failed to restart the engine as designed, leaving drivers dangerously unable to move their vehicles. The lawsuit further alleges that American Honda was fully aware of the defect before marketing the vehicles. The lawsuit provides numerous examples of consumers endangered by the Idle Stop defect on multiple occasions, each using different Honda makes and models, in Florida, California, Alabama, Connecticut, Delaware, Illinois, Indiana, Louisiana, Maryland, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, Texas, Virginia, and Washington.

12. On this news, Honda's ADS price fell $0.74 per share, or 3.23%, to close at $22.19 per ADS on September 29, 2022.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiffs and other Class members have suffered significant losses and damages.

[1] *Cooper et al v. American Honda Motor Co., Inc.*, No. 1:22-cv-05299 (N.D. Ill.). This case has since been transferred to the Central District of California, 2:22-cv-04252-MCS-SK (C.D. Cal.) ("Consumer Class Action").

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). American Honda is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

17. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18. Lead Plaintiff Clark, as set forth in his previously filed Certification (ECF No. 18-3), acquired Honda ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures or materializations of concealed risks.

19. Named Plaintiff Gund, as set forth in her previously filed Certification (ECF No. 14-3), acquired Honda ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures or materializations of concealed risks.

20. Defendant Honda is organized under the laws of Japan with principal executive offices located at 2-1-1, Minami-Aoyama 2-chome, Minato-ku, Tokyo

107-8556, Japan. Honda's ADSs trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "HMC."

21. Defendant American Honda is the Company's North American subsidiary and maintains its principal executive offices in Torrance, California.

22. Defendant Honda and American Honda are collectively referred to herein as "Defendants."

**RELATED PARTIES**[2]

23. Toshihiro Mibe ("Mibe") has served as Honda's President, Chief Executive Officer ("CEO"), and Representative Director since April 1, 2021.

24. Takahiro Hachigo ("Hachigo") served as Honda's President, CEO, and Representative Director from before the start of the Class Period to April 1, 2021.

25. Kohei Takeuchi ("Takeuchi") has served as Honda's Chief Financial Officer at all relevant times. Takeuchi also currently serves as Honda's Executive Vice President and a Director of the Company.

26. Toshiaki Mikoshiba ("Mikoshiba") has served as the CEO of American Honda and the President and Director of parent company Honda from April 2016.

27. Noriya Kaihara ("Kaihara") has served as the President and CEO and director of American Honda, and the chief officer of Regional Operations (North America) for parent company Honda, since October 1, 2021.

**SUBSTANTIVE ALLEGATIONS**

**A. Background**

28. Honda is a multinational conglomerate manufacturer of automobiles, motorcycles, and power equipment.

[2] Pursuant to a tolling agreement entered into by the Parties, Plaintiffs agreed to voluntarily dismiss Mibe, Hachigo and Takeuchi (collectively referred to as, the "Individual Defendants") from this action without prejudice or otherwise name the Individual Defendants as defendants in any amended pleading unless and until Honda and/or American Honda file an Answer in this action. *See* ECF Nos. 47, 56.

29. Honda began its U.S. operations in Los Angeles, California in 1959 by selling motorcycles. In 1969, Defendant began marketing and selling automobiles, with its operations still centered in California. In 1982, Honda became the first Japanese automaker to begin local automobile production in the U.S. In 1986, Honda established the Acura Brand and launched an exclusive sales network in the U.S.

30. The Company's U.S.-based operations are conducted through its North American subsidiary, American Honda. According to the organizational structure set forth in each of Honda's annual 20-F filings, Honda has 100% ownership and voting interest in American Honda. Moreover the 20-F filings explain that American Honda's financials are consolidated with Honda (as are other of Honda's subsidiaries) because ***Honda has direct control over American Honda***. (*See* Forms 20-F, section titled, "*Basis of Consolidation*").

31. Honda's vehicles use gasoline engines of three, four or six-cylinder configurations, gasoline-electric hybrid systems, and gasoline-electric plug-in hybrid systems. Honda also offers other alternative fuel-powered vehicles such as battery electric vehicles, fuel cell vehicles, and flexible fuel vehicles.

**B. Honda Responds to Stricter Regulations by Implementing Idle Stop System in Gasoline Engines**

32. The automotive industry is a heavily regulated industry, subject to various government regulations, including environmental and safety regulations. Such regulations relate to items such as emissions, fuel economy, recycling, and safety. Honda maintains that its "efforts to meet the wide range of applicable regulatory requirements, both in its production activities and in its research and development activities, are an integral part of, and inseparable from, its normal operational activities as a manufacturer and its efforts to continuously develop competitive products meeting consumer preferences."[3]

---

[3] Honda Motor, Co., Ltd., Form 20-F, at 13 (June 6, 2022).

33. Under the Clean Air Act, the State of California is permitted to establish its own emission control standards to the extent they are more stringent than federal standards. Pursuant to this authority, in August 2012, the California Air Resources Board (CARB) issued the Advanced Clean Car package of regulations, which included amendments to the California Low Emission Vehicle Program III (LEV III) and Zero Emission Vehicle (ZEV) regulations. The LEV III regulation, which applied to 2015 and subsequent model years, tightened limits on emissions and evaporative emissions.

34. In March 2014, the Environmental Protection Agency (EPA) finalized Tier 3 regulation, the federal emission and fuel standards. Tier 3 set exhaust and evaporative emission standards equivalent to California LEV III.

35. The Federal Motor Vehicle Information and Cost Savings Act requires automobile manufacturers to comply with the Corporate Average Fuel Economy (CAFE) standards. Under the CAFE standards, manufacturers are subject to substantial penalties if automobiles produced by them in any model year do not meet the average standards for each category. The standard for the 2016 model year was 250 g-$CO_2$/mile, or a 35.5 mpg industry average.

36. In August 2012, the NHTSA and EPA issued regulation regarding Green House Gas (GHG) and CAFE regulations for the 2017 through 2025 model years. The standard for the 2025 model year is 163 g-$CO_2$/mile or a 54.5 mpg industry average.

37. In response to these more stringent regulations on emissions and fuel economy, the 2015 model year was seen as the tipping point where stop/start idle control really took off in the U.S.[4] While the stop/start idle systems had been in use on hybrid vehicles for nearly a decade, by 2015, almost every major automaker offered one or more non-hybrid models with stop/start idle control.

[4] Next Generation Start/Stop Systems - (tomorrowstechnician.com)

38. Indeed, certain of Honda's vehicles—including the 2018-2020 model year ("MY") Honda Odyssey, 2016-2020MY Honda Pilot, 2019-2020MY Honda Passport, 2015-2020MY Acura TLX, and 2015-2020MY Acura MDX—include a so-called stop/start "Idle Stop" engine feature, purportedly to enhance fuel economy and reduce idle emissions.

39. The Idle Stop feature is automatically activated whenever a vehicle equipped with the feature is turned on. In other words, it is not a feature that drivers choose to activate. Though the Idle Stop feature can be *deactivated* by a driver, it must be manually deactivated upon each use because the feature automatically reactivates with each ignition cycle.

40. When functioning properly, the Idle Stop feature automatically shuts off the vehicle's engine when the brake pedal is fully applied and the vehicle reaches idling revolutions per minute ("RPM"), and "instantly and smoothly" restarts the engine when the driver releases the brake pedal, or after the vehicle sits for an extended period of time with auxiliary systems running (air conditioning, etc.).

41. Throughout the Class Period, as set forth below, Defendants described the functionality of the Idle Stop feature and touted Honda and Acura vehicles equipped with the Idle Stop feature as safe. But what Defendants failed to disclose to the public—*and what has never been disclosed to consumers*—is that certain Honda vehicles equipped with the Idle Stop feature (multiple models and model years identified herein) pose a significant safety risk given the frequency with which it has proven defective. Indeed, in Honda and Acura vehicles with the defective Idle Stop feature, the engine shuts off during a stop but fails to restart when the brake pedal is released as it is supposed to; instead, the impacted vehicle becomes inoperable leaving drivers unable to move. The impacted vehicles then must be manually restarted to resume operation, oftentimes not restarting for multiple minutes or without a jump start.

### C. Honda's Obligation to Identify and Track Safety Related Defects

42. NHTSA is a federal agency charged with ensuring that manufacturers of motor vehicles comply with the safety standards contained in the National Traffic and Motor Vehicle Safety Act of 1966, codified at 49 U.S. Code Chapter 31 (the "Safety Act").

43. The Safety Act requires a motor vehicle manufacturer to notify NHTSA, and vehicle owners, purchasers and dealers if it "(1) learns [one of] the [manufacturer's] vehicle[s] or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety; or (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard …."

44. The Safety Act further defines "motor vehicle safety" as:

> the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle.

45. If the manufacturer identifies a "defect related to motor vehicle safety," the Safety Act requires manufacturers to implement a remedy, which typically occurs through a recall.

46. Manufacturers are also required, under NHTSA's implementing regulations, to "furnish a report to the NHTSA for each defect in [the manufacturer's] vehicles or in [the manufacturer's] items of original or replacement equipment that [the manufacturer] or the Administrator determines to be related to motor vehicle safety." This is commonly referred to as a "573 Report."

47. NHTSA further requires all such reports to be submitted "not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related."

48. It is critical that vehicle manufacturers commence recalls expeditiously after identifying safety-related defects in their vehicles. The 573 Report is the beginning of the entire recall process. Failure to timely initiate a recall within five working days puts the safety of vehicle owners at risk. This requirement exists so that the public is expeditiously notified of safety risks and that vehicle defects are remedied within a reasonable time.

49. In addition, each manufacturer is required to amend information submitted in a 573 Report within 5 working days after it has new information that updates or corrects information that was previously reported.

50. In each 573 Report, the manufacturer is required to include:

- Identification of the vehicles or items of motor vehicle equipment potentially containing the defect or noncompliance.
- The total number of vehicles or items of equipment potentially containing the defect or noncompliance.
- In the case of a defect, a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with their dates of receipt.
- A description of the manufacturer's program for remedying the defect or noncompliance.
- The estimated date(s) on which it will begin sending notifications to owners, and to dealers and distributors, that there is a safety-related defect or noncompliance and that a remedy without charge will be available to owners, and the estimated date(s) on which it will complete such notifications (if different from the beginning date). If a manufacturer subsequently becomes aware that either the beginning or the completion dates reported to NHTSA for any of the notifications will be delayed by more than two weeks, it must promptly advise the agency of the delay and the reasons therefore, and furnish a revised estimate.
- A representative copy of all notices, bulletins, and other communications that relate directly to the defect or noncompliance and are sent to more than one manufacturer, distributor, dealer or purchaser. These copies must be submitted to NHTSA's Recall Management

> Division not later than 5 days after they are initially sent to manufacturers, distributors, dealers, or purchasers.

51. When a manufacturer files a 573 Report, the manufacturer must also provide notification to owners of the recall. The manufacturer is required to submit a copy of its proposed owner recall notice to NHTSA no fewer than five business days before it intends to begin mailing it to owners. The recall notices to vehicle owners must be furnished no later than 60 days from the date the manufacturer files its 573 Report. In the event that the remedy for the defect or noncompliance is not available at the time of notification, the manufacturer is required to issue a second notification within a reasonable time and in accordance with the above requirements once the remedy is available.

52. Thus, even if a manufacturer does not have parts available to repair a vehicle defect within 60 days, that is not an excuse for delaying owner notices. In such a case, the manufacturer must send what is known as an "interim notice" to owners, informing them of the defect and the associated risk to motor vehicle safety. The reason for this is that owners are entitled to understand the risk of continuing to drive their vehicles, and to be advised of steps they can take to mitigate the risk before having their vehicles repaired. In other words, vehicle owners are entitled to make informed decisions about their safety. Where a manufacturer sends an interim notice, it must also send a follow-up owner notice once repair parts are available. That follow-up notice tells vehicle owners when they can schedule a repair with their local dealership. Regardless of whether a manufacturer is prepared to immediately fix vehicles, NHTSA has made clear that 60 days is the absolute deadline to inform a vehicle owner about a recall.

53. Upon receipt of every 573 Report, NHTSA enters it into its Artemis database as investigators in NHTSA's Office of Defect Investigations screen it for completeness, proper scope, timeliness, and effectiveness of the proposed remedy. NHTSA sends an acknowledgement letter and recall summary to the manufacturer,

identifying any deficiencies and requesting the manufacturer to supply any missing information.

54. NHTSA carefully reviews recall submissions to ensure that recalls are timely. For recalls involving a safety defect, a manufacturer is required to submit a chronology of all principal events that were the basis for the manufacturer's determination that the defect related to motor vehicle safety. NHTSA uses these chronologies to help determine whether recalls are timely.

55. NHTSA has stated that accurate and timely notices to owners are "critical to ensuring the success of a recall." If vehicle owners do not know about defects in their vehicles they are unknowingly putting themselves at risk of harm every time they drive. Since the inception of the Safety Act in 1966, vehicle manufacturers have been required to notify vehicle owners about safety-related defects in their vehicles. The basic right to know about unreasonable risks to safety existed even before Congress required manufacturers to actually fix those defects.

56. NHTSA has made it clear to vehicle manufacturers that when a vehicle manufacturer does not send owner notices in a timely manner, safety is compromised.

57. The Safety Act includes the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD"), which was passed by Congress in 2000. The TREAD Act imposes additional reporting obligations on auto manufacturers, including Honda. Specifically, the TREAD Act mandates that manufacturers submit quarterly reports to NHTSA called "Early Warning Reports" (or "EWRs"). EWRs must include warranty reports; consumer complaints; property damage claims; and field reports broken down by make, model, and model year and problem category. Manufacturers are also required to submit to NHTSA summaries of each death or injury claim against the manufacturer that concerns a safety-related defect. Moreover, NHTSA's early warning data tracks the number of cases where

warranty services are provided on a vehicle, and the part of the vehicle that is associated with the warranty service.

58. At NHTSA, the ODI is charged with administering TREAD Act requirements and investigating defects brought to NHTSA's attention by either manufacturers or customers and other members of the public.

**D. Defendants' Knew or Recklessly Disregarded the Idle Stop Defect Following Pre-Release Testing**

59. Automotive manufacturing is a highly sophisticated and thoroughly regulated business with many well-developed industry standards and associated terminology.

60. For example, the Automotive Industry Action Group ("AIAG") developed the Product Part Approval Process ("PPAP") setting the industry standard regarding the approval and release of a product or a part to the market. The use of PPAP—when done properly—is supposed to ensure that parts are made in conformance with requirements and engineering specifications, and implements a framework to avoid the usage of unapproved or non-conforming parts. By signing the documentation required under PPAP, Honda had to provide written evidence that it understood and maintained the product or part's requirements, meaning each vehicle containing the Idle Stop feature was tested and certified as conforming with AIAG standards.

61. The generally accepted, AIAG-specified PPAP manual contains eighteen elements, as follows: (1) Design Records; (2) Engineering Change Documents; (3) Customer Engineering Approval; (4) Design Failure Mode and Effects Analysis ("DFMEA"); (5) Process Flow Diagram / Process Flow Chart ("PFC"); (6) Process Failure Model and Effects Analysis ("PFMEA"); (7) Control Plan (CP); (8) Measurement System Analysis ("MSA") Studies; (9) Dimensional Results; (10) Material / Performance Test Results; (11) Initial Process Studies (Capability Studies); (12) Qualified Laboratory Documentation; (13) Appearance

Approval Report ("AAR"); (14) Sample Production Parts; (15) Master Sample; (16) Checking Aids; (17) Records of Compliance with Customer-Specific Requirements; and (18) Part Submission Warrant.[5]

62. In addition to the PPAP, Honda must complete a design and process Failure Mode and Effects Analysis ("FMEA") prior to the start of production. FMEA tests assess methods or modes by which a particular component or system might fail. Such testing examines the materials used in each component, the assembly of the part, and whether use in various manners would cause the part to fail. For example, FMEA testing would explore, among other things, how and under what conditions the idle stop feature, including the software, the valves, and the starter, among other things, could fail, how likely failure was under different conditions, and how likely each condition tested was to occur. If properly performed, FMEA testing here would have revealed that the pervasiveness of the Idle Stop defect.

63. Likewise, in September 2016, the NHTSA issued the Federal Automated Vehicles Policy for safety testing and deployment of automated vehicles. This policy comprises four sections: vehicle performance guidance for automated vehicles, model state policy, current regulatory tools, and modern regulatory tools. The vehicle performance guidance section outlines a 15 point "safety assessment" for the safe design, development, testing and deployment of automated vehicles.

64. Honda also performs field testing at its proving grounds in California and Ohio.

65. As such, prior to the production, marketing and distribution of its vehicles equipped with the Idle Stop defect, Honda conducted extensive pre-release design, testing, and validation of all the parts, components, systems, and features of its vehicles. Considering the early time in service and frequency at which the Idle Stop defect becomes apparent, as the NHTSA complaints (cited below) illustrate,

[5] https://www.aiag.org/quality/automotive-core-tools/ppap

Honda knew or recklessly and deliberately disregarded the Idle Stop defect if they performed adequate pre-release testing and validation. As a result, Defendants knew or recklessly and deliberately disregarded the Idle Stop defect prior to the marketing, production, and distribution of these vehicles.

66. Nevertheless, Honda proceeded to manufacture and market vehicles with the Idle Stop feature despite the troubling defect (or alternatively, the lack of adequate pre-release testing that would have revealed the defect). Not a single piece of marketing material touting attributes of the impacted vehicles, nor a single SEC filing issued during the Class Period warned the public regarding the defect.

### E. Honda Repeatedly Promotes the Safety and Reliability of Vehicles Equipped with the Idle Stop Defect

67. Leading up to and throughout the Class Period, Defendants published various marketing materials touting the safety and reliability of Honda's vehicles equipped with the Idle Stop defect.

68. For example, on August 4, 2014, Honda released a press kit[6] for the 2015 Acura TLX. Therein, Honda repeatedly touted the vehicle as safe and described the Idle Stop System, representing that:

> To help improve fuel efficiency, TLX SH-AWD models come equipped with a new Idle Stop capability. When the system is active and certain operating conditions are met, the TLX engine will automatically shut off when the vehicle comes to a stop. When the driver releases the brake pedal after a stop, the engine automatically restarts and the TLX is ready to accelerate.
>
> The system is engineered to operate smoothly and seamlessly. When stopped, a special cold storage evaporator in the air conditioning system helps maintain a comfortable cabin temperature even in warm weather. The TLX's active engine mounts help smooth the restart. Idle Stop operation is fully integrated into the operation of the TLX's Brake Hold

[6] Each press kit referenced herein was publicly disseminated and is available on hondanews.com.

> system and its available Adaptive Cruise Control (ACC) with Low Speed Follow.

69. On February 12, 2015, Honda published a press release announcing the debut of the 2016 Honda Pilot at the 2015 Chicago Auto Show. In the press release, Honda touted its "advanced safety performance," and described its "Idle Stop technology":

> For improved fuel efficiency, the Pilot will include available Idle Stop technology that shuts off the engine when the vehicle is stopped, instantly and smoothly restarting the engine when the driver lifts their foot off the brake pedal.

70. On May 20, 2015, Honda released a press kit for the 2016 Honda Pilot. Therein, Honda repeatedly touted the vehicle as safe and described the Idle Stop System, representing that:

> To help improve fuel efficiency, the Pilot Touring and Elite are equipped with Idle-Stop capability. When the system is enabled by the driver and certain operating conditions are met, the Idle-Stop system will automatically shut off the engine when the vehicle comes to a stop. The engine is automatically restarted when the driver releases the brake pedal after a stop.
>
> The system is engineered to operate smoothly and seamlessly. When stopped, a special cold storage evaporator in the air conditioning system helps maintain a comfortable cabin temperature even in warm weather. The Pilot's active engine mounts help smooth the restart. Idle-Stop operation is fully integrated into the operation of the Pilot's Brake Hold system and its available Adaptive Cruise Control (ACC) system.

71. On September 23, 2015, Honda published a press release regarding the 2016 Acura TLX, touting its safety and the idle stop capability. Regarding the idle stop feature, the press release stated that:

> The TLX SH-AWD also incorporates an idle-stop capability for improved fuel efficiency. A 28-volt Active Control engine mount significantly reduces engine vibration during restarts.

72. On July 15, 2016, Honda published a press release regarding the 2017 Acura TLX which made the same representations as to safety and the idle stop feature as the press release regarding the 2016 Acura TLX.

73. On May 18, 2017, Honda released a press kit for the 2018 Acura TLX. Therein, Honda repeatedly touted the vehicle as safe and described the Idle Stop System, representing that:

> To help improve fuel efficiency, TLX SH-AWD models come equipped with Idle Stop. When the system is active and certain operating conditions are met, the TLX engine will automatically shut off when the vehicle comes to a stop. When the driver releases the brake pedal after a stop, the engine automatically restarts and the TLX is ready to accelerate.

**F. A Deluge of Consumer Complaints Alerted Defendants to the Defect**

74. According to the NHTSA website, federal regulations mandate that "vehicle and vehicle equipment manufacturers comply with Early Warning Reporting ("EWR").[7] Pursuant to the EWR requirements, manufacturers must submit to the NHTSA copies of their manufacturer communications, including:

> [A]ll notices, bulletins, and other communications including warranty and policy extensions and product improvement communication sent to dealers, distributors, owners, purchasers, lessors, or lessees regarding any defect, failure or malfunction beyond normal deterioration in use, failure of performance, flaw or other unintended deviation from design specifications whether it is safety-related or not.

As such, to comply with federal regulations and make the necessary submissions to the NHTSA, Defendants had to monitor and track all incidents, like the Idle Stop defect, that would necessitate such "manufacturer communications."

75. Customers have been complaining about the Idle Stop defect for years. That Defendants knew about, or at minimum deliberately and recklessly disregarded,

[7] https://www.govinfo.gov/content/pkg/CFR-2015-title49-vol7/pdf/CFR-2015-title49-vol7-part579.pdf

the Idle Stop defect, is evident by technical service bulletins ("TSB") and service messages issued to dealerships by American Honda, dating as far back as 2015, instructing them to perform certain countermeasures to remediate issues with the Idle Stop feature.

76. An automaker issues a TSB when it becomes aware of common problems with a particular make and model, often from one or more model years. Those problems may have been reported by car owners or repair shops or discovered by the automaker itself. In other words, by the time American Honda issued its first TSB, Defendants already had knowledge of pervasive issues with Idle Stop. The TSB is supposed to advise the dealerships own service bays on how to fix the issue.

77. For example, on July 25, 2015, American Honda issued a TSB concerning the 2015MY Acura TLX, stating that the "vehicle hesitates, surges, idles high, shifts hard, or auto idle stop does not work."[8] The TSB proposes a corrective action. However, subsequent TSBs confirm that the corrective action did not work and the problem persisted.

78. Indeed, Honda continued to acknowledge its awareness of the Idle Stop defect in TSBs issued throughout the Class Period covering multiple models and model years equipped with the feature.

79. On January 12, 2016, American Honda issued an Acura TSB concerning the 2016MY MDX.[9] One of the "symptoms" described in the bulletin is "hesitation from a stop (with idle stop cancelled)." In the bulletin, American Honda claimed to have made improvements and described repair procedures to address the issue.

80. Then on April 21, 2016, American Honda issued another service bulletin, this time for the 2016 Pilot, regarding the *same issue*, *i.e.*, "hesitation from

---

[8] https://static.nhtsa.gov/odi/tsbs/2015/SB-10107186-9340.pdf
[9] https://static.nhtsa.gov/odi/tsbs/2016/SB-10099544-9340.pdf

a stop (with idle stop cancelled)."[10] Again, American Honda claimed that "quality improvements" remediated the issue.

81. On March 10, 2017, American Honda sent yet another TSB to "All Honda Service Managers/Advisors" stating that "American Honda [ ] is investigating certain 2016-2017 Pilots with a customer complaint of the ***automatic idle stop inoperable***.[11] To fully understand the cause of this condition, [American Honda] would like to inspect the vehicle prior to you attempting a repair of any kind." Therein, American Honda further requested that the service managers and advisors alert Honda's Technical Research & Support Group regarding any impacted vehicle that comes to their attention.

82. American Honda sent the identical TSB on March 16, 2017, but this time regarding the 2017MY Acura MDX.[12]

83. American Honda sent the identical TSB *again* on June 22, 2017, but this time regarding the 2016-2017MY Acura MDX.[13]

84. On May 10, 2018, American Honda sent yet another TSB to "All Honda Service Managers/Advisors" stating that "American Honda [ ] is investigating certain 2018 Odysseys & Pilots with a customer complaint of the ***automatic idle stop inoperative***.[14] To fully understand the cause of this condition, [American Honda] would like to inspect the vehicle prior to you attempting a repair of any kind." Therein, American Honda further requested that the service managers and advisors alert Honda's Technical Research & Support Group regarding any impacted vehicle that comes to their attention.

---

[10] https://static.nhtsa.gov/odi/tsbs/2016/SB-10083875-2280.pdf
[11] https://static.nhtsa.gov/odi/tsbs/2017/MC-10108268-9340.pdf
[12] https://static.nhtsa.gov/odi/tsbs/2017/MC-10108296-9340.pdf
[13] https://static.nhtsa.gov/odi/tsbs/2017/MC-10108909-9999.pdf
[14] https://static.nhtsa.gov/odi/tsbs/2018/MC-10142619-9999.pdf

85. The Idle Stop defect continued to plague Honda vehicles in 2019. In June 2019, American Honda issued a Service News Article titled, "Send Tech Line Snapshots When Calling for Auto Idle Stop System Issues," and identified "Affected Vehicles" as "ALL Models with Auto Idle Stop."[15] This service message underscored the prevalence of the Idle Stop defect and the Company's inability to comprehend the cause or solve the issue:

> Until recently, Tech Line had only two categories for auto idle stop system issues. That made it hard for our engineering staff to understand what was specifically inhibiting the system. To help with this, Tech Line has added more categories to match what's listed in the service information. As a result, when calling them for an auto idle stop issue, you must now send a snapshot. Tech Line needs it for troubleshooting and won't be able to help unless you do. Our engineering staff will then use this categorized info to address market issues and ultimately generate system improvements.

86. American Honda issued another TSB on July 5, 2019, titled "Auto Idle Stop Does Not Work (BMS Inhibited)," which listed the 2018-2019MY Honda Odyssey as the "Affected Vehicles."[16] This TSB identified corrective action.

87. However, a few weeks later, on July 30, 2019, another TSB regarding the Idle Stop defect made clear that Defendants still had not identified the root cause and had not implemented corrective action that actually worked.[17] This TSB stated, "American Honda [ ] is investigating certain 2016-2017 Pilot Tourings or Elites with a customer complaint of a no auto re-start condition after going into an auto idle stop. Customer should have been able to re-start the vehicle by placing the gear into the Park position and pressing the Start button. To better understand the cause of this condition, [American Honda] would like to inspect the vehicle prior to you attempting a repair of any kind." The TSB also made clear that the message therein

[15] https://static.nhtsa.gov/odi/tsbs/2019/MC-10162072-0001.pdf
[16] https://static.nhtsa.gov/odi/tsbs/2019/MC-10162451-0001.pdf
[17] https://static.nhtsa.gov/odi/tsbs/2019/MC-10163414-0001.pdf

was not intended for the public; highlighted in red font was the directive: "This message is solely directed to Honda dealership personnel; please handle accordingly." American Honda once again asked that all reports of the defect should be reported to TRS.

88. An identical TSB issued the same day pertaining to the 2015-2017 TLX.[18]

89. Then again on December 2, 2019, yet another TSB covering the 2019-2020 Odyssey, Passport, and Pilot, stating, "American Honda [ ] is investigating certain 2019-2020 Odysseys, Passports & Pilots with a customer complaint of the auto idle stop inop[erable]. To better understand the cause of this condition, [American Honda] would like to inspect the vehicle prior to you attempting a repair of any kind."[19] The TSB again made clear that the message therein was not intended for the public; highlighted in red font was the directive: "This message is solely directed to Honda dealership personnel; please handle accordingly." American Honda once again asked that all reports of the defect be reported to TRS.

90. American Honda issued the same TSB, covering the same vehicles, again on January 7, 2020.[20]

91. Later that month, on January 28, 2020, American Honda issued a TSB to all Acura service managers and consultants covering the 2016 MDX & 2015-2017 TLX AWDs due to reports of "no auto re-start condition after going into an idle stop."[21] The content of the TSB otherwise mirrored prior TSBs transmitted regarding the Idle Stop defect.

92. On February 13, 2020, American Honda sent another TSB investigating the 2016MY Honda Pilot Tourings or Elites with a customer complaint of a no auto

---

[18] https://static.nhtsa.gov/odi/tsbs/2019/MC-10163447-0001.pdf
[19] https://static.nhtsa.gov/odi/tsbs/2019/MC-10169067-0001.pdf
[20] https://static.nhtsa.gov/odi/tsbs/2020/MC-10170224-0001.pdf
[21] https://static.nhtsa.gov/odi/tsbs/2020/MC-10171053-0001.pdf

re-start condition after going into an auto idle stop."[22] American Honda again asked to inspect such vehicles, asked that only Honda dealership personnel handle the TSB, and asked for reports regarding any known instances of the Idle Stop defect.

93. A March 30, 2022 TSB stated that the defect persisted with the 2015-2020MY TLX Acura, where "under certain circumstances, after coming to a stop and the idle stop feature engages, the vehicle may not automatically restart."[23] American Honda advised a software update for "affected vehicles" and sent out a related warranty extension, wherein the Company admitted that "during development, the idle stop enable criteria was mis-set."[24] Similar TSBs went out that same month covering the 2022 Pilot and 2022 Ridgeline[25].

94. The complaints that led to the issuance of the identified TSBs are only the tip of the iceberg. Defendants also knew of, or deliberately and recklessly disregarded, the Idle Stop defect from warranty data collected. Per the TREAD Act, Honda tracks its vehicles' diagnoses and repairs from dealership technicians in a single, aggregated database. Honda monitors the database for repair trends, and engineering and management staff review such trends in regular meetings.[26] Moreover, the average consumer is more likely to submit a warranty claim to Honda for the defective Idle Stop feature, then to file a complaint with the NHTSA. The NHTSA complaints thus, upon information and belief, represent a mere fraction of the warranty claims covering the same issue that Honda received for each of the impacted models.[27]

---

[22] https://static.nhtsa.gov/odi/tsbs/2020/MC-10171546-0001.pdf

[23] https://static.nhtsa.gov/odi/tsbs/2022/MC-10210100-0001.pdf

[24] https://static.nhtsa.gov/odi/tsbs/2022/MC-10210101-0001.pdf; https://static.nhtsa.gov/odi/tsbs/2022/MC-10210085-0001.pdf

[25] https://static.nhtsa.gov/odi/tsbs/2022/MC-10209074-0001.pdf

[26] *See* https://static.nhtsa.gov/odi/rcl/2020/RCLRPT-20V439-2939.PDF, at 10.

[27] *See, e.g.,* https://static.nhtsa.gov/odi/rcl/2017/RMISC-17V418-5009.pdf, Honda's thermal event issue as documented in this NHTSA chronology, and which ultimately led to a recall, led to 3,826 warranty claims but *zero* field reports.

95. The persistence of the Idle Stop defect demonstrates that Defendants never actually fixed the problem. As set forth below, Defendants continually touted the benefits of Idle Stop and made assurances regarding the safety of the vehicles equipped with the feature, but never revealed a root cause for the Idle Stop defect nor did they reveal that the countermeasures set forth in the TSBs *did not work*. Indeed, examples of complaints submitted to the NHTSA demonstrate that the problems persisted despite these supposed countermeasures covered in the TSBs.[28]

96. That Defendants have known about the Idle Stop defect since the deluge of consumer complaints began even before 2016, and continued unabated for years, is evident. The public, however, did not begin to learn about the severity and prevalence of the defect until June 3, 2022 when the NHTSA's Office of Defects Investigation (ODI), after receiving 221 complaints and "several field reports" for the 2016-2020MY Honda Pilot alone, opened an investigation into the "Auto Start/Stop" (*i.e.*, Idle Stop) defect. The investigation, NHTSA Action Number PE22005, is still ongoing. The "ODI Resume" that opened the investigation[29] indicates an estimated population of ***194,731 impacted vehicles***, though that only encompasses the 2016-2020MY Honda Pilot. In other words, the actual universe of vehicles impacted by the Idle Stop defect when taking into account the other models/model years with that feature, is exponentially greater.

97. According to the ODI Resume, which lists each of the 221 complaints with a unique NHTSA Identification number:

> [T]he complaints allege that the engine fails to restart on its own from a complete stop at a traffic light or road intersection with the Auto Start/Stop function engaged. Some of the complainants allege that a jump was required for the vehicle to restart. The subject vehicles are

[28] *See, e.g.*, NHTSA ID 11473698, 2015 Acura TLX, July 13, 2022; NHTSA ID 11512729, 2017 Honda Pilot, March 20, 2023; NHTSA ID 11510301, 2017 Honda Pilot, March 6, 2023; NHTSA ID 11509290, 2017 Honda Pilot, February 27, 2023.

[29] https://static.nhtsa.gov/odi/inv/2022/INOA-PE22005-9303.PDF

equipped with a 3.5L engine coupled with a 9-speed automatic transmission.

98. The ODI Resume confirms Defendants' awareness of the defect, not just in the Honda Pilot but in other Honda and Acura makes/models. Indeed, ODI explained that it met with Honda "on various occasions on this issue" and that "Honda indicated that per the information provided from NHTSA complaints and TREAD [ ] reports, they have found a correlation with customers' allegations for the Auto Start/Stop failure to restart the vehicle when the system is activated. ***Honda also indicated other Honda models (Honda Odyssey, Acura TLX & Acura MDX) with the 3.5L engines equipped with the 9-speed automatic transmissions experience the same failure mode***." (emphasis added).

99. American Honda sent a nearly contemporaneous "warranty extension" that same week to owners of affected 2015-2020MY Acura TLX V6 SH-AWD[30] stating the reason for the warranty extension is that:

> Under certain circumstances, after coming to a stop and the idle stop feature engages, the vehicle may not automatically restart. To ensure your confidence in your vehicle. Acura is extending the warranty coverage for starter and starter relays and a valve adjustment related to this condition to 10 years from the original date of purchase with no mileage limitation.

100. On June 17, 2022, ODI issued a request for information[31] ("RFI") to American Honda, addressed to Mr. Jeff Chang, the Division Head of Product Safety, covering the 2016-2020MY Honda Pilot, 2015-2020MY Honda Odyssey, 2015-2020MY Acura TLX, and 2015-2020MY Acura MDX vehicles equipped with a 3.5L engine coupled with a 9-speed transmission manufactured for sale or lease in the United States. Mr. Chang has worked for American Honda for over fifteen years and is the point of contact at American Honda for the NHTSA. Mr. Chang is

[30] https://static.nhtsa.gov/odi/tsbs/2022/MC-10215501-0001.pdf
[31] https://static.nhtsa.gov/odi/inv/2022/INIM-PE22005-87993P.pdf

responsible for communicating with the NHTSA regarding defects and recalls on behalf of American Honda.

101. On behalf of American Honda, Mr. Chang (cc, Michelle Jongkind, the Department Lead for the Product Regulatory Office at American Honda), responded to the RFI on August 9, 2022 ("Response").[32] The information American Honda provided in its Response is redacted in the version posted to the NHTSA website. The exhibits attached thereto are similarly unavailable to the public.[33]

102. Then, on September 20, 2022, American Honda issued yet another TSB covering the 2020-2021MY Acura RDX, stating the "engine does not auto restart after entering into auto Idle Stop,"[34] and again on January 6, 2023, providing a "product update and warranty extension for certain 2016-2023 Passport, Pilot and Ridgeline vehicles to update the PGM-FI software that may affect the idle stop operation and starter under certain conditions,"[35] and for the 2016-20 Acura MDX[36]. In all the January 6, 2023 TSBs, American Honda admitted that the defect occurred because "during development, the idle stop enable criteria was mis-set…"

---

[32] https://static.nhtsa.gov/odi/inv/2022/INRL-PE22005-90569P.pdf.

[33] On April 19, 2023, Plaintiffs submitted a Freedom of Information Act ("FOIA") request to the NHTSA to obtain communications and documents relevant to their allegations, including any information American Honda produced in response to the RFI. On June 8, 2023, responding to Plaintiffs' inquiry regarding the status of their FOIA request, the NHTSA indicated that it has "received a large volume of records from the program office that may contain documents responsive to your request" and while it could not provide a "firm completion date" for Plaintiffs' request, the NHTSA indicated that it "will promptly provide [Plaintiffs] a final response as soon as it is complete."

[34] https://static.nhtsa.gov/odi/tsbs/2022/MC-10222079-0001.pdf

[35] https://static.nhtsa.gov/odi/tsbs/2023/MC-10229678-0001.pdf; https://static.nhtsa.gov/odi/tsbs/2023/MC-10229675-0001.pdf

[36] https://static.nhtsa.gov/odi/tsbs/2023/MC-10229688-0001.pdf; https://static.nhtsa.gov/odi/tsbs/2023/MC-10231058-0001.pdf; https://static.nhtsa.gov/odi/tsbs/2023/MC-10229689-0001.pdf

103. In March 2023, American Honda sent out a warranty extension similar to the one issued in June 2022 as a result of the Idle Stop defect, but this time covering the 2019-2022MY Honda Passport, 2016-2022MY Honda Pilot, and 2020-2023MY Honda Ridgeline,[37] and another warranty extension covering the 2016-2020MY Acura MDX.[38]

104. The significance of the complaint volume is apparent by simple comparison to Honda's competitor vehicles. While ODI stated that it received 221 complaints solely regarding the defective Idle Stop feature in the 2016-2020MY Honda Pilot vehicles, a search of the NHTSA database reveals zero hits for 2016-2020MY Toyota 4Runner vehicles; zero hits for 2016-2020MY Ford Explorer vehicles; one hit for 2016-2020MY Ford Expedition vehicles; and four hits for 2016-2020MY Toyota Highlander vehicles.

105. As of the date of this Complaint, the ODI's investigation is still ongoing.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD[39]

106. Despite their awareness, or at minimum deliberate and reckless disregard, of the Idle Stop defect in multiple Honda and Acura models, spanning several model years, placing Honda customers in perilous situations when their vehicles suddenly stopped operating with no warning, Defendants nevertheless touted the functionality of the Idle Stop feature and the safety of every vehicle containing the Idle Stop feature throughout the Class Period. Defendants never

[37] https://static.nhtsa.gov/odi/tsbs/2023/MC-10232975-0001.pdf

[38] https://static.nhtsa.gov/odi/tsbs/2023/MC-10232974-0001.pdf

[39] The portions of the statements alleged to be false and misleading and/or giving rise to an alleged duty to disclose material facts in order for the statements to not be misleading are bold and italicized in this Section.

revealed, however, that the Idle Stop defect rendered Honda vehicles equipped with that feature unsafe and/or raised a heighted risk of collision.

107. Defendants publicly disseminated brochures (available on Honda's Info Center website) and press kits (available at hondanews.com) for the impacted Honda and Acura models containing the Idle Stop feature[40], which described the purported functionality of the Idle Stop system and touted the many features that supposedly rendered these vehicles safe.

108. These publicly disseminated marketing materials (described with particularity herein) misled the market because they described the vehicles as safe, pointing to specific features designed to keep the cars and their occupants safe, but failed to mention that Honda had also equipped these models with a defective Idle Stop feature that rendered the vehicles *unsafe* with drivers unable to restart the engine after an "idle stop," placing occupants in perilous conditions unable to move their cars. The description of the Idle Stop System contained in the marketing materials, representing that the engine would automatically restart following an "idle stop" also misled the market because, with the defect, the engine would not automatically restart.

109. Moreover, at all relevant times, Honda represented on its website, https://www.honda.com/safety, that:

> ***We're focused on the safety of all road users. That's why we developed safety technology that not only helps protect occupants but takes into consideration pedestrians as well***.

110. The foregoing statements misled the market because Honda had equipped many of its models since 2015 with a defective Idle Stop feature, which meant that following an "idle stop" the engine would not restart, rendering drivers

[40] Including the 2015-20 Acura MDX, 2015-20 Acura TLX, 2016-20 Honda Pilot, 2018-20 Honda Odyssey, and 2018-20 Honda Passport.

unable to move their vehicles and placing all occupants in hazardous situations vulnerable to accidents.

111. On June 20, 2018, Honda filed an annual report on Form 20-F with the SEC during pre-market hours, signed by Honda President and CEO Takahiro Hachigo, reporting the Company's financial and operational results for the Company's fiscal fourth quarter and year ended March 31, 2018 (the "2018 20-F"). Regarding product quality, Defendants stated:

> To strengthen customer trust by ***offering products founded in safety*** and achieve a new level of outstanding quality of products, Honda has ***created a system that continuously enhances and improves quality at every stage: design, development, production, sales and service***.

112. The foregoing statements misled investors because the "system" Honda created did not prevent the design, development, production or sale of multiple vehicle models containing a defective Idle Stop feature, that did not operate as advertised, and put vehicle occupants in hazardous situations when the engine failed to restart after an "idle stop."

113. On August 21, 2018, Honda published a press release regarding the 2019 Honda Pilot touting its safety and claiming that, "Pilot's Idle Stop system now provides quicker restarts and more seamless operation." The press release expanded on this statement, explaining:

> Pilot also has an upgraded Idle Stop system. Fully integrated with the new second-gear launch mode, it features new programming and a new brake pressure trigger for ***quicker restarts when accelerating immediately after engine stop, making the system less noticeable in heavy traffic and similar driving situations***. The air conditioning has been reconfigured as well to reduce engine restarts. Additionally, when in idle stop, the engine remains off after shifting to Park for a more intuitive driving experience.

114. The description of the Idle Stop system in the foregoing press release misled the market because drivers will not experience "quicker restarts" in 2019

Honda Pilot vehicles with the defective feature, but rather a cessation of drivability altogether. Moreover, the 2019 Honda Pilot vehicle with the defective Idle Stop were not safe because drivers suddenly could not operate their vehicles when the engine failed to restart, leaving occupants vulnerable to accidents.

115. In the publicly disseminated brochure marketing the 2018 Pilot[41], American Honda stated that the Pilot "has achieved top ratings from NHTSA and IIHS[] and ***is equipped with innovative safety and driver-assistive technology*** including available Honda Sensing,® a suite of features that can assist and help you sense things you might miss while driving."

116. Likewise, in the publicly disseminated brochure marketing the 2018 Odyssey[42], American Honda stated that the Odyssey is the "***most sophisticated, technologically advanced minivan yet***," "***[a]t the forefront of safety***," and "designed to achieve top ratings from NHTSA and IIHS, and ***features a full suite of available safety and driver-assistive technologies to help protect you and your passengers***."

117. In the publicly disseminated brochure marketing the 2019 Odyssey[43], American Honda stated that the Odyssey is "***[a]t the forefront of safety***," "has achieved a top safety pick rating from IIHS.[] ***Every model comes standard with advanced safety features to assist and help protect you and your most precious cargo***," and "offers Honda Sensing,® an available ***suite of safety and driver-assistive technologies designed to assist and help protect you and your passengers***."

118. The foregoing Honda vehicle brochures misled the market because they described the vehicles as safe, pointing to specific features designed to keep the cars safe, but failed to mention that Honda had also equipped these models with a

---

[41] Available at https://www.hondainfocenter.com/2018/Pilot/#feature-guide.

[42] Available at https://www.hondainfocenter.com/2018/Odyssey/#feature-guide.

[43] Available at https://www.hondainfocenter.com/2019/Odyssey/#feature-guide.

defective Idle Stop feature that rendered the vehicles *unsafe* with drivers unable to restart their engine after an "idle stop," placing them and their "precious cargo" in perilous conditions unable to move their cars.

119. On Honda's Info Center website, the Company described the "Idle-Stop System as "further enhance[ing] fuel efficiency" in the 2018 Pilot (touting it as a feature in "higher Pilot trims"), 2018 Odyssey (touting it as a feature in trims with 10-speed automatic), and 2019 Odyssey (same)[44]:

- When the vehicle brakes to a stop for at least two seconds—such as at a traffic light—the engine automatically shuts off to save fuel.
- ***When the driver releases the brake pedal, the engine starts back up by itself***.

120. The description of the Idle Stop System on the Honda Info Center website, publicly available throughout the Class Period as to all models and years equipped with the Idle Stop feature, misled the market because the feature had proven defective since 2015 and the engine does not necessarily "start back up by itself" after the feature automatically shuts off the engine to save fuel, thus leaving drivers suddenly unable operate their vehicles and vulnerable to accidents.

121. On January 29, 2019, Honda issued a "2019 Honda Passport Press Kit"[45] which stated, in relevant part:

---

[44] https://www.hondainfocenter.com/2018/Pilot/Feature-Guide/Engine-Chassis-Features/Idle-Stop-System/; https://www.hondainfocenter.com/2018/Odyssey/Feature-Guide/Engine-Chassis-Features/Idle-Stop-System/; https://www.hondainfocenter.com/2019/Odyssey/Feature-Guide/Engine-Chassis-Features/Idle-Stop-System/. The Honda Info Center website included the same description of the Idle Stop feature as to all models and years of Honda and Acura vehicles equipped with the Idle Stop feature.

[45] Available at https://hondanews.com/en-US/releases/release-7beb71c86dfb4f2e8cb1760256d2dbbe-2019-honda-passport-press-kit.

> **Idle-Stop System**
>
> To help improve fuel efficiency, all Passports are equipped with Idle-Stop capability. When the system is enabled by the driver and certain operating conditions are met, the Idle-Stop system will automatically shut off the engine when the vehicle comes to a stop. ***The engine is automatically restarted when the driver releases the brake pedal after a stop.***
>
> ***The system has been engineered to operate smoothly and seamlessly***. Fully integrated with the second-gear launch mode, its programming and brake pressure trigger ***ensure quick restarts when accelerating immediately after engine stop, making the system less noticeable in heavy traffic and similar driving situations***. The air conditioning has been reconfigured as well to reduce engine restarts. Additionally, when in idle stop, the engine remains off after shifting to Park for a more intuitive driving experience. When stopped, a special cold storage evaporator in the air conditioning system helps maintain a comfortable cabin temperature even in warm weather. Passport's active engine mounts help smooth the restart. Idle-Stop operation is fully integrated into the operation of the Brake Hold system and available Adaptive Cruise Control (ACC).
>
> ***
>
> As with all Honda vehicles, the 2019 Passport is designed to provide a high level of safety performance, starting with ***predictable and stable driving dynamics that help drivers maintain control over their vehicle*** in a wide variety of driving environments and circumstances, including emergency avoidance maneuvers.[46]

122. The description of the Idle Stop System in the foregoing press kit misled the market because in 2019 Passport vehicles with the defective feature, the engine would not necessarily "automatically restart" and the Passport would therefore would not "accelerate[] immediately after engine stop." Moreover, the 2019 Passport vehicle with the defective Idle Stop did not provide a "high level of safety" or "predictable and stable driving dynamics" because drivers suddenly and

[46] https://hondanews.com/en-US/releases/2019-honda-passport-press-kit

without warning could not operate their vehicles when the engine failed to restart, leaving occupants vulnerable to accidents.

123. On June 19, 2019, Honda filed an annual report on Form 20-F with the SEC, signed by Takahiro Hachigo, reporting the Company's financial and operational results for the Company's fiscal fourth quarter and year ended March 31, 2019 (the "2019 20-F"). Once again the 2019 20-F represented:

> To strengthen customer trust by ***offering products founded in safety*** and achieve a new level of outstanding quality of products, Honda has ***created a system that continuously enhances and improves quality at every stage: design, development, production, sales and service including suppliers***.

124. The foregoing statements misled investors because the "system" Honda created did not prevent the design, development, production or sale of multiple vehicle models containing a defective Idle Stop feature, that did not operate as advertised, and put vehicle occupants in hazardous situations when the engine failed to restart after an "idle stop."

125. On August 12, 2019, American Honda issued a press release issued a press release entitled "Honda Celebrates 25 Years of Odyssey with 25th Anniversary Accessory Package and 10-Speed Automatic Transmission for All Trims." The press release touted, in relevant part, that "***all 2020 Odyssey minivans now come standard with Idle Stop and Honda's 10-speed automatic, the company's newest and most advanced transmission***."

126. The foregoing press release touting Idle Stop as an advantage of the 2020 Odyssey misled the market because in 2020 Odyssey vehicles with the defective feature, the engine would not reliably restart after an "idle stop" leaving occupants in unsafe situations because drivers suddenly could not operate their vehicles, leaving occupants vulnerable to accidents.

127. In the brochure for the 2020 Acura TLX[47], American Honda listed Idle Stop as a feature of the TLX V-6 SH-AWD and stated that the TLX "***delivers a full suite of advanced, active safety and driver-assistance technologies as standard equipment***," and touts that "***there is no better amenity than safety***."

128. The foregoing brochure contained misleading statements regarding the safety of the 2020 Acura TLX with Idle Stop, because while pointing to specific features designed to keep the car safe, the Company failed to mention that Honda had also equipped this model with another "amenity"— a defective Idle Stop feature— that rendered the vehicle *unsafe* with drivers unable to restart their engine after an "idle stop."

129. The statements referenced in ¶¶ 106-128 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Honda had overstated the safety and reliability of the Idle Stop engine feature; (ii) the defective Idle Stop engine feature did not function as marketed, leaving drivers unable to operate their vehicles following an "idle stop"; (iii) as a result of the foregoing deficiencies, Honda failed to prevent American Honda from marketing and selling thousands of vehicles that contained a defective Idle Stop feature; (iv) the foregoing conduct subjected the Company and/or its subsidiaries to a heightened risk of litigation, as well as financial and/or reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

130. On June 3, 2022, the NHTSA's ODI announced an investigation into Honda's Idle Stop feature due to 221 complaints received as well as "several field

[47] Available at https://www.auto-brochures.com/makes/acura/tlx/Acura_US%20TLX_2020.pdf.

reports" that the engine fails to restart on its own from a complete stop at a traffic light or road intersection with the Auto Start/Stop (*i.e.* Idle Stop) function engaged in the 2016-2019MY Honda Pilot. ODI further indicated that Honda admitted that the issue extended beyond the Pilot to other Honda vehicles with a 3.5L engine and 9 speed automatic transmission, such as the Honda Odyssey, Acura TLX, and Acura MDX. Following the announcement of the investigation, Honda securities fell $0.88 per share, or 3.41%, to close at $24.96 on June 3, 2022.

131. On September 28, 2022, the Consumer Class Action was filed against American Honda alleging that it had sold thousands of vehicles equipped with a flawed Idle Stop feature. Per the allegations in the class action complaint, after initially shutting off a vehicle's engine, the Idle Stop system in the affected vehicles routinely fails to restart the engine as designed, leaving drivers unable to move their vehicles, and American Honda was fully aware of the defect before marketing these vehicles. Specifically, the Consumer Class Action stated, in relevant part:

> Each Class Vehicle suffers from a safety defect that causes the Idle Stop feature to suddenly, without any warning, fail to restart the engine after the feature automatically turns off the engine at red stoplights and other momentary stops (the "Engine Defect"). Although the Idle Stop feature is designed to restart after the driver releases pressure on the brake pedal, since at least 2015, scores of drivers have reported incidents where their Class Vehicles stalled and left them unable to move at intersections and highway entrances.
>
> The seriousness of the safety risks created by the undisclosed Engine Defect cannot be overstated. As detailed in the scores of customer complaints detailed [in the complaint], the Defect has left drivers stranded in their stalled vehicles in the middle of oncoming traffic. One driver reported that after the Idle Stop engaged and they removed their foot from the brake the "Honda Pilot stalled in the middle of an intersection, waiting to turn left, of a busy main highway, with my husband and young children inside."[] The driver warned that "this car has placed myself and my family in danger now on multiple occasions." Drivers have also reported that it takes multiple attempts to restart the vehicle after stalling, which can take up to fifteen minutes.

Honda [America] knew, and/or was on notice of the fact, that its Class Vehicles suffered from the Engine Defect even before commencing sales. Honda is experienced (and touts itself as such) in the design and manufacture of consumer vehicles and conducts extensive pre-sale tests on all of its components, including the Idle Stop feature, to verify the vehicle is free from defects and complies with its specifications.

Honda also has access to and monitors numerous sources of reports of Class Vehicle failures caused by the Engine Defect, including their own records of customer complaints, dealership repair records, warranty claims, third-party websites, and NHTSA complaints, which it is required under the TREAD Act, Pub. L. No. 106-414, 114 Stat.180 (2000) to monitor in order identify potential defects in their vehicles.

***

The prevalence of the Engine Defect in the Class Vehicles further came to light on June 2, 2022, when the National Highway Traffic Safety Administration's ("NHTSA") Office of Defects Investigation ("ODI") disclosed that it is conducting an investigation into Honda's Idle Stop feature and the Engine Defect. [] The investigation was prompted by 221 complaints and several field reports ODI received relating to the Engine Defect in 2016-2019MY Honda Pilot vehicles alone. It was also revealed that after numerous meetings between ODI and Honda, Honda admitted that it has "found a correlation with customers' allegations for the Auto Start/Stop failure to restart the vehicle when the system is activated" in other models equipped with 3.5L engines (*i.e.*, the Class Vehicles).

***

If Plaintiffs and/or other Class members knew of the Engine Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them. Plaintiffs and other Class members were denied the benefit of the bargain in connection with their purchases and/or leasing of the Class Vehicles.

The conduct described herein makes Defendant liable for, among other things, breach of express and implied warranties, and unfair, deceptive, and/or fraudulent business practices. In turn, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value.

132. On this news, Honda's ADS price fell $0.74 per share, or 3.23%, to close at $22.19 per share on September 29, 2022.

133. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiffs and other Class members have suffered significant losses and damages.

## **ADDITIONAL SCIENTER ALLEGATIONS**

134. As early as July 2015 and continuing throughout the Class Period, Defendants have issued TSBs demonstrating their awareness of the Idle Stop defect in each of the vehicles covered both by the ODI investigation and the Consumer Class Action. *See* ¶¶ 77-93.

135. To comply with federal regulations and make the necessary NHTSA submissions, Defendants had to monitor and track all incidents, like the Idle Stop defect, that would necessitate such "manufacturer communications." *See* ¶¶43-58, 74.

136. This is not Honda's first time hiding enduring safety issues with its vehicles. Indeed, the NHTSA fined Honda $70 million in 2015 "for failing to comply with laws that safeguard the public," which include submitting comprehensive EWR reports identifying potential or actual safety issues to NHTSA.[48] Specifically, Honda failed to report deaths, injuries, and certain warranty claims to the federal government in violation of the TREAD Act.

137. Prior to the start of the Class Period, Honda issued a Tech Line Summary Article, in February 2018 titled, "Send Tech Line Snapshots When Calling for Auto Idle Stop System Issues." When discussing the "affected vehicles"—2018MY Honda Odyssey and 2016-2018MY Honda Pilot—Honda states that,

---

[48] https://www.transportation.gov/briefing-room/us-department-transportation-fines-honda-70-million-failing-comply-laws-safeguard#:~:text=WASHINGTON%20%E2%80%93%20The%20U.S.%20Department%20of,certain%20warranty%20claims%20to%20the

"[u]ntil recently, Tech Line had only two categories for auto idle stop system issues. That made it hard for our engineering staff to understand what was specifically inhibiting the system." To resolve this reporting problem, Honda "added more categories to match what's listed in the service information" to the Tech Line, to which its engineering staff would then "use this categorized info[rmation] to address market issues and ultimately generate system improvements." This indicates that as early as February 2018 Honda had assessed the Idle Stop defect enough to be able to categorize the reported issues and was actively using this information to address market issues and generate system improvements.

**PRESUMPTION OF RELIANCE (FRAUD-ON-THE MARKET)**

138. During the Class Period, the artificial inflation of Honda's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements and/or omitted material facts about Honda's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Honda and its business, operations, and prospects, thus causing the price of its securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and misleading statements and/or omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

139. At all relevant times, the market for Honda's securities was an efficient market for the following reasons, among others:

a. Honda's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

b. Over 107.5 million shares of Honda ADSs were outstanding, owned and/or publicly traded on the NYSE by hundreds, if not thousands, of persons;

c. As a regulated issuer, Honda filed periodic public reports with the SEC and/or the NYSE;

d. Honda regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. Honda was followed by at least 24 securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. In addition, each of these reports were publicly available and entered the public marketplace; and

f. Multiple market makers made a market in Honda's securities during the Class Period.

140. During the Class Period, the price of Honda's securities responded quickly to incorporate and reflect new public information concerning the Company. As a result of the foregoing, the market for Honda's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Honda's ADS price. Under these circumstances, all purchasers of Honda's securities during the Class Period suffered similar injury through their purchase of Honda's securities at artificially inflated prices and a presumption of reliance applies.

141. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

142. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

143. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the

forward-looking statement was authorized or approved by an executive officer of Honda who knew that the statement was false and/or misleading when made.

**LOSS CAUSATION**

144. The false and misleading statements and/or omission of material facts, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class members they represent.

145. During the Class Period, Plaintiffs and the other members of the Class purchased or otherwise acquired Honda ADSs at artificially inflated prices and were damaged thereby. The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were disseminated and publicly revealed.

146. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Honda ADSs and/or maintaining inflation in the price of Honda ADSs, by publicly issuing false and misleading statements and/or omitting material information necessary to make Defendants' statements, as set forth herein, not misleading. The alleged misstatements and omissions were material because they failed to disclose material adverse information and/or misrepresented the truth about Honda's business, operations, and prospects, as alleged herein.

147. At all relevant times, the material misstatements and omissions particularized in this Complaint directly and proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. Defendants made or caused to be made materially false and misleading statements and/or omitted material information about the safety and reliability of Honda's Idle Stop system. These material misstatements and omissions had the cause and effect of creating in the market a false positive assessment of the Company and its vehicle safety and regulatory compliance, internal controls, and

related well-being, thus causing the Company's securities to be overvalued and the price of its ADSs to be artificially inflated at all relevant times. Defendants' materially false and misleading statements, as alleged herein, resulted in Plaintiffs and other members of the Class purchasing Honda ADSs at artificially inflated prices, and causing the damages complained of herein when the truth was revealed in a series of corrective disclosures – including those on June 3, 2022 and September 28, 2022 – resulting in the trading price of Honda ADSs to materially decline upon the removal of the previously embedded artificial inflation.

## CLASS ACTION ALLEGATIONS

148. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Honda ADSs during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants named herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

149. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Honda ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Honda or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

150. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

151. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

152. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Honda;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Honda ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

153. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

154. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Honda ADSs are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Honda ADSs between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

155. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

156. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

### **For Violations of Section 10(b) of the Exchange Act and Rule 10b-5, Promulgated Thereunder**

157. Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

158. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

159. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Honda ADSs; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Honda ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

160. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Honda ADSs. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Honda's business, operations, and prospects.

161. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

162. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Honda ADSs was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Honda's business, operations, and prospects which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Honda ADSs at artificially inflated prices and relied upon the price of the ADSs, the integrity of the market for the ADSs and/or upon statements disseminated by Defendants, and were damaged thereby.

163. During the Class Period, Honda ADSs were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Honda ADSs at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADSs, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Honda ADSs was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Honda ADSs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

164. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

165. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's ADSs during the

Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: June 22, 2023

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/ Adam M. Apton

Adam M. Apton (SBN 316506)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com
Email: dglass@zlk.com

-and-

Devyn R. Glass (*pro hac vice*)
55 Broadway, 4th Floor
New York, NY 10006
Tel: (212) 363-7500
Email: dglass@zlk.com

*Lead Counsel for Plaintiffs and the Class*

**POMERANTZ LLP**
Tamar Weinrib (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Facsimile: (917) 463-1044
Email: taweinrib@pomlaw.com

*Additional Counsel for Plaintiffs and the Class*