**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Devyn R. Glass (*pro hac vice*)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com
Email: dglass@zlk.com

*Lead Counsel for Plaintiffs and the Class*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| RHONDA BAYLOR, Individually and On Behalf of All Others Similarly Situated,<br><br>     *Plaintiff,*<br><br>    v.<br><br>HONDA MOTOR CO., LTD. and AMERICAN HONDA MOTOR COMPANY, INC.,<br><br>     *Defendants.* | Case No. 2:23-cv-00794-WLH-AGR<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 2

    I. Defendants' Corporate History in the U.S. ...................................................... 2

    II. Honda Incorporates Idle Stop into its Gasoline-Powered Vehicles. .............. 3

    III. Honda Monitored the Defect for Years Without Informing the Public. ......... 3

    IV. Honda Attracts Investors with Positive Statements about the Safety, Reliability, and Functionality of Its Vehicles While Concealing Material Adverse Information about Idle Stop. ............................................................. 4

    V. The Idle Stop Defect Results in Regulatory Exposure and Litigation. ........... 5

LEGAL STANDARD ................................................................................................ 6

ARGUMENT .............................................................................................................. 6

    I. The Exchange Act Applies to the Transactions at Issue in this Case. ........... 6

    II. The Complaint Adequately Alleges Defendants Made Materially False and Misleading Statements. .................................................................................... 7

        A. Defendants Misled Investors about the Safety, Reliability, and Functionality of Honda's Idle Stop Feature. ............................................. 8

        B. Section 10(b) Violations Are Not Limited to False and Misleading SEC Filings. .......................................................................................... 12

        C. Honda and AHM are "Makers" of False and Misleading Statements. .... 14

    III. The Complaint Raises a Strong Inference of Scienter. ................................ 15

    IV. The Complaint Adequately Pleads Loss Causation. .................................... 19

CONCLUSION ........................................................................................................ 22

i

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**

*In re Amgen Inc., Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008).................................................................20

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989)..............................................................................20

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ........................................ 11, 12, 14

*In re Banc of California Sec. Litig.*,
2017 WL 3972456 (C.D. Cal. Sept. 6, 2017).......................................................20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................................................6

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .......................................................................... 9, 15

*Bien v. LifeLock Inc.*,
2015 WL 12819154 (D. Ariz. July 21, 2015) ......................................................13

*In re BofI Holding, Inc. Sec. Litig.*,
977 F. 3d 781 (9th cir. 2020)................................................................................21

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012)................................................................18

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
56 F. Supp. 3d 549 (S.D.N.Y. 2014) ....................................................................15

*In re Carter-Wallace, Inc. Sec. Litig.*,
150 F.3d 153 (2d Cir. 1998) .................................................................................12

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989).................................................................................10

*City of Pontiac Policemen's Sys. v. UBS AG*,
752 F.3d 173 (2nd Cir. 2014)..................................................................................7

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) .......................................................................................9

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017)...............................................................................21

*In re CytRx Corp. Sec. Litig.*,
2015 WL 5031232 (C.D. Cal. July 13, 2015) ......................................................13

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) .................................................................22

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017) .......................................13

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .................................................................................19

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
2023 WL 5496507 (9th Cir. Aug. 25, 2023) ................................. 7, 16

*Elbit Sys. Ltd. v. Credit Suisse Grp.*,
917 F. Supp. 2d 217 (S.D.N.Y. 2013) ...............................................15

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ...............................................................22

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ..............................................10

*In re Financial Corp. of America Shareholder Litigation*,
796 F.2d 1126 (9th Cir. 1986) ...............................................................14

*Gebhart v. SEC*,
595 F.3d 1034 (9th Cir. 2010) ...............................................................15

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .................................................................11

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) .................................................................18

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) .................................................................................15

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ...................................................... 6, 7, 9

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011) .................................................................10

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ...............................................................19

*Longo v. OSI Sys., Inc.*,
2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ..................................10

*Loos v. Immersion Corp.*,
762 F. 3d 880 (9th Cir. 2014) ...............................................................21

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ...................................................................................18

*Metzler Inv. GmbH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...............................................................................22

*Miller v. Thane Intern., Inc.*,
   519 F.3d 879 (9th Cir. 2008) .................................................................................20

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
   881 F.3d 750 (9th Cir. 2018) .................................................................................19

*Morgan v. AXT, Inc.*,
   2005 WL 2347125 (N.D. Cal. Sept. 23, 2005)........................................................9

*Morrison v. National Australia Bank*,
   561 U.S. 247 (2010) ...........................................................................................6, 7

*Muzinich & Co. v. Raytheon Co.*,
   2002 U.S. Dist. LEXIS 26962 (D. Idaho Apr. 30, 2002)......................................13

*N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) ...............................................................................15

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015)......................................................................21

*In re Nat'l Golf Props., Inc.*,
   2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) .....................................................10

*In re Nature's Sunshine Prods. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah. 2007) ..................................................................16

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .......................................................................... 10, 19

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...............................................................................17

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 Fed. Appx. 480 (9th Cir. 2019) ................................................................. 9, 13

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ..............................................................................................11

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016) ..................................................................................15

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) .................................................................................21

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Quality Systems, Inc., Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ............................................................... 11, 17

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ......................................................13

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ....................................................................15

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016) ................................................ 20, 22

*In re Rocket Fuel Sec. Litig.*,
  2015 WL 9311921 (N.D. Cal. 2015) .........................................................12

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .....................................................................9

*SEC v. Clark*,
  915 F.2d 439 (9th Cir. 1990) ....................................................................12

*SEC v. Mack*,
  2012 WL 13005963 (C.D. Cal. Aug. 7, 2012) ..........................................12

*SEC v. Zandford*,
  535 U.S. 813 (2002) .................................................................................12

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
  2020 WL 571724 (D. Md. Feb. 4, 2020) ...................................................14

*Stoyas v. Toshiba Corp.*,
  896 F.3d 933 (9th Cir. 2018) .....................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................ 6, 16

*In re Toyota Motor Corp. Sec. Litig.*,
  2012 WL 3764903 (C.D. Cal. Feb. 21, 2012) ...........................................17

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ...................................................................................9

*U.S. v. Martoma*,
  2013 WL 6632676 (S.D.N.Y. Dec. 17, 2013) ...........................................6, 7

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ......................................................21

*In re Volkswagen "Clean Diesel" Marketing, Sales Practies, and Products Liability Litigation*,
  2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .................................................12

v

*Warshaw v. Xoma Corp.,*
   74 F.3d 955 (9th Cir. 1996) ..................................................................................11

*Westley v. Oclaro, Inc.,*
   897 F. Supp. 2d 902 (N.D. Cal. Sept. 21, 2012) ...................................................10

*Zhou v. Faraday Future Intell. Elec. Inc.,*
   2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) ............................................ 16, 19

**Statutes**

15 U.S.C. § 78u-4..........................................................................................................7

17 C.F.R. § 240.10b-5....................................................................................................6

**Rules**

Rule 15(a)....................................................................................................................22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## PRELIMINARY STATEMENT

When functioning properly, the "Idle Stop" feature in automobiles automatically shuts off the engine when the brake pedal is fully applied and automatically restarts it when the brake pedal is released. In 2015, car manufacturers, including Honda Motor Co., Ltd. ("Honda"), began incorporating Idle Stop into gasoline-powered vehicles to comply with new U.S. regulations on emissions and fuel economy. Thereafter, and throughout the Class Period, Honda made several public statements touting the safety, reliability and functionality of its Idle Stop featured in numerous Honda and Acura models. These statements, however, were false and ultimately caused significant losses for unsuspecting investors.

Specifically, Honda's Idle Stop did not function as described. Honda vehicles equipped with a faulty Idle Stop suffered from "system issues" causing a sudden and unexpected failure to restart the engine after a stop (the "Defect"), leaving drivers in potentially perilous situations unable to move. Defendants had notice of the Defect no later than July 2015. By June 20, 2018, the start of the Class Period, Defendants had received countless reports of the Defect appearing in multiple Honda and Acura models across all years. In fact, by the start of the Class Period, Honda had issued and/or received technical service bulletins, notices of investigation, and warranty claims concerning the Defect in the: 2015 Acura TLX; 2016-2017 Acura MDXs; 2016-2018 Honda Pilots; and 2018 Honda Odyssey. The Defect increased in scope as time went on and, during the Class Period itself, expanded to include additional vehicle models: 2019-2020 Odysseys; 2016 Pilot Tourings; 2016 Pilot Elites; 2018-2019 Odyssey Tourings; 2018-2019 Odyssey Elites; 2019-2020 Honda Passports; 2019-2020 and 2022 Pilots; 2016-2020 TLXs; 2022 Honda Ridgeline; and 2020-2021 Acura RDXs.

Honda's internal correspondence with the National Highway Traffic Safety Administration ("NHTSA") as well as communications with Honda dealers, service

1

managers, advisors, and consultants not only demonstrate the existence, persistence, and pervasiveness of the Defect, but also demonstrate that Honda's high level managers knew about it. However, because of Defendants' duplicity, Honda consumers and investors did not. As a result, when news of NHTSA's investigation into the Defect ultimately surfaced and consumers filed a class action lawsuit, the price of Honda's securities declined sharply, leaving investors who had purchased Honda ADSs at artificially inflated prices with no knowledge of the heighted regulatory and legal exposure, with significant losses.

Defendants moved to dismiss under Rule 12(b)(6), arguing primarily that Plaintiffs fail to adequately allege falsity, scienter, and loss causation under Section 10(b). Given that the existence of the Defect, and Defendants' knowledge thereof, are beyond peradventure, as detailed below, Defendants cannot credibly dispute falsity or scienter. Likewise, loss causation is sufficiently pled because Honda's ADS price dropped precipitously when NHTSA's investigation and the consumer class action lawsuit revealed the existence, breadth, and severity of the Defect that Defendants concealed with their false and misleading statements during the Class Period. As such, under Ninth Circuit law, Plaintiffs sufficiently state a claim for relief and Defendants' motion should be denied.

## STATEMENT OF FACTS

**I.      Defendants' Corporate History in the U.S.**

Honda is a multinational automotive manufacturer. ¶28.[1] Honda began its U.S. operations in 1959. ¶29. Today, Honda conducts its U.S.-based operations, which include the Acura brand, through its wholly owned and controlled American subsidiary, American Honda Motor Co., Inc. ("AHM"). ¶30.

---

[1] Citations to "¶__" refer to Plaintiffs' Amended Class Action Complaint (ECF No. 60) ("Complaint").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## II.    Honda Incorporates Idle Stop into its Gasoline-Powered Vehicles.

Between 2012 and 2014, the U.S. heightened its standards on emissions and fuel economy. ¶¶33-36. In response, almost every major automaker began offering Idle Stop in gasoline-powered vehicles in 2015. ¶¶37-38. Honda was no exception. Unbeknownst to the market, however, Honda's Idle Stop was defective from the very first model year offered. ¶¶41, 77-93. The Defect exposed Honda and Acura drivers, as well as innocent bystanders, to the risk of accidents, injury, and death; it also exposed Honda, and thus Honda's investors, to a heightened risk of regulatory action and litigation. ¶¶41, 77-99, 102-03.

## III.    Honda Monitored the Defect for Years Without Informing the Public.

Through multiple monitoring channels, Honda identified the Defect as early as 2015 and remained highly focused on it leading up to, and throughout, the Class Period.  For example, in response to customer complaints, AHM issued a myriad of manufacturer communications ("MC"), including technical service bulletins ("TSB") and notices of investigation ("Notice"), addressing the Defect in several Acura and Honda models beginning in 2015 and continuing unabated throughout the Class Period. *See, e.g.,* ¶77 (July 25, 2015 TSB concerning 2015 Acura TLX); ¶79 (January 12, 2016 TSB concerning 2016 Acura MDX); ¶80 (April 21, 2016 TSB concerning 2016 Honda Pilot); ¶¶81-82 (March 10 & 16, 2017 Notices for 2016-2017 Pilots & 2017 MDX); ¶83 (June 22, 2017 Notice for 2016-2017 MDXs); ¶137 (February 2018 Tech Line Summary Article for 2018 Honda Odyssey & 2016-2018 Pilots); ¶84 (May 10, 2018 Notice for 2018 Odysseys & Pilots); ¶85 (June 2019 Service News Article for "*ALL Models with Auto Idle Stop*"); ¶86 (July 5, 2019 TSB concerning 2018-2019 Odyssey Elites & Tourings); ¶¶87-88 (July 30, 2019 Notices for 2016-2017 Pilots & 2015-2017 TLXs); ¶89 (December 2, 2019 Notice for 2019-2020 Odysseys, Passports & Pilots); ¶91 (January 28, 2020 Notice for 2016 MDX & 2015-2017 TLXs); ¶92 (February 13, 2020 Notice for 2016 Pilot Tourings &

3

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Elites); ¶93 (March 11, 2022 TSB for 2022 Pilot and 2022 Honda Ridgeline); ¶93 (March 30, 2022 TSB concerning 2015-2020 TLXs); ¶102 (September 20, 2022 TSB concerning 2020-2021 Acura RDXs). Moreover, at least quarterly, Honda submitted reports to NHTSA that included non-public copies of all warranty reports, consumer complaints, property damage claims, death or injury claims, MCs concerning *inter alia* product defects, and field reports broken down by make, model, year and problem category. ¶¶ 57, 74. Honda also tracked vehicle diagnoses and repairs from dealership technicians in a single, aggregated database. ¶94.

## IV.     Honda Attracts Investors with Positive Statements about the Safety, Reliability, and Functionality of Its Vehicles While Concealing Material Adverse Information about Idle Stop.

Defendants repeatedly promoted Honda's vehicles, equipped with Idle Stop, as safe and reliable. ¶¶67-73. On the first day of the Class Period, in its Form 20-F for the year ending March 31, 2018, Honda expounded on the quality of its vehicles, stating in pertinent part, "[t]o strengthen customer trust by offering products found in safety…Honda has created a system that continuously enhances and improves quality at every stage: design, development, production, sales and service." ¶111. Likewise, on August 21, 2018, Defendants issued a press release promoting the 2019 Pilot. In it, Defendants described Idle Stop, stating in pertinent part, "Pilot has an upgraded Idle Stop system…it features new programming and a new brake pressure trigger for quicker restarts when accelerating immediately after engine stop, making the system less noticeable in heavy traffic and similar driving situations." ¶113. Defendants omitted, however, any reference to the Defect, which by that time they had known about for three years and failed to resolve with any effective corrective actions. ¶¶80-84, 112, 114. Throughout the Class Period, Defendants continued to promote Honda's vehicles equipped with Idle Stop as supposedly "[a]t the forefront of safety" with "a full suite of advanced active safety and driver-assistive technologies" (¶¶109, 115-17, 123, 127), and chose to make additional statements

4

regarding the functionality and reliability of Idle Stop (¶¶119, 121, 125), all while concealing the Defect and the resulting safety risks.

## V.   The Idle Stop Defect Results in Regulatory Exposure and Litigation.

On June 3, 2022, NHTSA announced its investigation into the Defect, exposing Defendants' knowledge of the Defect and partially revealing the scope and prevalence of the issue. ¶¶96, 130. NHTSA cited its receipt of at least 221 consumer complaints and "several field reports" as the impetus for initiating the investigation. ¶¶96, 130. NHTSA also disclosed that it met with Honda "on various occasions on this issue" and that "Honda indicated that per the information provided from NHTSA complaints and TREAD [ ] reports, they have found a correlation with customers' allegations for the Auto Start/Stop failure to restart the vehicle when the system is activated." ¶98. Honda also admitted that other models, including the "Honda Odyssey, Acura TLX & Acura MDX …experience the same failure mode." *Id.* Following this announcement, Honda securities fell $0.88 per share, or 3.41%, to close at $24.96 on June 3, 2022. ¶130.

Then, on September 28, 2022, *Cooper et al v. American Honda Motor Co., Inc.*, No. 1:22-cv-05299 (N.D. Ill.) (the "Consumer Class Action"), was filed against AHM alleging violations of consumer protection laws after selling thousands of vehicles equipped with the Defect. ¶¶11, 131. The Consumer Class Action fully exposed the severity and prevalence of the Defect, the unreasonable safety risks posed by the Defect, and Defendants' multi-year effort to conceal the Defect. ¶¶11, 77-93, 131. Indeed, the Consumer Class Action highlighted numerous complaints to NHTSA from Honda customers regarding the Defect in 2018-2020 Odysseys, 2016-2020 Pilots, 2019-2020 Passports, 2015-2020 TLXs, and 2015-2020 MDXs (*i.e.*, significantly expanding the models/years identified initially by NHTSA) and provided further detail on the danger caused by the Defect. ¶¶11, 131. On this news,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Honda's ADS price fell $0.74 per share, or 3.23%, to close at $22.19 per share on September 29, 2022. ¶132.

## LEGAL STANDARD

Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) make it unlawful to "make any untrue statement of material fact or to omit to state a material fact in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b)(2). To state a Section 10(b) claim, a plaintiff must allege: (1) a material misrepresentation or omission (*i.e.*, falsity); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018).

In assessing a Rule 12(b)(6) motion, a court must "consider the complaint in its entirety," "accept all factual allegations . . . as true" and construe those allegations in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint "does not need detailed factual allegations," it need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Khoja*, 899 F.3d at 1008.

## ARGUMENT

### I.    The Exchange Act Applies to the Transactions at Issue in this Case.

Section 10(b) applies to "transactions in securities listed on domestic exchanges." *Morrison v. National Australia Bank*, 561 U.S. 247, 267 (2010). Defendants admit that "Honda's ADSs are traded on the NYSE." ECF No. 65 ("Mot.") at 5. Consequently, Section 10(b) applies to Plaintiffs' claims. *See U.S. v. Martoma*, 2013 WL 6632676, at *4 (S.D.N.Y. Dec. 17, 2013) ("Because the Elan

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

ADRs are securities that are listed and traded on the NYSE, the first prong of *Morrison* is satisfied.") (collecting cases).

Defendants' reliance on *City of Pontiac Policemen's Sys. v. UBS AG*, 752 F.3d 173 (2nd Cir. 2014), and *Stoyas v. Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018), is misplaced. In *Pontiac*, the Second Circuit held that "*Morrison* does not support the application of § 10(b) of the Exchange Act to claims by a ***foreign*** purchaser of ***foreign***-issued shares on a ***foreign*** exchange simply because those shares are also listed on a domestic exchange." 752 F.3d at 180-81 (emphasis added). Here, Plaintiffs are ***domestic*** purchasers of ***domestically*** listed and issued securities. *See* ¶¶18-20, 139; *see also* ECF Nos. 14-3 (Gund's transactions in Honda ADSs), 14-4 (confirming Gund's U.S. residency), 18-3 (Clark's transactions in Honda ADSs), 18-6 (confirming Clark's U.S. residency). Similarly, in *Stoyas*, the court found that "[t]he over-the-counter market on which Toshiba ADRs trade is simply not an 'exchange' under the Exchange Act." 896 F.3d at 947, 951. Here, Defendants do not and cannot argue that the NYSE is not a domestic exchange. *See* ¶¶18-20, 139.[2]

## II.   The Complaint Adequately Alleges Defendants Made Materially False and Misleading Statements.

To plead falsity, the Private Securities Litigation Reform Act of 1995 "merely requires that 'the complaint [ ] state with particularity all facts on which [the] belief [underlying an allegation of falsity] is formed.'" *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 2023 WL 5496507, at \*18 (9th Cir. Aug. 25, 2023) (quoting 15 U.S.C. § 78u-4(b)(1)(B)). A defendant's statement is considered materially false when it "directly contradict[s] what the defendant knew at the time." *Khoja*, 899 F.3d at 1008. "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008-09. "[A] statement is misleading if it would give

---

[2] As such, Plaintiffs also satisfy *Morrison*'s second prong. *See Martoma*, 2013 WL 6632676, at \*5 (finding *Morrison*'s second prong satisfied where "it is undisputed that the Elan ADRs at issue were traded on the NYSE").

7

a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists." *NVIDIA*, 2023 WL 5496507, at *7.

**A.  Defendants Misled Investors about the Safety, Reliability, and Functionality of Honda's Idle Stop Feature.**

Defendants described the functionality of Honda's Idle Stop feature, stating that "when the driver releases the brake pedal, the engine starts back up by itself," "[t]he system has been engineered to operate smoothly and seamlessly," and "ensure[s] quick restarts when accelerating immediately after engine stop, making the system less noticeable in heavy traffic and similar driving situations," and touting vehicles that "come standard with Idle Stop" as having "the company's newest and most advanced transmission." ¶¶113, 119, 121, 125. Defendants also told investors that Honda was "focused on the safety of all road users," "offering products founded in safety," and "creat[ing] a system that continuously enhances and improve quality at every stage: design, development, production, sales and service." ¶¶109, 111, 115-17, 123, 127. These statements were false and/or materially misleading when made because Honda's Idle Stop was defective. As Defendants admitted, "during development, the idle stop enable criteria was mis-set" causing the sudden and unexpected failure of the vehicle's engine to restart following a stop, such as at a traffic light or intersection. ¶¶11, 41, 93, 97-99, 102, 131. In some instances, customers could only restart the vehicle by "placing the gear into the Park position and pressing the Start button" or by "a jump start." ¶¶87-88, 97.

Indeed, by the start of the Class Period, AHM had issued at least eight (8) MCs regarding the Defect, affecting numerous models/years. ¶¶77-84, 137. At least three (3) of these MCs provided Honda and Acura service managers and advisors with purported corrective action to resolve the Defect (which it did not). ¶77. At no point did Defendants notify the public of the Defect, nor did they undertake any action to universally resolve the issue. ¶¶79-80. As such, year after year, Honda would release additional models equipped with the Defect and customer complaints

8

would follow. ¶¶81-84, 87-92. Nevertheless, Defendants continued to promote Honda to investors by highlighting the functionality of its Idle Stop and emphasizing the safety and reliability of its vehicles. ¶¶106-29. "[O]nce [D]efendants chose to tout the company's [Idle Stop], they were bound to do so in a manner that wouldn't mislead investors as to [how Idle Stop functioned]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (statements about "backlog" misleading where defendants omitted "stop-work orders"); *see also Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 Fed. Appx. 480, 483 (9th Cir. 2019) (statements about "'real-time' nature" of theft alerts misleading where alerts were "sent more than one week late"); *Khoja*, 899 F.3d at 1010 (statements about "positive 25 percent interim result" misleading in light of omission that results were "unreliable"); *Schueneman v. Arena Pharm., Inc.,* 840 F.3d 698, 705-06 (9th Cir. 2016) (defendants required to disclose negative information about "Rat Study" once they told public that "animal studies supported [drug's] safety").

Defendants raise a handful of meritless arguments in support of their motion. *First*, they claim the challenged statements were "immaterial" to investors. Mot. at 10-12. Dismissal for immateriality is only appropriate where a statement is so obviously unimportant to an investor that "reasonable minds cannot differ on the question of materiality." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976); *see also Morgan v. AXT, Inc.,* 2005 WL 2347125, at *10 (N.D. Cal. Sept. 23, 2005) (whether defendants' "quality statements" are material "would require the Court to make factual findings," which are inappropriate at the motion to dismiss stage). Honda is one of the top automotive companies in the world. Whether Honda in fact produces cars that are safe and reliable, as Defendants claimed throughout the Class Period, is undeniably material to investors. ¶¶33-38; *see Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 8 (1st Cir. 2021) (noting "importan[ce] [of a] product" to a company is relevant in determining materiality of

statement concerning product's effectiveness); *see also Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 720 (2d Cir. 2011) (statement's "significance to a particularly important segment of a registrant's business tends to show its materiality"); *In re Equifax Inc. Sec. Litig.,* 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) (statements relating to "core aspect" of business "makes it even more likely that a reasonable investor would assign weight to them"). No reasonable investor would invest in an automotive company selling cars with hidden defects affecting the safety and functionality of its vehicles, given the resulting risks of regulatory and legal exposure.

Indeed, investors responded to news about the Defect by selling their stock, further substantiating the materiality of Defendants' misstatements. ¶¶130, 132; *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 949 (9th Cir. 2003) (finding stock price decline following disclosure "support[ed] a finding of materiality"); *accord Longo v. OSI Sys., Inc.,* 2021 WL 1232678, at *7 (C.D. Cal. Mar. 31, 2021); *Westley v. Oclaro, Inc.,* 897 F. Supp. 2d 902, 914 (N.D. Cal. Sept. 21, 2012); *In re Nat'l Golf Props., Inc.*, 2003 WL 23018761, at *5 (C.D. Cal. Mar. 19, 2003) ("[i]t cannot be said, at least at the pleading stage, that these disparities would not be material to a reasonable investor" in light of "one-day decline in value" following disclosure).

*Second*, Defendants argue that several of the challenged statements—when viewed in isolation—are non-actionable corporate puffery or opinion. Mot. at 8-9. This argument is not supported by the case law. *See*, *e.g.*, *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."). General statements of optimism, "when taken in context, may form a basis for a securities fraud claim." *Warshaw v. Xoma Corp.,* 74 F.3d 955, 959

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

(9th Cir. 1996). Even vague, "feel good" statements may be actionable if they "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *In re Quality Systems, Inc., Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). Statements of opinion, even if literally accurate, may be rendered misleading by the omission of a material fact. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186-87 (2015).

Defendants represented that Honda's vehicles, for example, were "[a]t the forefront of safety" with "advanced safety features to assist and help protect [customers and their] most precious cargo" (¶117; *see also* ¶109, 111, 123), and that Idle Stop had "been engineered to operate smoothly and seamlessly" and was "designed to provide a high level of safety … with predictable and stable driving dynamics that help drivers maintain control over their vehicle" (¶121; *see also* ¶¶115, 127). Given Defendants' knowledge of the Defect spanning numerous models/years (*see* ¶¶77-90, 137), they had no basis for these statements; *i.e.*, "[t]hese concrete assurances did not 'fairly align[ ] with the information in [Defendants'] possession at the time' and are therefore actionable." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023) (finding phrases such as "tracking very well" or "very large pipeline" actionable as they "contravened the unflattering facts in [defendant's] possession."); *see also Warshaw*, 74 F.3d at 959 (finding that reassuring investors that "everything [was] going fine" when the company knew otherwise was materially misleading); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *14-15 (N.D. Cal. June 2, 2020) (holding defendant's statement, "[t]he XS and XS Max got off to a really great start" actionable, and noting that "[a]lthough investors understand that corporate optimism may be unreliable, a party cannot affirmatively create a positive impression of an area it knows to be doing poorly").

## B. Section 10(b) Violations Are Not Limited to False and Misleading SEC Filings.

Defendants argue that they should not be held liable for any false and misleading statements they issued in press releases, product brochures, or on AHM's website, *i.e.*, anything other than an SEC filing. Mot. at 7-8. They are wrong. There is no exception to Section 10(b) liability based on the medium used to disseminate the false statement. *Apple,* 2020 WL 2857397, at *17 (". . . there is no rule that only market-related documents, such as regulatory filings, public presentations, or press releases, can contain actionable misstatements under Section 10(b)"). Liability exists so long as the fraud alleged "somehow touches upon" or has "some nexus" with "any securities transaction." *SEC v. Clark,* 915 F.2d 439, 449 (9th Cir. 1990); *see also SEC v. Zandford*, 535 U.S. 813, 819 (2002) (the Exchange Act "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'").

Investors had every right to rely upon Defendants' statements about the safety, reliability and functionality of Honda's vehicles equipped with Idle Stop when deciding whether to invest in the company regardless of whether that statement appeared in an annual report, a press release, or a marketing brochure. Defendants cannot evade liability by baselessly and unilaterally dictating which statements investors should or should not have heeded when deciding to invest. *See In re Carter-Wallace, Inc. Sec. Litig.,* 150 F.3d 153, 156 (2d Cir. 1998) (reversing dismissal of § 10(b) claim based on misrepresentations in product advertisements); *In re Volkswagen "Clean Diesel" Marketing, Sales Practies, and Products Liability Litigation*, 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017) (holding Volkswagen's emissions compliance stickers placed on vehicles sold in the U.S. actionable); *In re Rocket Fuel Sec. Litig.,* 2015 WL 9311921, at *6 (N.D. Cal. 2015) (statement on company's website promoting its digital advertising technology was actionable); *SEC v. Mack*, 2012 WL 13005963, at *2 (C.D. Cal. Aug. 7, 2012) (representations made on "website, as well as [in] advertising brochures" were actionable).

Moreover, it is irrelevant whether the alleged false and misleading statements were "made for the purpose or object of influencing the decisions of market participants." *Muzinich & Co. v. Raytheon Co.*, 2002 U.S. Dist. LEXIS 26962, at *9 (D. Idaho Apr. 30, 2002). Defendants' "fraud could be 'in connection with' the sale of securities even if [Defendants] had no intent to influence investors." *Id*. Under this standard, Defendants' argument has no merit.

The cases Defendants rely on are inapposite. In *Di Donato v. Insys Therapeutics Inc.,* 2017 WL 3268797 (D. Ariz. Aug. 1, 2017), the "in connection with" requirement was not met where one of the statements at issue included quotations from a third-party article that did not particularize "when, where, or to whom [the individual defendant] made this statement, only that it was published in the article." *Id.* at *16. Here, the Complaint clearly alleges that the statements at issue come directly from Honda and AHM and appear in their own SEC filings, press releases, and/or marketing materials; as such, there is no uncertainty as to who is responsible for the false statements. ¶¶107-28; *see In re QuantumScape Sec. Class Action Litig.,* 580 F. Supp. 3d 714, 739-40 (N.D. Cal. 2022) (finding statements made during company's earnings call, during CNBC interviews and in an officer's LinkedIn post actionable); *In re CytRx Corp. Sec. Litig.,* 2015 WL 5031232, at *9 (C.D. Cal. July 13, 2015) (finding company statements in press release and conference calls actionable).

While in *Bien v. LifeLock Inc.*, 2015 WL 12819154, at *9 (D. Ariz. July 21, 2015), the district court held that statements made in "advertisements" did not "meet the 'in connection with' element" under Section 10(b), subsequent to that decision, the Ninth Circuit held that statements about the "'real-time' nature of [LifeLock's] identity theft alerts" were actionable because, similar to the statements at bar, they "concealed a significant flaw affecting LifeLock's identity theft products." *LifeLock*,

13

780 Fed. Appx. at 483.[3] Notably, courts examining *Bien v. LifeLock Inc.* have held that the fact "that the misstatements appeared in certain medium [is] not dispositive." *In re Sinclair Broad. Grp., Inc. Sec. Litig.,* 2020 WL 571724, at *5, n.8 (D. Md. Feb. 4, 2020); *accord Apple*, 2020 WL 2857397, at *17 (statements made in letter to Congress were actionable).

Lastly, *In re Financial Corp. of America Shareholder Litigation*, 796 F.2d 1126 (9th Cir. 1986), is also unpersuasive. In that case, Arthur Andersen & Co. provided accounting advice concerning how to account for mortgage certificates and, importantly, not the value of the certificates themselves. *Id.* at 1128. Thus, while Arthur Andersen's advice subsequently proved to be "inappropriate," the advice was sufficiently removed from the losses that investors ultimately sustained when the corporation reported net losses. *Id.* at 1130. Unlike Arthur Andersen's accounting advice, Defendants' statements about Idle Stop directly impacted the value of Honda's vehicles and the risks associated with investing in the company, *i.e.*, increased regulatory risk and litigation exposure. *See* ¶¶129, 147.[4]

**C.     Honda and AHM are "Makers" of False and Misleading Statements.**

Defendants do not dispute that Honda made the alleged false and misleading statements in its annual reports (¶¶111, 123), nor do they dispute that AHM made the alleged false and misleading statements in product press releases, press kits, brochures, and on company websites (¶¶109, 113, 115-17, 119, 121, 125, 127). However, Defendants incorrectly argue that Honda should not be held liable for AHM's statements in product-related documents and on its website. Mot. at 6.

---

[3] The Ninth Circuit's decision in *LifeLock* emanated from a different but related lawsuit against LifeLock, Inc., styled *Avila v. LifeLock Inc.*, 2017 WL 3669615 (D. Ariz. Aug. 21, 2017).

[4] Defendants also misplace reliance on *McGann v. Ernst Young,* 102 F.3d 390 (9th Cir. 1996), which held that Ernst & Young could be liable for preparing a fraudulent audit report while knowing that its contents would be disseminated to the public.

In accordance with *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), Honda had "ultimate authority" over AHM's statements, because Honda "directed their public statements" by virtue of its position as their ultimate parent, its involvement in their day-to-day operations, and ability to appoint their board of directors and executive officers. *See* ¶¶25-27, 29-30; *see also In re Pfizer Inc. Sec. Litig.,* 819 F.3d 642, 657-58 (2d Cir. 2016) (holding company responsible for third parties' statements given its involvement in approving and disseminating the statements); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558 (S.D.N.Y. 2014) (refusing under *Janus* to dismiss claims against parent company and CEO for statements attributed to subsidiary); *Elbit Sys. Ltd. v. Credit Suisse Grp.,* 917 F. Supp. 2d 217, 228 (S.D.N.Y. 2013) (finding *Janus* does not absolve parent of liability for statements made by subsidiary given parent's authority over subsidiary). Plaintiffs' allegations of authority, control, and entanglement sufficiently satisfy *Janus.*

## III.    The Complaint Raises a Strong Inference of Scienter.

To plead the element of scienter, a plaintiff must "'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987. "[A]llegations of recklessness have been sufficient where defendants failed to review or check information that they had a duty to monitor." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011); *see also Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) ("deliberate recklessness" where defendant "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts"). Moreover, "[s]cienter can be established by direct or circumstantial evidence." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). The relevant

inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323.

As early as 2015, Defendants had in their possession material adverse information concerning the Defect. Pursuant to federal regulations and NHTSA reporting requirements, Honda was required to monitor and track all incidents like the Defect. Indeed, Honda tracked vehicle diagnoses and repairs in a single aggregated database and submitted quarterly reports to NHTSA that included *inter alia* MCs concerning product defects, warranty reports, consumer complaints, and field reports broken down by make, model, year, and problem category. ¶¶57, 74, 94. The Complaint describes over twenty (20) MCs that AHM issued concerning the Defect between July 25, 2015 and March 2023. *See* ¶¶77-103, 137. Indeed, AHM even admitted that the Defect occurred because "***during development, the idle stop enable criteria was mis-set***" in 2015. ¶102 (emphasis added); *see also* ¶93. Despite Defendants' undeniable awareness of the Defect *for years*, they concealed it from the public, explicitly telling service managers in MCs that "this message is solely directed to Honda dealership personnel; please handle accordingly." ¶¶81-84, 87-92.[5] These allegations, which Defendants tellingly fail to address in their Motion, construed in the light most favorable to Plaintiffs, collectively give rise to a strong inference of scienter, particularly given that vehicle production and sale are Honda's sole business. *See NVIDIA*, 2023 WL 5496507, at *22 (inference of scienter based on "obvious" inference due to CEO's familiarity with business operations); *Zhou v. Faraday Future Intell. Elec. Inc.,* 2022 WL 13800633, at *10 (C.D. Cal. Oct. 20, 2022) (scienter pled where "[vehicle] production and sale constituted the core business operation of [corporate defendant]").

---

[5] Defendants' efforts to conceal the Defect strengthen the inference of scienter in light of Honda's prior safety violations. *See* ¶136 (discussing 2015 NHTSA fine); *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) (attempt to "cover-up" information "is strong proof of scienter").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Disregarding the Complaint's well-pled allegations, Defendants primarily argue there is no scienter because Plaintiffs fail to allege particular facts indicating that "any particular Honda or [AHM] employee" knew about the Defect "before any of the challenged statements." Mot. at 18. The Complaint alleges, however, that leading up to and throughout the Class Period, AHM's Technical Research and Support Group issued several MCs to all Honda or Acura Service Managers, Advisors and/or Consultants explicitly addressing customer complaints. *See* ¶¶81-92 (listing TSBs and Notices). Additionally, as Honda's quarterly reports to NHTSA and NHTSA's announcement on June 3, 2022 all confirm, the Defect was discussed at regularly held meetings attended by corporate management and was covered in reports to which corporate management had access. ¶¶57, 77-94, 98, 100-02, 137. Defendants' subsequent warranty extensions and product updates further evidence the widespread nature of the Defect. *See* ¶¶99-103 (describing various warranty extensions and product fixes between June 2022 and March 2023).

As such, Plaintiffs have sufficiently pled an inference of scienter for Defendants' high-level managers, which must be imputed to Honda and AHM, thus establishing "corporate scienter." ¶¶93, 100-01, 111, 123; *see Quality Sys.*, 865 F.3d at 1145 (scienter where "executive-level management…had access to and used reports documenting in real time [the disputed information] during the Class Period"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (scienter where plaintiffs alleged that the company maintained a database with sales information and that, because "the top executives admit to having monitored the database, [company] must have been aware that it was not going to meet its sales projections earlier in the third quarter, and that its statements to the contrary were therefore made with scienter."); *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3764903, at *1 (C.D. Cal. Feb. 21, 2012) (denying defendants' motion for judgment on the pleadings and holding in pertinent part that "it is unlikely

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

that the law allows corporations to shield themselves from securities fraud liability by funneling fraudulent statements through an 'ignorant' spokesperson with no way for the public to know who, specifically, prepared the spokesperson's statements").

"Corporate scienter" also exists where "a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (emphasis in original); *Brown v. China Integrated Energy, Inc.,* 875 F. Supp. 2d 1096, 1123 (C.D. Cal. 2012) (corporate scienter where statements about fuel production "strain[ed] credulity"). That premise applies here, where Defendants claimed to have successfully designed and produced Idle Stop in numerous Honda and Acura models between 2015 and 2022 when, in reality, the feature was defective. ¶¶68-73, 96, 106-28; *see Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 710 (7th Cir. 2008) (providing hypothetical scenario where "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero").

Defendants duped the public into thinking Honda's Idle Stop functioned consistently and effectively and successfully added to a vehicle that stacked up to the competition, despite knowing that the Defect caused the unexpected failure to restart the engine following an idle stop, *e.g.*, at a stop light or intersection, and, as a result, put unwitting customers at unreasonable risk of accidents, injury or death and, in turn, exposed Honda's investors to increased risk of regulatory action and litigation. ¶¶11, 96-99, 102-03, 131. The safety, reliability, and functionality of Honda's vehicles is critical to Defendants' operations. Therefore, at least *some* "high-level managers directly responsible for day-to-day operations must have known that statements about [Idle Stop] were misleading when made, by reason of their positions of authority and the fact that the [Defect] related to the companies' core operations, such that 'it would be absurd to suggest that top management was

18

unaware of them.'" *Zhou*, 2022 WL 13800633, at *10 (scienter where "[vehicle] production and sale constituted the core business operation of [the corporate defendant]"); *see also America West*, 320 F.3d at 943 n.21 (scienter where, in part, it would be "absurd" to suggest that the Board of Directors would not discuss issues related to a Federal Aviation Administration investigation which could have resulted in substantial penalties).

**IV.    The Complaint Adequately Pleads Loss Causation.**

Pleading loss causation is "not meant to impose a great burden upon a plaintiff," but to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). This is satisfied by alleging a "causal connection between the *facts* misrepresented and the plaintiff's loss." *Mineworkers' Pension Scheme v. First Solar, Inc.,* 881 F.3d 750, 752 (9th Cir. 2018) (emphasis in original). In the Ninth Circuit, "loss causation is a 'context-dependent' inquiry, as there are an 'infinite variety' of ways for a tort to cause a loss," *Lloyd v. CVB Fin. Corp.,* 811 F.3d 1200, 1210 (9th Cir. 2016), including price declines that accompany the materialization of concealed risks or the disclosure of information previously concealed by fraud, *First Solar*, 881 F.3d at 753-54.

Plaintiffs' allegations easily meet this standard. *First*, NHTSA's announcement on June 3, 2022, revealed information about Idle Stop that contradicted Defendants' prior representations about the safety, reliability, and functionality of Honda's vehicles. ¶¶10, 96-99, 130. Honda's ADS price declined by approximately 3.41% in response as the market reassessed the regulatory exposure and litigation risk associated with the Defect. ¶130; *see Lloyd*, 811 F. 3d at 1210 (finding plaintiff adequately pled loss causation with respect to announcement of government investigation).

*Second*, the risks emanating from the Defect continued to materialize with the filing of the Consumer Class Action on September 28, 2022, which revealed in stark detail the severity of the Defect and Defendants' long-standing knowledge of it. ¶¶ 11-12, 77-93, 131-32. This news sharply contrasted with Defendants' previous representations about the safety, reliability and functionality of Honda's vehicles and revealed the unreasonable risks posed by the nearly decade-long Defect. In response, the price of Honda ADSs dropped approximately 3.23%. ¶132; *see Robb v. Fitbit Inc.,* 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) (loss causation allegations supported by complaints made in consumer lawsuit).

Inappropriately asserting a "truth-on-the-market" defense, Defendants argue that NHTSA announcement and Consumer Class Action did not reveal any new information to the market and thus were not "corrective." Mot. at 19-20. As a general rule, the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *In re Amgen Inc.*, *Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). Moreover, "[i]t isn't appropriate to find the information allegedly revealed in the [NHTSA announcement and Consumer Class Action] immaterial as a matter of law at the pleading stage, just because the information was based on public documents." *In re Banc of California Sec. Litig.,* 2017 WL 3972456, at *5 (C.D. Cal. Sept. 6, 2017) (loss causation based on public information revealed in blog). Indeed, investors need not "look beyond a given document to discover what is true and what is not." *Miller v. Thane Intern., Inc.*, 519 F.3d 879, 887 (9th Cir. 2008); *see also In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1114 (9th Cir. 1989) ("omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public.").

Defendants' argument is also factually incorrect. NHTSA's announcement had not previously been disclosed to the market. In addition to news of the investigation itself, the announcement also disclosed Honda's admission of the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defect and "several [non-public] field reports" issued in response to customer complaints. ¶¶96, 98. Likewise, as detailed *supra*, the Consumer Class Action revealed Defendants' knowledge of the Defect dating back to as early as 2015 and provided a more complete and expansive picture of the true scope of affected vehicles and the risks posed by the Defect. ¶¶11, 76-93, 131.[6]

Finally, Defendants incorrectly argue there is no loss causation because Honda's ADS price "recovered" after NHTSA's announcement (Mot. at 20-21) and claim that Honda's ADS price declined following the Consumer Class Action because of Honda's dividend (Mot. at 21-22). *First*, Honda's stock price never recovered following reports of NHTSA's investigation; from $25.84 per share before the investigation was announced, Honda's ADS price fell to $22.19 per share after the Consumer Class Action was filed at the end of the Class Period. *See* ¶¶130-32. In any event, a rebound in stock price does not defeat loss causation. *See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 984 (N.D. Cal. 2015) (price recovery does not negate loss "because the price rebound could be explained by external events"); *In re UTStarcom, Inc. Sec. Litig.,* 617 F. Supp. 2d 964, 978 (N.D. Cal. 2009) ("To the extent that stock price actually increased after corrective disclosures, Defendants will have the opportunity after discovery to demonstrate

---

[6] Given that new information entered the market, Defendants' reliance on *Loos v. Immersion Corp.*, 762 F. 3d 880 (9th Cir. 2014), and *Curry v. Yelp Inc.,* 875 F.3d 1219 (9th Cir. 2017), is misplaced. Mot. at 19. Unlike these cases, NHTSA's report combined with the Consumer Class Action revealed significantly more than simply a number of "customer complaints," as Defendants contend when relying on *Curry*. NHTSA's report evidenced the Defect and Honda's knowledge of it. The Consumer Class Action then revealed how expansive the Defect was and the safety risks it posed. Further, the Ninth Circuit has recently explained that even blog posts containing public information can still be "corrective." *In re BofI Holding, Inc. Sec. Litig.*, 977 F. 3d 781, 793-97 (9th cir. 2020); *see also Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (article analyzing public Medicare records was corrective disclosure).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

that, in fact, the subject of the alleged misrepresentations did not cause Plaintiffs' claimed loss.").

*Second*, Plaintiffs are not required to rule out all other possible causes of the stock drop prior to expert or merits discovery, meaning that Defendants' argument as to the cause of Honda's ADS price decline is improper and premature. *In re Daou Sys.*, 411 F.3d 1006, 1025 (9th Cir. 2005); *Robb*, 216 F. Supp. 3d at 1033 ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial…"). Defendants' authority is distinguishable and not to the contrary. In *Metzler Inv. GmbH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 (9th Cir. 2008), the alleged fraud occurred in connection with an extremely small percentage of the defendants' overall operations, *i.e.*, at only one of the eighty-eight schools operated by the defendants. Here, the Defect was far more pervasive. The Complaint thus sufficiently alleges a causal connection between Defendants' false and misleading statements and the losses suffered by investors.

## **CONCLUSION**

Plaintiffs respectfully request the Court deny Defendants' motion in its entirety.[7]

//
//
//
//
//
//
//
//

---

[7] Alternatively, Plaintiffs request leave to amend under Rule 15(a). *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Dated:  September 21, 2023

Respectfully submitted,

**LEVI & KORSINSKY LLP**

 /s/ Adam Apton
Adam M. Apton (SBN 316506)
Devyn R. Glass (*pro hac vice*)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com
Email: dglass@zlk.com

*Lead Counsel for Plaintiffs and the Class*

**POMERANTZ LLP**
Tamar Weinrib (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Facsimile: (917) 463-1044
Email: taweinrib@pomlaw.com

*Additional Counsel for Plaintiffs and the Class*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this Memorandum of Points and Authorities contains 6,989 words, which complies with the word limit of L.R. 11-6.1.

/s/ *Adam Apton*

Adam M. Apton

24

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS