UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RHONDA BAYLOR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HONDA MOTOR CO., LTD. and AMERICAN HONDA MOTOR COMPANY, INC.,<br><br>Defendants. | Case No. 2:23-cv-00794-WLH-AGR<br><br>**ORDER RE DEFENDANTS' MOTION TO DISMISS [65]** |

Defendants Honda Motor Co., Ltd. ("Honda") and American Honda Motor Co., Inc. ("American Honda") (collectively, "Defendants") move to dismiss Plaintiffs Brian Clark and Marilyn Gund's (collectively, "Plaintiffs") First Amended Complaint ("FAC"). (Mot. to Dismiss ("Mot."), Docket No. 65). For the reasons below, the Motion is **GRANTED** with leave to amend.

## I. BACKGROUND

This is a putative securities class action alleging one count for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b–5. Defendant Honda "is a multinational conglomerate manufacturer of automobiles, motorcycles and power equipment" that "conducts its U.S.-based operations through American Honda." (FAC, Docket No. 60 ¶ 2). Several of the vehicles Defendants manufacture include an "Idle Stop" feature. (*Id.* ¶ 3). When working properly, the Idle Stop feature "automatically shut[s] off a vehicle's engine to save fuel when the vehicle brakes to a stop for at least two seconds—for example, at a traffic light—and … automatically restart[s] the engine when the driver releases the vehicle's brake pedal." (*Id.* ¶ 4). A number of Honda vehicles spanning the 2015–2022 model years suffer from a defect in the Idle Stop system, causing affected vehicles not to restart after the brake pedal is released. (*Id.* ¶ 5). Because of the defect, Plaintiffs allege, "the vehicle will suddenly cease to operate altogether, creating … situations of grave danger for drivers suddenly unable to drive their vehicles after stopping at red lights, stop signs, pausing to make left hand turns in the middle of an intersection, or when on the entrance ramp to a highway." (*Id.*).

Plaintiffs allege that Defendants knew of the Idle Stop defect as early as 2015, when consumers began sending complaints regarding the Idle Stop defect to the National Highway Traffic Safety Administration ("NHTSA") and posting complaints online. (*Id.* ¶¶ 6, 96). That same year, American Honda began issuing technical service bulletins ("TSBs") to Honda dealerships "instructing them to perform certain

countermeasures to remediate issues with the Idle Stop feature." (*Id.* ¶ 75). According to Plaintiffs, "[a]n automaker issues a TSB when it becomes aware of common problems with a particular make and model …. In other words, by the time American Honda issued its first TSB, Defendants already had knowledge of pervasive issues with Idle Stop." (*Id.* ¶ 76). From 2015 until mid-2022, Defendants issued a slew of TSBs and other notices addressing the Idle Stop defect in a host of its vehicle models[1] but did not publicly disclose "the severity and prevalence" of the defect. (*Id.* ¶ 96).

The extent of the issue became better known to the public when, on June 3, 2022, the NHTSA's Office of Defects Investigations announced it had opened an investigation into the Idle Stop defect (the "Investigation") after receiving 221 complaints from Honda customers. (*Id.* ¶¶ 10, 96). That day, the value of Honda's American Depository Shares ("ADSs")—a security traded on the New York Stock Exchange—"fell $0.88 per share, or 3.41%, to close at $24.96." (*Id.* ¶¶ 10, 139). Soon after, on September 28, 2022, consumers filed a class action against American Honda (the "Consumer Class Action") "alleging that it had sold thousands of vehicles equipped with a flawed Idle Stop feature" and that American Honda had been well-aware of the defect. (*Id.* ¶ 131). Again, "Honda's ADS price fell $0.74 per share, or 3.23%, to close at $22.19 per ADS on September 29, 2022." (*Id.* ¶¶ 11–12).

---

[1] *See* FAC ¶ 77 (July 25, 2015, TSB concerning 2015 Acura TLX); ¶ 79 (January 12, 2016, TSB concerning 2016 Acura MDX); *id.* ¶ 80 (April 21, 2016, TSB concerning 2016 Honda Pilot); *id.* ¶¶ 81-82 (March 10 & 16, 2017, Notices for 2016–2017 Pilots & 2017 MDX); *id.* ¶ 83 (June 22, 2017, Notice for 2016–2017 MDXs); *id.* ¶ 137 (February 2018 Tech Line Summary Article for 2018 Honda Odyssey & 2016–2018 Pilots); *id.* ¶ 84 (May 10, 2018, Notice for 2018 Odysseys & Pilots); *id.* ¶ 85 (June 2019 Service News Article for "ALL Models with Auto Idle Stop"); *id.* ¶ 86 (July 5, 2019, TSB concerning 2018–2019 Odyssey Elites & Tourings); *id.* ¶¶ 87–88 (July 30, 2019, Notices for 2016–2017 Pilots & 2015–2017 TLXs); *id.* ¶ 89 (December 2, 2019, Notice for 2019-2020 Odysseys, Passports & Pilots); *id.* ¶ 91 (January 28, 2020, Notice for 2016 MDX & 2015–2017 TLXs); *id.* ¶ 92 (February 13, 2020, Notice for 2016 Pilot Tourings & Elites); *id.* ¶ 93 (March 11, 2022, TSB for 2022 Pilot and 2022 Honda Ridgeline); *id.* ¶ 93 (March 30, 2022, TSB concerning 2015–2020 TLXs); *id.* ¶ 102 (September 20, 2022, TSB concerning 2020–2021 Acura RDXs).

Plaintiffs Clark and Gund each acquired Honda ADSs between June 20, 2018, and the filing of the Consumer Class Action on September 28, 2022. (*Id.* ¶¶ 18–19). They seek to represent a class of individuals who purchased Honda ADSs during the same period. (*Id.* ¶ 150). Plaintiffs allege that Defendants caused Plaintiffs to incur significant losses when they "inflat[ed] the price of Honda ADSs … by publicly issuing false and misleading statements and/or omitting material information necessary to make Defendants' statements … not misleading." (*Id.* ¶ 146). Specifically, Plaintiffs allege that the following statements by Defendants were materially false and misled investors as to both the safety of Honda's vehicles and the functionality of the Idle Stop feature (*see id.* ¶ 108):

- Statement 1. "***We're focused on the safety of all road users. That's why we developed safety technology that not only helps protect occupants but takes into consideration pedestrians as well.***"[2] (*Id.* ¶ 109 (quoting American Honda's website at https://www.honda.com/safety)).

- Statement 2. "To strengthen customer trust by ***offering products founded in safety*** and achieve a new level of outstanding quality of products, Honda has ***created a system that continuously enhances and improves quality at every stage: design, development, production, sales and service***." (*Id.* ¶ 111 (quoting Honda's 2018 annual report Form 20-F, filed with the SEC on June 20, 2018)).

- Statement 3. "Pilot's Idle Stop system now provides quicker restarts and more seamless operation …. Pilot also has an upgraded Idle Stop system. Fully integrated with the new second-gear launch mode, it features new programming and a new brake pressure trigger for ***quicker restarts when accelerating immediately after engine stop, making the system less noticeable in heavy***

---

[2] As in the FAC, the Court bolds and italicizes "[t]he portions of the statements alleged to be false and misleading and/or giving rise to an alleged duty to disclose material facts in order for the statements to not be misleading." (FAC at 27 n.39).

4

*traffic and similar driving situations*. The air conditioning has been reconfigured as well to reduce engine restarts. Additionally, when in idle stop, the engine remains off after shifting to Park for a more intuitive driving experience." (*Id.* ¶ 113 (quoting August 21, 2018, press release regarding the 2019 Honda Pilot)).

- Statement 4. The Pilot "has achieved top ratings from NHTSA and IIHS[] and *is equipped with innovative safety and driver-assistive technology* including available Honda Sensing,® a suite of features that can assist and help you sense things you might miss while driving." (*Id.* ¶ 115 (quoting American Honda brochure marketing the 2018 Honda Pilot)).

- Statement 5. The Odyssey is the "*most sophisticated, technologically advanced minivan yet*," "*[a]t the forefront of safety*," and "designed to achieve top ratings from NHTSA and IIHS, and *features a full suite of available safety and driver-assistive technologies to help protect you and your passengers*." (*Id.* ¶ 116 (quoting American Honda brochure marketing the 2018 Honda Odyssey)).

- Statement 6. The Odyssey is "*[a]t the forefront of safety*" and "has achieved a top safety pick rating from IIHS.[] *Every model comes standard with advanced safety features to assist and help protect you and your most precious cargo*," and "offers Honda Sensing,® an available *suite of safety and driver-assistive technologies designed to assist and help protect you and your passengers*." (*Id.* ¶ 117 (quoting American Honda brochure marketing the 2019 Honda Odyssey)).

- Statement 7. The Idle Stop system "further enhances fuel efficiency" in the 2018 Pilot, 2018 Odyssey, and 2019 Odyssey. "When the vehicle brakes to a stop for at least two seconds—such as at a traffic light—the engine automatically shuts off to save fuel …. *When the driver releases the brake pedal, the engine starts back up by itself.*" (*Id.* ¶ 119 (quoting American Honda's Info Center website)).

- Statement 8. The **Idle-Stop System**: To help improve fuel efficiency, all Passports are equipped with Idle-Stop capability. When the system is enabled by

the driver and certain operating conditions are met, the Idle-Stop system will automatically shut off the engine when the vehicle comes to a stop. ***The engine is automatically restarted when the driver releases the brake pedal after a stop. The system has been engineered to operate smoothly and seamlessly***. Fully integrated with the second-gear launch mode, its programming and brake pressure trigger ***ensure quick restarts when accelerating immediately after engine stop, making the system less noticeable in heavy traffic and similar driving situations*** …. As with all Honda vehicles, the 2019 Passport is designed to provide a high level of safety performance, starting with ***predictable and stable driving dynamics that help drivers maintain control over their vehicle*** in a wide variety of driving environments and circumstances, including emergency avoidance maneuvers." (*Id.* ¶ 121 (quoting American Honda Press Kit for the 2019 Honda Passport, issued January 29, 2019)).

- Statement 9. "To strengthen customer trust by ***offering products founded in safety*** and achieve a new level of outstanding quality of products, Honda has ***created a system that continuously enhances and improves quality at every stage: design, development, production, sales and service including suppliers***." (*Id.* ¶ 123 (quoting Honda's 2019 annual report Form 20-F, filed with the SEC on June 19, 2019)).

- Statement 10. "***[A]ll 2020 Odyssey minivans now come standard with Idle Stop and Honda's 10-speed automatic, the company's newest and most advanced transmission***." (*Id.* ¶ 125 (quoting August 12, 2019, press release regarding the 2020 Honda Odyssey)).

- Statement 11. The 2020 Acura TLX "***delivers a full suite of advanced, active safety and driver-assistance technologies as standard equipment* …. *[T]here is no better amenity than safety***." (*Id.* ¶ 127 (quoting American Honda brochure marketing the 2020 Acura TLX)).

6

## II. DISCUSSION

Under Section 10(b) of the Securities Exchange Act of 1934, it is unlawful for a person to use "any manipulative or deceptive" practice "in connection with the purchase or sale of any security registered on a national securities exchange." 15 U.S.C. § 78j(b). Securities and Exchange Commission Rule 10b-5 implements Section 10(b) by forbidding any person from, *inter alia*, "mak[ing] any untrue statement of a material fact or … omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. Prevailing on a claim under Section 10(b) and Rule 10b-5 requires that a plaintiff prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

Generally, to survive a motion to dismiss, a plaintiff must meet the pleading requirements of Federal Rule of Civil Procedure 8(a), which requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must construe the complaint in the light most favorable to the plaintiff and take its non-conclusory allegations as true. *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022). The court is not required, however, to accept as true legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions…").

7

In addition to the usual Rule 8(a) requirements, a complaint alleging claims under Section 10(b) and Rule 10b-5 must meet the more exacting pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(1). Under Rule 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). "Thus, Rule 9(b) requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).

For its part, "[t]he PSLRA imposes 'formidable pleading requirements to properly state a claim and avoid dismissal' under Rule 12(b)(6)." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008)). Under the PSLRA, plaintiffs alleging falsity must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)). "Whether its allegations concern an omission or a misstatement, a plaintiff must allege materiality." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018). "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Id.* (quoting *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005)).

A. **Domestic Transaction**

As a threshold issue, and as Defendants point out, Plaintiffs have failed to allege that they acquired their Honda ADSs in a domestic transaction, as required to bring their claims under the purview of Section 10(b) and Rule 10b-5. (*See* Mot. at 5–6). Though it is undisputed that Honda's ADSs are traded on the New York Stock Exchange—a "national securities exchange" as required under Section 10(b)—Plaintiffs fail to allege that that is where they purchased the ADSs. (*See* Opp'n to Mot., Docket No. 69 at 6–7). Honda's ADSs are likely also available in foreign markets, while "the focus of [Section 10(b)] is … upon purchases and sales of securities in the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010). Nothing in the FAC, however, explains where Plaintiffs "acquired" the ADSs. (*See* FAC ¶¶ 18–19). And while *Morrison* did not squarely address the issue, a number of lower courts "have rejected the argument that a transaction qualifies as a 'domestic transaction' under *Morrison* whenever the purchaser or seller resides in the United States, even if the transaction itself takes place entirely over a foreign exchange." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 532 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (citing *Cornwell v. Credit Suisse Group*, 729 F.Supp.2d 620, 627 (S.D.N.Y.2010); *Harry Stackhouse v. Toyota Motor Co., et al.*, No. 2:10-cv-0922-DSF, 2010 WL 3377409, at *1 (C.D.Cal. July 16, 2010); *In re Royal Bank of Scotland Grp. PLC Sec. Litig.*, 765 F. Supp. 2d 327, 339 (S.D.N.Y. 2011)). Thus, Plaintiffs must allege a domestic transaction, should they choose to amend a second time.

B. **Statements 1, 2, and 9**

"In the Ninth Circuit, vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019)

9

(quotations omitted). "'Puffing' concerns expressions of opinion, as opposed to knowingly false statements of fact," while "[s]tatements that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Id.* (quotations omitted). "Puffery" includes "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" upon which "investors do not rely." *In re Cutera Securities Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

Statements 1, 2, and 9 are general claims regarding Defendants' commitment to safety[3] that constitute mere puffery. For example, the statements that Honda is "offering products founded in safety" and "has created a system that continuously enhances and improves quality at every stage" (FAC ¶¶ 111, 123) are vague, optimistic, and lacking in any objectively verifiable detail on which investors would plausibly rely. *Cf. Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1070–71 (N.D. Cal. 2014) (finding statement that product had "largely been de-risked" was "a non-actionable vague expression of corporate optimism and puffery upon which no reasonable investor would rely"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (holding that the statements "[a] key principle of the [c]ompany is maintaining the highest levels of trust with borrowers, investors, regulators, stockholders and employees" and "by supporting bank's demanding diligence and regulatory requirements, we become a better company" were not actionable where defendant company allegedly engaged in unfair lending practices); *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (defendant's statements describing "high priority" placed on product development were non-actionable puffery). Moreover, "it is not necessarily inconsistent to assert that quality is stable or even increasing on the whole, while being aware of a potentially significant defect. There are many aspects of quality, and those could have been improving even though occasional defects—even substantial defects—

---

[3] Because the Court agrees with Defendants' categorization of the statements at issue (*see* Mot., Ex. B, Docket No. 65-5) it adopts those categories here.

10

were discovered." *In re Toyota Motor Corp. Sec. Litig.*, No. 2:10-cv-922 DSF (AJWX), 2011 WL 2675395, at *2 (C.D. Cal. July 7, 2011). Plaintiffs' claim therefore fails as to these statements.

### C. Statements 4, 5, 6, & 11

These statements, which concern particular vehicles, fall into two subcategories. The first subcategory consists of general statements regarding the vehicles' safety and technological advancement, *e.g.*, that the advertised vehicle is "at the forefront of safety" and is the "most sophisticated, technologically advanced minivan yet." (FAC ¶ 116). These statements are not actionable for the same reasons as the statements discussed above—they constitute non-verifiable puffery.

The second subcategory includes more particularized statements regarding the vehicle's available features, *e.g.*, that the vehicle "features a full suite of available safety and driver-assistive technologies to help protect you and your passengers." (*Id.*). These statements are objectively verifiable and thus do not constitute mere puffery.

Plaintiffs have not adequately alleged, however, that the statements in this second subcategory are misleading. "[A] statement might be misleading because it affirmatively misstates information" or "because it is made outside the context of other material information." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1054. Plaintiffs allege the latter scenario here. "Yet neither Section 10(b) nor Rule 10b–5 'create[s] an affirmative duty to disclose any and all material information.'" *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Rather, "[d]isclosure is required under these provisions only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (cleaned up). To be misleading, an omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Here, Plaintiffs do not allege that the touted safety features on Honda's advertised vehicles do not actually exist. Instead, they allege that Defendants' description of certain safety features misled the market into believing that the vehicles were safe. (*See* FAC ¶ 118). It is not plausible, however, that statements that certain models were equipped with safety features affirmatively created an impression that every one of those vehicles would be free of defects. *See In re Rigel Pharms.*, 697 F.3d at 880 (finding a press release that did not disclose certain side effects of a drug was not misleading, where the press release "clearly identified its table of results for certain side effects as '*key* safety results,' not 'all safety results' or even just 'safety results'"). Plaintiffs' claim therefore fails as to Statements 4, 5, 6, and 11.

### D. **Statements 3, 7, 8, & 10**

These statements describe the Idle Stop feature specifically, *e.g.*, by explaining that with the feature, "[t]he engine is automatically restarted when the driver releases the brake pedal after a stop." (FAC ¶ 121). Plaintiffs assert that such statements are misleading because, using the same example, "the engine would not necessarily 'automatically restart'" due to the Idle Stop defect. (*Id.* ¶ 122).

Plaintiffs' allegations fail here for the same reason their allegations regarding general safety features fail. Plaintiffs do not allege that the vehicles were not in fact equipped with Idle Stop or that Idle Stop, when working properly, did not function in the described manner. Again, their argument is that the description of Idle Stop affirmatively created an impression that the Idle Stop feature would be free of defects in every vehicle with the feature. That is not a plausible allegation. *See*, *e.g.*, *Lopes v. Fitbit, Inc.*, No. 2:18-cv-06665-JST, 2020 WL 1465932, at *6 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021) (finding that statements touting features that were "plagued with bugs" were not misleading); *In re Siebel Sys., Inc. Sec. Litig.*, No. 2:04-cv-0983 CRB, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005) ("That a new program has kinks does not make a positive statement about the program false. If

that were the case, the federal securities laws would prevent software companies from making any positive statements about new software."). Because Plaintiffs have not adequately alleged that these remaining statements describing the Idle Stop feature were misleading, the claim is **DISMISSED**.

### III. CONCLUSION

As discussed above, Plaintiffs have failed to allege a domestic transaction and have failed to allege "a material misrepresentation or omission" by Defendants sufficient to support a Section 10(b) claim. The Court therefore need not address the other five elements of such a claim, *see* II, *supra*, and the Motion to Dismiss is **GRANTED** with leave to amend. Plaintiffs have 45 days from the date of this Order to amend. Defendants' Request for Judicial Notice (Docket No. 65-2) is **DENIED** as moot.

**IT IS SO ORDERED.**

Dated: January 19, 2024

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE