**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Devyn R. Glass (*pro hac vice*)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com
Email: dglass@zlk.com

*Lead Counsel for Plaintiffs and the Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| RHONDA BAYLOR, Individually and On Behalf of All Others Similarly Situated, <br><br> *Plaintiff,* <br><br> v. <br><br> HONDA MOTOR CO., LTD. and AMERICAN HONDA MOTOR COMPANY, INC., <br><br> *Defendants.* | Case No. 2:23-cv-00794-WLH-AGR <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

LEGAL STANDARD..................................................................................................... 2

ARGUMENT .................................................................................................................. 2

I.   The Exchange Act Applies to Plaintiffs' Transactions......................................... 2

II.  The SAC Adequately Pleads Falsity..................................................................... 4

III. Statements "Aimed at Consumers" are Actionable. ........................................... 12

IV. Honda "Made" AHM-Attributed Statements....................................................... 15

V.  The SAC Adequately Pleads Scienter.................................................................. 16

VI. The SAC Adequately Pleads Loss Causation. ..................................................... 20

CONCLUSION............................................................................................................. 23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ...............................................................................................12

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................................................................................6

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012)...................................................................19

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
56 F.Supp.3d 549 (S.D.N.Y. 2014)..........................................................................16

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) .........................................................................................7

*Cornwell v. Credit Suisse Grp.*,
729 F.Supp.2d 620 (S.D.N.Y. 2010) .........................................................................3

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017)..................................................................................21

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017) ............................................................14

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
023 WL 5496507 (9th Cir. Aug. 25, 2023)..............................................................18

*Elbit Sys. Ltd. v. Credit Suisse Grp.*,
917 F.Supp.2d 217 (S.D.N.Y. 2013) ........................................................................16

*Fleming v. Charles Schwab Corp.*,
878 F.3d 1146 (9th Cir. 2017).................................................................................12

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ..................................................................................19

*Harry Stackhouse v. Toyota Motor Co., et al.*,
2010 WL 3377409 (C.D. Cal. July 16, 2010) ...........................................................3

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In Klein v. Altria Grp., Inc.*,
525 F.Supp.3d 638 (E.D. Va. 2021) ........................................................................14

*In re Amgen Inc.*, *Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...................................................................21

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) .................................................. 12, 15

*In re Banc of California Sec. Litig.*,
2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) ...........................................................22

*In re BofI Holding, Inc., Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .................................................................... 20, 22

*In re Carter-Wallace, Inc. Sec. Litig.*,
150 F.3d 153 (2d Cir. 1998) .....................................................................................15

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) ...................................................................................19

*In re Equifax Inc. Sec. Litig.*,
357 F.Supp.3d 1189 (N.D. Ga. 2019) .......................................................................8

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*,
402 F.Supp.3d 767 (N.D. Cal. 2019)........................................................................17

*In re Facebook, Inc. Sec. Litig.*,
405 F.Supp.3d 809 (N.D. Cal. 2019)............................................................... 14, 15

*In re Fin. Corp. of Am. S'holder Litig.*,
796 F.2d 1126 (9th Cir. 1986).................................................................................14

*In re Genius Brands Int'l, Inc.*,
2024 WL 1473942 (9th Cir. Apr. 5, 2024)........................................... 4, 6, 20, 22

*In re Lifelock, Inc. Sec. Litig.*,
690 F. App'x 947 (9th Circ. 2017) ...........................................................................15

*In re Nat'l Golf Props., Inc.*,
2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ........................................................8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Nature's Sunshine Prods. Sec. Litig.*,
    486 F. Supp. 2d 1301 (D. Utah 2007) ........................................................18

*In re New Century,*
    588 F.Supp.2d 1206 (C.D. Cal. 2008)........................................................20

*In re Pfizer Inc. Sec. Litig.*,
    819 F.3d 642 (2nd Cir. 2016) ....................................................................16

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ....................................................................17

*In re QuantumScape Sec. Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2022)........................................................14

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ........................................................................7

*In re Rocket Fuel Sec. Litig.*,
    2015 WL 9311921 (N.D. Cal. 2015)............................................................13

*In re Royal Bank of Scotland Grp. PLC Sec. Litig.*,
    765 F.Supp.2d 327 (S.D.N.Y. 2011) ............................................................3

*In re Shanda Games Ltd. Sec. Litig.*,
    2022 WL 992794 (S.D.N.Y. Mar. 31, 2022) ................................................3

*In re Siebel Sys., Inc. Sec. Litig.*,
    2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ..............................................6

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
    2020 WL 571724 (D. Md. Feb. 4, 2020)......................................................15

*In re Toyota Motor Corp. Sec. Litig.*,
    2012 WL 3764903 (C.D. Cal. Feb. 21, 2012)..............................................19

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F.Supp.2d 964 (N.D. Cal. 2009)...........................................................22

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022)..................................................2

iv

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F.Supp.2d 512 (S.D.N.Y. 2011), *aff'd sub nom.* 838 F.3d 223 (2d Cir. 2016)
   ........................................................................................................................3

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prod. Liab. Litig.*,
   2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .............................................................13

*In re Volkswagen AG Sec. Litig.*,
   661 F.Supp.3d 494 (E.D. Va. 2023)......................................................................14

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
   694 F.Supp.2d 1192 (W.D. Wash. 2009)...............................................................20

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) .............................................................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ........................................................................ 2, 4, 6

*Lapiner v. Camtek, Ltd.*,
   2011 WL 445849 (N.D. Cal. Feb. 2, 2011)...........................................................3

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2nd Cir. 2011) ...............................................................................8

*Longo v. OSI Sys., Inc.*,
   2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ......................................................8

*Loos v. Immersion Corp.*,
   762 F. 3d 880 (9th Cir. 2014).............................................................................21

*Lopes v. Fitbit, Inc.*, 2020 WL 1465932 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F.
   App'x 278 (9th Cir. 2021) ....................................................................................6

*McGann v. Ernst & Young*,
   102 F.3d 390 (9th Cir. 1996) ..............................................................................12

*McGuire v. Dendreon Corp.*,
   2008 WL 1791381 (W.D. Wash. Apr. 18, 2008)...................................................11

*Metzler Inv. GmbH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008)............................................................................22

v

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ........................................................................1, 2

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
  890 F.3d 60 (2d Cir. 2018) ..................................................................3

*N.M. State Inv. Council v. Ernst & Young LLP*,
  641 F.3d 1089 (9th Cir. 2011) ...........................................................17

*Nathanson v. Polycom, Inc.*,
  87 F.Supp.3d 966 (N.D. Cal. 2015) ...................................................22

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ................................................. 8, 11, 20

*Nursing Home v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ................................................. 16, 18

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019)..........................................................6

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) .............................................................22

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) .............................................................17

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016) ....................................... 21, 22

*Rudolph v. UTStarcom*,
  2008 WL 4002855 (N.D. Cal. Aug. 31, 2008)....................................20

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ...............................................................4

*SEC v. Gruder*,
  2010 WL 11500092 (N.D. Ga. Feb. 11, 2010)....................................13

*SEC v. Mack*,
  2012 WL 13005963 (C.D. Cal. Aug. 7, 2012) ....................................13

vi

*SEC v. Pirate Investor LLC*,
   580 F.3d 233 (4th Cir. 2009) ...........................................................................12

*SEC v. Rana Res. Inc.*,
   8 F.3d 1358 (9th Cir. 1993) ..............................................................................12

*SEC v. StratoComm Corp.*,
   2 F.Supp.3d 240 (N.D.N.Y. 2014) ....................................................................12

*SEC v. Tex. Gulf Sulphur Co.*,
   401 F.2d 833 (2d Cir. 1968) .............................................................................12

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) .............................................................................12

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
   2023 WL 3569981 (N.D. Cal. May 19, 2023) ....................................................4

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ...................................4

*Stoyas v. Toshiba Corp*,
   896 F.3d 933 (9th Cir. 2018) ................................................................... 3, 4, 12

*Stoyas v. Toshiba Corp.*,
   2022 WL 220920 (C.D. Cal. Jan. 25, 2022)................................................. 4, 13

*Westley v. Oclaro, Inc.*,
   897 F.Supp.2d 902 (N.D. Cal. Sept. 21, 2012) ...................................................8

*Yanek v. Staar Surgical, Co.*,
   388 F.Supp.2d 1110 (C.D. Cal. 2005)...............................................................11

*Zhou v. Faraday Future Intell. Elec. Inc.*,
   2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) .......................................... 18, 19

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## <u>PRELIMINARY STATEMENT</u>

This case arises from Defendants' material misstatements regarding Honda's Idle Stop feature, which concealed a perpetually flawed system causing sudden and unexpected failure (the "Defect").[1] The SAC contains new allegations that address concerns raised by the Court in its January 19, 2024 opinion, dismissing the prior complaint and granting leave to amend (ECF No. 80) ("Opinion").

*First*, Plaintiffs were asked to "simply state" that they purchased Honda ADSs on the NYSE. *See* MTD Hearing Tr. at 6-7; Opinion at 9. The SAC now explicitly states, Plaintiffs "acquired Honda ADSs in a domestic transaction on the [NYSE] at artificially inflated prices during the Class Period and w[ere] damaged upon the revelation of the alleged corrective disclosures or materializations of concealed risks." ¶¶19-20. Accordingly, Plaintiffs sufficiently plead a "domestic" transaction under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010).

*Second*, the Court asked for additional allegations regarding the "materiality" of the Defect to support finding, Defendants' unqualified, affirmative statements regarding the functionality and reliability of Honda's Idle Stop feature misled investors. *See* MTD Hearing Tr. at 11; Opinion at 12. The SAC now makes clear that the Defect impacted *every* Honda model sold in the U.S. between 2015 and 2023 equipped with Idle Stop, a 3.5L engine, and 9-speed+ automatic transmission, *i.e.*, ***hundreds of thousands*** of vehicles. Moreover, internal documents and a former employee's first-hand accounts support finding Defendants knew about the Defect before and during the Class Period but deliberately concealed it, and the resulting risks of regulatory and legal exposure, from the public.

---

[1] Unless otherwise noted, capitalized terms have the same meaning as in Plaintiffs' Second Amended Complaint (ECF No. 83) ("SAC"); all emphasis in quotations is added; and all internal citations are omitted. "¶_" refers to the SAC. References to "Mot." or "Motion" are to Defendants' Motion to Dismiss (ECF No. 86).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

With these new allegations, which directly respond to and remediate the Court's stated concerns, the SAC adequately states a claim under Section 10(b) of the Exchange Act. Defendants' motion boils down to premature factual disputes, mischaracterizations of Plaintiffs' allegations, and inappropriate inferences in their favor. Accordingly, Defendants' motion should be denied.

## LEGAL STANDARD

To state a claim under Section 10(b) and Rule 10b-5, plaintiffs must allege: (1) a material misrepresentation or omission (*i.e.*, falsity); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; that is, plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.*

## ARGUMENT

**I.      The Exchange Act Applies to Plaintiffs' Transactions.**

The SAC explicitly confirms both Plaintiffs purchased Honda ADSs on the NYSE. ¶¶19-20. Under *Morrison*, Plaintiffs' transactions are "domestic" and the Exchange Act applies. *Morrison*, 561 U.S. at 265-67; *e.g.*, *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *17 (E.D.N.Y. Jan. 11, 2022) (finding plaintiffs' "transactions on the NYSE—are by definition are domestic").

Defendants misconstrue *Morrison*'s holding. Mot. at 5-6. "*Morrison* clearly provided that the 'domestic transaction' prong is an independent [] basis for application of the [Exchange Act] to purportedly foreign conduct… summariz[ing] the standard in the ***disjunctive***: 'whether the purchase or sale is made in the [U.S.],

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*or* involves a security listed on a domestic exchange.'" *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67 (2d Cir. 2018). It is undisputed that Honda ADSs are "securities" registered and traded exclusively on the NYSE, a "domestic exchange." Mot. at 1; ¶¶21, 31, 139. Indeed, Defendants concede that Plaintiffs acquired Honda ADSs on the NYSE and **not** common stock on some foreign exchange. Mot. at 2; ¶¶1, 19-20. Accordingly, *Morrison*'s first prong is satisfied, requiring no further analysis. *See Lapiner v. Camtek, Ltd.*, 2011 WL 445849, at *2 (N.D. Cal. Feb. 2, 2011) (finding allegations that foreign entity's securities traded on NASDAQ and plaintiff purchased stock thereon, "sufficient at the pleading stage to establish the applicability of the Exchange Act" under *Morrison*'s first prong and defendants' challenge of "the truth of plaintiff's [purchase history] allegations" "unavailing" because it is "required to accept as true all well-pleaded factual allegations"); *In re Shanda Games Ltd. Sec. Litig.*, 2022 WL 992794, at *3 (S.D.N.Y. Mar. 31, 2022) (same).[2]

Defendants' reliance on *Stoyas v. Toshiba Corp*, 896 F.3d 933 (9th Cir. 2018) ("*Toshiba I*"), is misplaced. *Toshiba I* applied *Morrison*'s **second** prong to determine if plaintiffs' "over-the-counter" transactions qualified as "domestic." Notably, *Toshiba I* distinguished "over-the-counter" markets from national exchanges like the

---

[2] *See also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.Supp.2d 512, 529-34 (S.D.N.Y. 2011), *aff'd sub nom.* 838 F.3d 223 (2d Cir. 2016) (§10(b) applicable to investors "who purchased or otherwise acquired Vivendi ADRs" because those securities "fall within any reading of *Morrison*"); *Cornwell v. Credit Suisse Grp.*, 729 F.Supp.2d 620, 627 (S.D.N.Y. 2010) (same); *Harry Stackhouse v. Toyota Motor Co., et al.*, 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010) (appointing plaintiff with largest loss on Toyota ADSs on NYSE over common stock on foreign exchanges); *cf. In re Royal Bank of Scotland Grp. PLC Sec. Litig.*, 765 F.Supp.2d 327, 338-39 (S.D.N.Y. 2011) ("Defendants admit that under *Morrison*, trades on the NYSE fall within the territorial ambit of the Exchange Act" but plaintiffs do not "claim to have ever purchased ADRs representing ordinary shares on the NYSE, and as such… do not have standing to bring domestic ADR claims").

3

NYSE, finding "the over-the-counter market on which Toshiba ADRs trade [was] simply not an 'exchange' under the Exchange Act." *Id.* at 945-47; *see also Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2023 WL 3569981, at *3 (N.D. Cal. May 19, 2023) ("Given *Morrison*'s firm command that a security not listed on a national exchange must be purchased or sold in the [U.S.], the Ninth Circuit in [*Toshiba I*] adopted the 'irrevocable liability test' to determine where a transaction occurred for the purposes of the Exchange Act.").[3]

## II.     The SAC Adequately Pleads Falsity.

A statement is false or misleading if it "directly contradict[s] what the defendant knew at that time" or "omits material information." *Khoja*, 899 F.3d at 1008-09. Even without an affirmative duty to disclose, disclosure is required if information omitted is "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *In re Genius Brands Int'l, Inc.*, 2024 WL 1473942, at *6 (9th Cir. Apr. 5, 2024). Materiality is only appropriately resolved "as a matter of law" where "the omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011).

*First*, the SAC adequately pleads falsity because it identifies "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *Schueneman v. Arena Pharm., Inc.,* 840 F.3d 698, 705 (9th Cir. 2016). Specifically, throughout the Class Period, Defendants spoke in unqualified,

---

[3] Defendants' reliance on *Stoyas v. Toshiba Corp.*, 2022 WL 220920 (C.D. Cal. Jan. 25, 2022) ("*Toshiba III*"), is misplaced for the same reason; the *Toshiba* cases did **not** involve transactions a national exchange. Further, *Toshiba III* is a procedurally later decision, *i.e.*, class certification, meaning plaintiffs' allegations sufficed under *Morrison* at motion to dismiss. *See Stoyas v. Toshiba Corp.*, 424 F.Supp.3d 821, 826-27 (C.D. Cal. 2020) ("*Toshiba II*").

4

affirmative terms about Honda's Idle Stop feature across multiple models/years, including:

- "Pilot's Idle Stop system now provides quicker restarts and more seamless operation" ¶120;

- "The engine is automatically restarted when the driver releases the brake pedal after a stop" ¶122;

- "[W]hen the driver releases the brake pedal, the engine starts back up by itself" ¶118;

- "[E]nsure quick restarts when accelerating immediately after engine stop, making the system less noticeable in heavy traffic and similar driving situations" ¶¶120, 122;

- "[D]esigned to provide…predictable and stable driving dynamics that help drivers maintain control over their vehicle" ¶122; and

- Vehicles that "come standard with Idle Stop" have "the company's newest and most advanced transmission" ¶¶124, 126.

When making these unequivocal statements regarding the functionality and reliability of Honda's Idle Stop, however, Defendants failed to disclose that: (1) every Honda model between 2015 and 2023 equipped with a 3.5L engine and 9-speed+ automatic transmission came standard with a *faulty* Idle Stop feature impacting the vehicle's internal control system, and therefore, did *not* "provide…predictable and stable driving dynamics that help drivers maintain control over their vehicle" (¶¶41-42, 82-113, 129-30); (2) the Defect remained pervasive and unresolved throughout the Class Period so the marketed vehicles did *not* have the "most advanced transmission" (¶¶82-99, 112-13, 137); (3) hundreds, if not thousands, of Defect-related complaints, dating back to 2015, reported instances where Idle Stop: (a) did *not* provide "quicker restarts" or "seamless operation;" (b) did *not* "automatically" restart the engine "after a stop;" (c) did *not* cause "the engine

5

[to] start[] back up by itself;" and (d) did ***not*** "mak[e] the system less noticeable in heavy traffic and similar driving situations" (¶¶82-97, 101-16); and (4) as a result, Defendants faced an increased risk of regulatory action, litigation, and/or reputational harm (¶¶32, 46-63, 129-31, 134-36).

"Had [D]efendants released no [Idle Stop statements], their failure to mention the [Defect and related risks] might not have misled anyone. But once defendants chose to tout the company's [Idle Stop], they were bound to do so in a manner that wouldn't mislead investors as to [its safety, functionality, and reliability]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (finding "backlog" statements omitting "stop-work orders" misleading); *see also Genius Brands*, 2024 WL 1473942, at *6 (affirmative representations about solicitation practices triggered duty to disclose relationship with stock promoter); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) ("'real-time' nature" misleading where alerts were "sent more than one week late"); *Khoja*, 899 F.3d at 1010 ("positive 25 percent interim result" misleading because omitted results were "unreliable"); *Schueneman*, 840 F.3d at 05-06 (disclosure of negative "Rat Study" information required once defendants said "animal studies supported [drug's] safety").

Defendants' authorities are inapposite. Mot. at 8. Unlike *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *6 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021) and *In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *3-*4 (N.D. Cal. Dec. 28, 2005), Idle Stop was not a "new program with kinks." Honda introduced Idle Stop nearly a decade ago; the persistent and pervasive Defect impacted the drivability of hundreds of thousands of vehicles, exposing consumers to danger and investors to untold regulatory and legal risks. ¶¶41-42, 82-112, 129-30. Moreover, unlike *Siebel*, Defendants' statements were not statements of optimism but rather concrete statements of verifiable function. *See* ¶¶117-28. In *In*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 (9th Cir. 2012), defendants had no duty to call out secondary or tertiary side effects because the press releases at issue made clear they were listing only "'*key* safety results,' not 'all safety results' or even just 'safety results'" and "made clear what the criteria were for including patients in the category." Here, however, Defendants affirmatively and unequivocally touted the reliability and functionality of Idle Stop when detailing the "Engine Architecture and Features" of Honda's vehicles without providing any exception or warnings to the contrary. *See* ¶¶120, 122, 124, 126.

*Second*, Defendants' statements were "material" because "there is a substantial likelihood that a reasonable investor would have acted differently … had [the alleged statements] not been made or the [Defect and related risks] disclosed." *Khoja*, 899 F.3d at 1009. Honda's success is directly linked to regulatory compliance and consumer trust. The heavily regulated U.S. market serves as Honda's primary sales market. ¶¶29-31, 36, 46-63. Consumers purchase new vehicles with the expectation that they are safe and will reliably perform as marketed. ¶32. Indeed, in each Form 20-F Honda filed after implementing the Idle Stop feature in 2015 (responding to new regulations prioritizing efficiency and emissions-control, along with all other major manufacturers), Defendants made clear that "customer trust" was dependent on Honda's ability to offer products "founded in safety" and with "outstanding quality." ¶¶32-41. As such, when deciding which automotive company to invest in, a reasonable investor would consider the quality of the company's products, including whether hundreds of thousands of U.S.-sold Honda vehicles functioned as marketed or were susceptible to defect, affecting their safety, reliability, and functionality and, in turn, increasing the company's risk of regulatory and legal exposure, significant to their investment decision. *See* ¶¶138-39; *see, e.g., Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 8 (1st Cir. 2021) (noting "importan[ce] [of the] product" relevant to materiality); *Litwin v.*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) (same); *In re Equifax Inc. Sec. Litig.*, 357 F.Supp.3d 1189, 1224 (N.D. Ga. 2019) (same); *see also Matrixx*, 585 F.3d at 1178-79 (vacating dismissal based on finding that "the number of complaints of which the defendants were aware was not statistically significant" emphasizing that "[i]n relying on th[is] standard to determine materiality, the district court made a decision that should have been left to the trier of fact.").

Materiality is further substantiated by the fact that Honda's ADS price declined following news of the Defect and related risks. ¶¶129-31; *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 949 (9th Cir. 2003) (finding stock drop following disclosure "support[ed] a finding of materiality"); *accord Longo v. OSI Sys., Inc.,* 2021 WL 1232678, at *7 (C.D. Cal. Mar. 31, 2021); *Westley v. Oclaro, Inc.,* 897 F.Supp.2d 902, 914 (N.D. Cal. Sept. 21, 2012); *In re Nat'l Golf Props., Inc.*, 2003 WL 23018761, at *5 (C.D. Cal. Mar. 19, 2003) ("[i]t cannot be said, at least at the pleading stage, that these disparities would not be material to a reasonable investor" in light of "one-day decline in value" following disclosure).

Defendants raise a series of misguided arguments aimed at undermining the "materiality" of alleged misstatements. Mot. at 8-14.[4] *First*, Defendants improperly conflate "symptoms" of the defect with the Defect itself. Mot. at 8-10. As Defendants admitted, "during development, the idle stop enable criteria was mis-set" causing the feature to malfunction (*i.e.*, the Defect), creating unpredictable driving conditions, and in some instances, leaving vehicles inoperable (*i.e.*, the symptoms). ¶¶84-85, 98, 112-13. While the underlying Defect is the same, the "symptoms" reported varied based on certain conditions—mainly, the vehicle's

---

[4] Defendants' attack on CW1's credibility is misplaced. Mot. at 12. Plaintiffs do not rely on CW1 to corroborate other well-pled allegations of "the scope or extent of the alleged defect" (*id.*); rather, as detailed below, CW1's allegations support finding that Defendants acted with scienter (*see* §V).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

battery health, as AHM identified as early as March 2017. *See* ¶¶86-89, 91, 94-98, 112. For example, complaints dating back to July 2015, reported Defect-related "symptoms" such as: (i) sudden and unexpected failure to restart following a stop, *i.e.*, at a traffic light or intersection; (ii) "stalled in the middle of an intersection" when traveling at low speeds; (iii) "vehicle hesitates, surges, idles high, shifts hard, or auto idle stop does not work;" (iv) "hesitation from a stop;" (v) "poor acceleration or bogging noise at slow engine speeds;" and (vi) "auto idle stop inoperable." ¶¶10-12, 82-97, 105-07, 130. In some instances, restart was only possible by "placing the gear into the Park position and pressing the Start button" or by "a jump start." ¶¶45, 92-93, 105. Others required "multiple attempts to restart [] after stalling,…tak[ing] up to fifteen minutes." ¶130. As such, the Defect "symptoms" put Honda customers at unnecessary risk of accident, injury, or death, which in turn created heightened regulatory and legal risk for Honda. ¶¶32, 46-63. While the number of Field Reports Honda received is marked "confidential" and NHTSA's independent findings are still "to be determined," it is undisputed that the Defect impacted hundreds of thousands of vehicles. ¶¶106-08; 117.

*Second*, Defendants incorrectly claim Plaintiffs do not allege the "Idle Stop issue had already manifested in" certain models of concern—*i.e.*, the 2019 Pilot (¶120), 2019 Passport (¶122), and 2020 Odyssey (¶124)—when the statements were made. Mot. at 10. The SAC alleges that, despite years of internal investigations and countless complaints, Defendants never notified the public of the Defect, nor did they undertake any successful action to universally resolve it. ¶¶84-99. The "Idle Stop issue" began "during development" in every Honda (and Acura) model between 2015 and 2023 equipped with a 3.5L engine and 9-speed+ automatic transmission. ¶¶98, 112. Subsequent Defect-related customer complaints, noted in Manufacturer Communications ("MCs"), and Defendants' warranty extensions

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

concerning those models further confirm the Defect existed when the alleged statements were made. ¶¶94-95, 97, 112-13.

*Third*, Defendants misconstrue Plaintiffs' allegations when arguing the Defect existed in only "221 complaints" and "194,731 (estimated)" Honda Pilots. Mot. at 11-14. Before the Class Period began, AHM had already issued at least eight Defect-related MCs for numerous models/years, including *inter alia*, 2015 TLXs, 2016-17 MDXs, 2018 Odysseys, and 2016-18 Pilots. ¶¶82-89, 137. At least three Pre-Class Period MCs provided Honda/Acura technicians with purported (but futile) corrective action for 2015 TLXs, VIN range "*ALL*", 2016 Pilots in a VIN range of ~74,000, and 2016 MDXs in a VIN range of ~210,000. ¶¶82-85. During the Class Period, AHM issued at least a dozen Defect-related MCs. ¶¶90-98. Notably, a June 2019 Defect-related MC (replacing its July 2018 version) listed Honda's "affected vehicles" as "*ALL* Models with Auto Idle Stop." ¶90. In July 2019, AHM again internally issued purported (but again futile) corrective action for 2018-19 Odyssey Elites and Tourings, VIN range "*ALL*". ¶91. Honda's March 2022 Defect-related warranty extensions covered *all* vehicles encompassed in trim models: 2015-20 TLX "TECH" and "ADV"; 2018-20 TLX "BASE" and "TECH A-Spec"; 2020 TLX "PMC EDITION"; 2022 Pilot "TrailSport"; and 2022 Ridgeline "*ALL*." ¶98. The list of impacted models/years only grew following the NHTSA Investigation, Consumer Action, and Defendants' post-Class Period MCs and warranty extensions. ¶¶104-13, 129-30. Defendants thoroughly investigated the Defect and attempted multiple failed fixes throughout the Class Period (as the MCs indicate). The extent those efforts and the perpetual nature of the Defect demonstrate the size, scope and pervasiveness of the Defect and the significance of its impact, *i.e.* materiality.

*Fourth*, Defendants' argument that NHTSA did not receive a Honda Pilot complaint until October 2019 is a red herring. Mot. at 10. AHM issued the first of four Defect-related MCs concerning the Pilot in April *2016* and received the first

10

"customer complaint" in March **2017**, at the latest; both of which **predated** the NHTSA complaints by years. ¶¶85-86, 89, 92. Moreover, the volume of Pilot complaints reported to NHTSA is a small part of the story; NHTSA complaints routinely represent only a fraction of total complaints made—does not account for complaints made direct to manufacturer, mechanics and dealerships, warranty claims, etc. ¶101-02; *see* Mot. at 11-12. Further, car manufacturers have issued Idle Stop-related recalls on far fewer reports/complaints. ¶¶114-15. Thus, the universe of impacted vehicles is much greater than 221 NHTSA complaints, which again only concerned one of six models and three out of eight years known to be impacted.

*Lastly*, contrary to Defendants' assertion (Mot. at 11), the SAC alleges that NHTSA's investigation **is still ongoing** (¶116). Regardless, Defendants' liability does not hinge on whether that investigation ultimately results in disciplinary action, particularly given their admissions and undisputed population size of impacted vehicles. *Am. W. Holding*, 320 F.3d at 935 (finding misstatements "material" because information regarding "unsafe maintenance practices and *possible* sanction" following regulatory investigation was "significant"). Further, pursuant to NHTSA Guidance, ODI utilizes a multi-stage risk-based process to identify and investigate safety defects. ¶63. As seen here, ODI reaches stage three—formal investigation, beginning with a "Preliminary Evaluation"—if it concludes sufficient evidence of a safety-related defect exists. *See* ¶¶63, 104-08. "Although the observations in the [ODI Resume] are not final agency determinations … the disclosure of 'significant objectionable conditions' [identified therein] would significantly alter the total mix of information available to the reasonable investor." *McGuire v. Dendreon Corp.*, 2008 WL 1791381, at *4 (W.D. Wash. Apr. 18, 2008); *e.g.*, *Yanek v. Staar Surgical, Co.*, 388 F.Supp.2d 1110, 1129 (C.D. Cal. 2005) (finding "[t]he facts related to the issuance of [preliminary regulatory report] and the problems described therein" material).

### III.    Statements "Aimed at Consumers" are Actionable.

Defendants' claim that Section 10(b) does not reach material misstatements "aimed at consumers" is wrong. Mot. at 14-15. "The Supreme Court has consistently embraced an expansive reading of §10(b)'s 'in connection with' requirement." *SEC v. Pirate Investor LLC*, 580 F.3d 233, 244 (4th Cir. 2009); *see, e.g., Fleming v. Charles Schwab Corp.*, 878 F.3d 1146, 1155 (9th Cir. 2017) (finding "in connection with" a "slim hurdle" to overcome). *Toshiba I* affirmed "'in connection with' should be construed not technically and restrictively, but flexibly." 896 F.3d at 951; *see also SEC v. Rana Res. Inc.*, 8 F.3d 1358, 1361-62 (9th Cir. 1993) (liability exists where fraud alleged "somehow touches upon or has some nexus with any securities transaction"). Under this expansive reading, "it is irrelevant that the misrepresentations were not made for the purpose or the object of influencing the investment decisions of market participants." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000) (applying standard enunciated in *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968)); *see also In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *17 (N.D. Cal. June 2, 2020) ("…there is no rule that only market-related documents, such as regulatory filings, public presentations, or press releases, can contain actionable misstatements"); *SEC v. StratoComm Corp.*, 2 F.Supp.3d 240, 258-59 (N.D.N.Y. 2014) (finding "publicly-disseminated press releases, research reports, and website representations that contain materially false and misleading statements regarding an issuer of securities satisfies the 'in connection with' requirement").[5] Reasonable investors "generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 n.24 (1988).

---

[5] Defendants misplace reliance on *McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir. 1996), which held that E&Y could be liable for preparing fraudulent audit report while knowing its contents would be publicly-disseminated.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants' misstatements, disseminated on AHM's website and in product-related press releases and press-kits, directly related to the value of Honda's vehicles and concealed risks associated with investing in Honda, *i.e.*, increased regulatory and legal exposure. ¶¶128-32, 147. "[B]ecause the [misstatements] appeared widely in a forum where [they] w[ere] likely seen by potential investors, [their] publication in [press releases, press-kits and AHM's website] w[ere] in connection with the sale of a security." *SEC v. Gruder*, 2010 WL 11500092, at *6 (N.D. Ga. Feb. 11, 2010) (finding statements in magazine advertisements and postcards sent to customers actionable); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prod. Liab. Litig.*, 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017) (emissions compliance stickers placed on U.S.-sold vehicles actionable); *In re Rocket Fuel Sec. Litig.,* 2015 WL 9311921, at *6 (N.D. Cal. 2015) (company website statements actionable); *SEC v. Mack*, 2012 WL 13005963, at *2 (C.D. Cal. Aug. 7, 2012) (statements on "website, as well as [in] advertising brochures" actionable). While Defendants attempt to unilaterally and baselessly dictate which statements investors should or should not have heeded when deciding to purchase or sell Honda securities, they cannot escape that "in connection with" is met where, as here, the alleged misrepresentations would influence a reasonable investor, affect the value of Honda securities, or conceal risks involved in purchasing them. *Toshiba II*, 424 F.Supp.3d at 828 (allegations that defendants "concealed the true condition of Toshiba's business and the risks to its financial success and misled investors about the risks associated with the purchase or sale of securities…plausibly demonstrate some causal connection between Defendant's conduct and the purchase or sale of the ADRs at issue"). Accordingly, "th[e] Court cannot say as a matter of law that a reasonable investor would not use [press releases, press-kits, and AHM's website] in making investment decisions." *In re Facebook, Inc. Sec. Litig.*, 405 F.Supp.3d

809, 834 (N.D. Cal. 2019) (finding defendant's online "privacy policies may be used to show a material misstatement or omission").

Furthermore, allegations of a "close-knit" relationship between Defendants (¶¶21-22, 27-28, 30-31) "demonstrate the appropriateness of extending [§10(b)]'s reach to securities of a parent company, when that parent company exercises substantial involvement over the day-to-day operations of a wholly-owned subsidiary alleged to have violated federal securities laws." *In re Volkswagen AG Sec. Litig.*, 661 F.Supp.3d 494, 530 (E.D. Va. 2023). Otherwise, it "would reward [Honda] with a scapegoat mechanism through their unlisted subsidiaries to avoid §10(b)'s remedial scheme." *Id.*; *see also Klein v. Altria Grp., Inc.*, 525 F.Supp.3d 638, 658 (E.D. Va. 2021) (finding issuer company jointly liable for other company's statements because the nature of their relationship "result[ed] in the merger of the[ir] advertisement and distribution resources").

Defendants' authorities are inapposite. In *Di Donato v. Insys Therapeutics Inc.*, third-party article quotations were found inactionable because plaintiff failed to particularize "when, where, or to whom [defendant] made this statement, only that it was published in the article." 2017 WL 3268797, at *16 (D. Ariz. Aug. 1, 2017). Here, Plaintiffs clearly allege where, when, and who (AHM) issued the misstatements (¶¶117-28); thus, there is no uncertainty as to Defendants' connection therewith. *See id.* at *16 ("The kinds of statements courts have found to satisfy the 'in connection with' requirement are…at the very least documents produced by the defendants themselves."); *see also In re QuantumScape Sec. Litig.,* 580 F. Supp. 3d 714, 739-40 (N.D. Cal. 2022) (finding statements in company's earnings call, CEO's CNBC interviews and officer's LinkedIn post actionable). Next, in *In re Fin. Corp. of Am. S'holder Litig.*, while an accounting firm's advice on how to account for mortgage certificates (not on the value of the certificates) was subsequently deemed "inappropriate," it was sufficiently removed from investor losses sustained when the

corporation reported net losses. 796 F.2d 1126, 1128-30 (9th Cir. 1986). Here, Defendants' misstatements directly impacted Honda's vehicles and concealed risks of regulatory and legal exposure, the revelation of which directly caused significant investor loss. *See* ¶¶128-32, 147.

Lastly, Defendants cite *In re Lifelock, Inc. Sec. Litig.*, to argue press releases and press-kits concerning Honda's vehicles have no probative value here. 690 F. App'x 947, 953-54 (9th Cir. 2017). These press materials, however, are more akin to the "detailed" ads considered *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 154 (2d Cir. 1998) than the "simple" ads considered and distinguished in *Lifelock*. For example, the 51-page "2019 Honda Passport Press Kit" details all vehicle components, including the function, design, and benefits of Idle Stop (*see* ¶122); thus, markedly different from the "simple descriptive chart checking off LifeLock's 'Types of Protection' and comparing them against 'Credit Monitoring,' 'Do It Yourself,' and 'Credit Card Protection'" and the "passive ad" stating "identity theft protection helps proactively safeguard your credit." *Lifelock*, 690 F. App'x at 953-54; *see also Facebook*, 405 F.Supp.3d at 834 (distinguishing data policy from *Lifelock* ads). Further, unlike here, *Lifelock* plaintiffs failed to describe source of the challenged advertisements publication calling into question the accessibility of a reasonable investor. *Compare* ¶¶117-28 *with Lifelock* at 954. Notably, courts examining *Lifelock*'s district court opinion reiterate that, the fact "that the misstatements appeared in certain medium [is] not dispositive." *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *5, n.8 (D. Md. Feb. 4, 2020); *accord Apple*, 2020 WL 2857397, at *17.

## IV. Honda "Made" AHM-Attributed Statements.

Defendants incorrectly argue Honda cannot be held liable for statements on AHM's website or in AHM-issued documents related to Honda products. Mot. at 15-16. In accordance with *Janus Capital Grp., Inc. v. First Derivative Traders*, 564

15

U.S. 135, 142 (2011), Honda had "ultimate authority" over AHM's statements by virtue of its position as their parent, involvement in their day-to-day operations, and ability to appoint their board of directors and executive officers, and therefore, "directed their public statements." *See* ¶¶27-28, 30-31; *see also In re Pfizer Inc. Sec. Litig.,* 819 F.3d 642, 657-58 (2d Cir. 2016) (holding company responsible for third-parties' statements given its involvement in approving and disseminating the statements); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 56 F.Supp.3d 549, 558 (S.D.N.Y. 2014) (refusing dismissal under *Janus* against parent company and CEO for statements attributed to subsidiary); *Elbit Sys. Ltd. v. Credit Suisse Grp.*, 917 F.Supp.2d 217, 228 (S.D.N.Y. 2013) (finding *Janus* does not absolve parent liability for subsidiary-made statements given its authority thereover).

## V.    The SAC Adequately Pleads Scienter.

The SAC alleges scienter as to Defendants' statements in the "most direct way… via contemporaneous reports or data, *available* to the party, which contradict the statement." *Nursing Home v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). Pursuant to federal regulations, Honda tracked vehicle diagnoses and repairs in a single aggregated database and submitted quarterly reports to NHTSA including *inter alia*, MCs concerning product defects, warranty reports, consumer complaints, and field reports broken down by make, model, year, and problem category. ¶¶61, 79, 99. Between July 2015 and March 2023, AHM's Technical Research and Support Group issued over twenty Defect-related MCs, on behalf of Honda, to all Honda/Acura Service Managers, Advisors and/or Consultants. ¶¶82-113, 137. From the first MC, AHM identified known "symptoms" to include "vehicle hesitates, surges, idles high, shifts hard, or auto idle stop does not work." ¶82. Indeed, AHM later admitted the Defect's long-standing existence stating, "***during development, the idle stop enable criteria was mis-set***." ¶¶ 98, 112. Between 2015 and 2016, AHM

16

attempted to internally correct the Defect in thousands of 2015 TLXs, 2016 MDXs, and 2016 Pilots to no avail. ¶¶82-84. By March 2017, AHM acknowledged the persistence of the Defect and "customer complaint of the automatic idle stop inoperable" in 2016-17 Pilots and 2016-17 MDXs. ¶¶86-88. In May 2018, AHM identified similar complaints relating to 2018 Odysseys and Pilots. ¶89. Notably, AHM listed Honda's "affected vehicles" as "ALL Models with Auto Idle Stop" by June 2019, at the latest. ¶90 (MC replacing July 2018 version). At no point did Defendants make any attempts to universally resolve the Defect, nor is there any indication that Idle Stop was materially changed from one model year to the next. Subsequent Class Period MCs, concerning 2016 MDXs, 2015-17 TLXs, 2016-17, 2019-20, and 2022 Pilots, 2019-20 Odysseys and Passports, and 2022 Ridgelines, demonstrate the perpetual pervasiveness of the Defect. ¶¶91-98. Defendants' Post-Class Period warranty extensions and product updates further evidence the Defect's widespread nature. ¶¶109-13. Accordingly, Defendants "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014); *see also N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) (scienter "where defendants failed to review or check information that they had a duty to monitor."); *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 402 F.Supp.3d 767, 800 (N.D. Cal. 2019) ("contrast" between statement and "reality" sufficient "to infer fraudulent intent").

Additionally, Honda's quarterly reports and NHTSA's Investigation confirm, and CW1 corroborates, the Defect was discussed at regularly held meetings attended by corporate management and was covered in reports management had access to. ¶¶61, 82-103, 107, 110-12, 137. Collectively, these allegations give rise to a strong inference of scienter. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter where "executive-level management…had access to and

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

used reports documenting in real time [the disputed information] during the Class Period"); *Oracle*, 380 F.3d at 1231 (scienter where company-maintained database contained adverse information and "top executives admit to having monitored the database"). This is particularly true given that U.S. automotive sales are core to Honda's business and the Defect impacted hundreds of thousands of U.S.-sold vehicles. *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 2023 WL 5496507, at *22 (9th Cir. Aug. 25, 2023) (finding "obvious" inference of scienter due to CEO's familiarity with business operations); *Zhou v. Faraday Future Intell. Elec. Inc.,* 2022 WL 13800633, at *10 (C.D. Cal. Oct. 20, 2022) (scienter where "[vehicle] production and sale constituted the core business operation of [corporate defendant]"). Moreover, Defendants' efforts to conceal the Defect from the public strengthen the inference of scienter considering Honda's prior safety violations. *See* ¶¶86-89, 92-97 (MCs directed at Honda service managers explicitly stating, "this message is solely directed to Honda dealership personnel; please handle accordingly."); ¶136 (discussing 2015 NHTSA fine); *see also In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah. 2007) (attempt to "cover-up" information "is strong proof of scienter").

Defendants try to avoid responsibility for official company statements by arguing no "corporate scienter" exists absent allegations of "what information any *particular* Honda or [AHM] employee had at any time when the alleged statements were made." Mot. at 17. Notwithstanding detailed allegations of what information Defendants' service managers, advisors, consultants, technicians, and corporate management knew or had access to when the statements were made, this argument ignores how standard agency principles work in the securities fraud context. The "spokesperson" who made the alleged statements is the quintessential example of an agent who is authorized to speak for corporate defendants like AHM and Honda, and thus are equally Defendants' fraud. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809

F.3d 471, 476 (9th Cir. 2015) ("In the context of Rule 10b-5, we have adopted the general rule of imputation and held that a corporation is responsible for a corporate officer's fraud committed within the scope of his [or her] employment *or* for a misleading statement made by an employee or other agent who has actual or apparent authority."); *see also In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3764903, at *1 (C.D. Cal. Feb. 21, 2012) (rejecting notion that "the law allows corporations to shield themselves from securities fraud liability by funneling fraudulent statements through an 'ignorant' spokesperson with no way for the public to know who, specifically, prepared the spokesperson's statements").

"Corporate scienter" also exists where "a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (emphasis in original); *Brown v. China Integrated Energy, Inc.,* 875 F. Supp. 2d 1096, 1123 (C.D. Cal. 2012) (corporate scienter where statements about fuel production "strain[ed] credulity"). The safety, reliability, and functionality of Honda's vehicles is critical to its operations. Yet for years, Defendants duped the public into thinking Honda's Idle Stop functioned as intended, stacking up to the competition, despite knowing the Defect impaired the drive function of hundreds of thousands of vehicles sold, and as a result, put unwitting customers at unreasonable risk of harm and, in turn, exposed investors to increased risk of regulatory action and litigation. ¶¶10-12, 82-116, 129-30. At least *some* "high-level managers directly responsible for day-to-day operations must have known that statements about [Idle Stop] were misleading when made, by reason of their positions of authority and the fact that the [Defect] related to the companies' core operations, such that 'it would be absurd to suggest that top management was unaware of them.'" *Zhou*, 2022 WL 13800633, at *10; *see also*

*Am. W. Holding*, 320 F.3d at 943 n.21 (scienter where it would be "absurd" to suggest that company did not discuss FAA investigation).

**VI.    The SAC Adequately Pleads Loss Causation.**

"[L]oss causation is simply a variant of proximate cause." *Genius Brands*, 2024 WL 1473942, at \*6. "Plaintiffs need only show a 'causal connection' between the fraud and the loss" which is most commonly done by pointing to a "corrective disclosure" containing "information correcting the misstatement or omission" *Id.* at \*6-\*7. "That effort should not prove burdensome, for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *In re BofI Holding, Inc., Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). This standard is easily met here.

The undisclosed risks emanating from the Defect began to materialize with NHTSA's June 3, 2022 announcement of investigation into the Defect, which revealed information about Idle Stop that contradicted Defendants' prior representations about the reliability and functionality of Honda's models with Idle Stop. ¶¶10, 96-99, 130. In response, Honda's ADS price declined by approximately 3.41%. ¶130; *see In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F.Supp.2d 1192, 1224-25 (W.D. Wash. 2009) (loss causation where stock price declined following disclosure of SEC investigation); *see also In re New Century,* 588 F.Supp.2d 1206, 1237-38 (C.D. Cal. 2008) (loss causation where stock price declined after announcement of internal investigation); *Rudolph v. UTStarcom*, 2008 WL 4002855, at \*4 (N.D. Cal. Aug. 31, 2008) (same). These risks continued to materialize with the filing of the Consumer Action on September 28, 2022, which revealed in stark detail the severity of the Defect and Defendants' long-standing knowledge. ¶¶11-12, 82-93, 131-32. This news sharply contrasted with Defendants' previous representations about the safety, reliability and functionality of Honda's

vehicles and revealed unreasonable consumer risks posed by a near decade-long Defect. In response, Honda's ADS price dropped approximately 3.23%. ¶132; *see Robb v. Fitbit Inc.,* 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) (loss causation supported by complaints made in consumer lawsuit).

Defendants argue neither the NHTSA Investigation nor Consumer Action revealed any new information to the market and thus were not "corrective." Mot. at 19-20. This "truth-on-the-market" defense is premature at the pleading stage, *In re Amgen Inc.*, *Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008), and is also factually incorrect. NHTSA's investigation itself had not previously been disclosed to the market and the public was not aware that Honda had received "field reports" in response to customer complaints. ¶¶104-06. In addition, pre-announcement, the public was unaware that Honda admitted the Defect existed in 2016-20 Pilots as well as Odysseys, TLXs, and MDXs. ¶¶107-08. Indeed, the "public" customer complaints identified in the ODI were limited to the Pilot, meaning Honda's admission regarding the other models was not made public until that day. Likewise, the Consumer Action revealed Defendants' long-standing knowledge of the Defect, dating back to 2015; and expanded the scope and severity of the Defect, providing a more expansive list of affected vehicles and the risks posed to consumers. ¶¶12, 82-98, 130. Further, in addition to public information collected and detailed in the Consumer Action, the allegations were also based on plaintiffs' "personal knowledge as to facts specific to each of them" which cannot reasonably be considered "public" prior to the filing of the complaint. *See* ¶12 n.1.

Accordingly, Defendants' reliance on *Loos v. Immersion Corp.*, 762 F. 3d 880 (9th Cir. 2014) and *Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017), is misplaced. Mot. at 19-20. Unlike *Curry*, the NHTSA Investigation and Consumer Action revealed more than just "customer complaints" and unlike *Loos*, the information revealed was not "derived entirely from…publicly available sources." Nevertheless,

even blog posts containing public information can be "corrective." *In re BofI Holding, Inc. Sec. Litig.*, 977 F. 3d at 793-97; *In re Banc of California Sec. Litig.*, 2017 WL 3972456, at \*5 (C.D. Cal. Sept. 6, 2017) (same); *see also Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (article analyzing public Medicare records deemed corrective).

Finally, Defendants incorrectly argue Honda's ADS price "recovered" after the NHTSA Investigation and "a far more plausible reason" for the price decline following the Consumer Action is Honda's dividend. Mot. at 21-22. *First*, Honda's ADS price never recovered – from $25.84 per share before the NHTSA Investigation, Honda's ADS price fell to $22.19 per share after the Consumer Action was filed (*i.e.*, the end of the Class Period). ¶¶130-32. Notwithstanding, a rebound in stock price does not defeat loss causation. *See Nathanson v. Polycom, Inc.*, 87 F.Supp.3d 966, 984 (N.D. Cal. 2015) (price recovery does not negate loss "because the price rebound could be explained by external events"); *In re UTStarcom, Inc. Sec. Litig.,* 617 F.Supp.2d 964, 978 (N.D. Cal. 2009) ("To the extent that stock price actually increased after corrective disclosures, Defendants will have the opportunity after discovery to demonstrate that, in fact, the subject of the alleged misrepresentations did not cause Plaintiffs' claimed loss.").

*Second*, Plaintiffs "need not show that a misrepresentation was the *sole* reason for a price decline, but rather that it was one substantial cause." *Genius Brands*, 2024 WL 1473942, at \*6. Therefore, Defendants' counter-narrative for why Honda's ADS price declined is improper and premature. *Robb*, 216 F.Supp.3d at 1033 ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial…"). Defendants' authority is distinguishable and not to the contrary. In *Metzler Inv. GmbH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 (9th Cir. 2008), the alleged fraud occurred in connection with an extremely small percentage of defendants' overall operations,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*i.e.*, at one out of eighty-eight schools operated by defendants. Here, the Defect was far more pervasive, and thus a substantial cause of investor loss.

## CONCLUSION

Defendants' motion should be denied for the foregoing reasons.[6]

Dated:  April 12, 2024                    Respectfully submitted,


                                          **LEVI & KORSINSKY LLP**

                                           /s/ Adam Apton
                                          Adam M. Apton (SBN 316506)
                                          Devyn R. Glass (*pro hac vice*)
                                          445 South Figueroa Street, 31st Floor
                                          Los Angeles, CA 90071
                                          Tel: (213) 985-7290
                                          Email: aapton@zlk.com
                                          Email: dglass@zlk.com

                                          *Lead Counsel for Plaintiffs and the Class*

                                          **POMERANTZ LLP**
                                          Tamar Weinrib (*pro hac vice*)
                                          600 Third Avenue, 20th Floor
                                          New York, New York 10016
                                          Tel: (212) 661-1100
                                          Facsimile: (917) 463-1044
                                          Email: taweinrib@pomlaw.com

                                          *Additional Counsel for Plaintiffs and the Class*

---

[6] Alternatively, Plaintiffs request leave to amend under Rule 15(a). *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

23

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this Memorandum of Points and Authorities contains 6,993 words, which complies with the word limit of L.R. 11-6.1.

/s/ *Adam Apton*

Adam M. Apton

24

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS