UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. WESLEY L. HSU, JUDGE PRESIDING

RHONDA BAYLOR, individually and on behalf of all others similarly situated, )
)
)
)
                PLAINTIFFS, )
)
                vs. ) No. 2:23-cv-00794-WLH-AGR
)
HONDA MOTOR CO., LTD.; AMERICAN HONDA MOTOR COMPANY, INC.; TOSHIHIRO MIBE; TAKAHIRO HACHIGO; and KOHEI TAKEUCHI, )
)
)
)
)
              DEFENDANTS )
_____)

REPORTER'S TRANSCRIPT OF

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

LOS ANGELES, CALIFORNIA

FRIDAY, JANUARY 19, 2024

10:02 A.M.

Wil Wilcox, CSR 9178
Official U.S. District Court Reporter
First Street Courthouse
350 West First Street, Room 4311
Los Angeles, CA  90012
wil.wilcox@gmail.com

2

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFFS:
                          LEVI & KORSINSKY
                          BY:  ADAM APTON, ATTORNEY AT LAW
                          445 South Figueroa Street, 31st Floor
                          Los Angeles, CA 90071
                          213-985-7290
                          Fax: 212-363-7171
                          Email: aapton@zlk.com


FOR THE DEFENDANTS:
                          WHITE & CASE LLP
                          BY:  CHRISTOPHER CURRAN, ATTORNEY AT LAW
                          AND: BRYAN MERRYMAN, ATTORNEY AT LAW
                          555 South Flower Street, Suite 2700
                          Los Angeles, CA 90071-2433
                          213-620-7700
                          Fax: 213-452-2329
                          Email: ccurran@whitecase.com
                          Email: bmerryman@whitecase.com

LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 19, 2024

10:02 A.M.

- - - - -

THE CLERK:  Please be seated and come to order.

Calling item number one, LA-23-cv-00794, Rhonda Baylor versus Honda Motor Co., Ltd., et al.

Counsel, please state appearances starting with plaintiff.

MR. APTON:  Good morning, Your Honor.

Adam Apton of Levi & Korsinsky for the lead plaintiffs.

THE COURT:  Good morning.

MR. CURRAN:  Good morning, Judge Hsu.

I'm Christopher Curran of White & Case on behalf of both defendants.  I'm joined at counsel table with my partner, Bryan Merryman.

THE COURT:  All right.  Good morning to you both.

MR. CURRAN:  Good morning, Your Honor.

THE COURT:  The matter's on calendar for the defendants' motion to dismiss the Amended Class Action Complaint.  We issued a tentative yesterday, which I am assuming that both parties have reviewed.

Mr. Merryman, was there anything that you wanted to add here orally?

MR. CURRAN:  Your Honor, it's Mr. Curran.

THE COURT:  Oh, I'm sorry.

MR. CURRAN:  I'll be handling the -- speaking from the podium today.

THE COURT:  Okay.

MR. CURRAN:  I do have one comment that I'd like to offer to Your Honor.

THE COURT:  Okay.

MR. CURRAN:  And that is on page 7 of your tentative ruling, at the very top.

THE COURT:  Okay.

MR. CURRAN:  You see there's a sentence that begins:  "Honda's ADSs are likely also listed on foreign exchanges."

THE COURT:  Yes.

MR. CURRAN:  I think it would be more accurate, Your Honor, to say:  "Honda's ADSs are likely also available outside the United States."

THE COURT:  Fair.  Okay.

MR. CURRAN:  Maybe that's self-explanatory.  I can elaborate if necessary.

THE COURT:  No, that's not necessary.  That makes sense.

MR. CURRAN:  Okay.  Otherwise, Your Honor, I'd like to reserve the opportunity to comment based on what Mr. Apton has to say.

THE COURT:  Yes, of course.

MR. CURRAN:  Thank you.

THE COURT:  Mr. Apton.

MR. APTON:  Thank you, Your Honor.

And if I may, I could pick up from that very same sentence.

There is no evidence or any indication in the record that my clients purchased those ADSs anywhere but the New York Stock Exchange.  Every piece of information in the record points to purchases -- domestic purchases on the New York Stock Exchange.

Both clients are United States citizens.

The certifications they filed in conjunction with their lead plaintiff motions that were incorporated into the amended complaint show purchases and sales on the New York Stock Exchange by way of the fact that the pricing matches the pricing -- historical stock pricing for the New York Stock Exchange on that day.

The very depository bank for these ADSs is JPMorgan in New York.  Honda's SEC filings even say that their ADSs are listed and traded on the New York Stock Exchange since 1977 every year.

There's no indication that they are available or that they were bought anywhere else on the record.

THE COURT:  But I don't -- I just don't think

that's what the cases that I cited require.

I mean, I don't think that -- because I think with the caveat that was raised this morning, it's clear that it's possible that they purchased this from outside -- they made this purchase outside of the country, and it seems to me that this is something that is uniquely within your client's purview to be able to allege in the complaint.

So why should I rely on inferences to be drawn from the complaint that you drafted, rather than asking your client to simply state what is something that is uniquely within their knowledge, which is that it was purchased in the United States.

MR. APTON:  So, Your Honor, we do allege that these were purchased on the New York Stock Exchange, not just by way of the certifications that I referenced but also in our class action allegations.  They were bought on the New York Stock Exchange.

THE COURT:  What paragraph?

MR. APTON:  Well, so 148 to 149 and 154.

In fairness, Your Honor, the words "ADSs were bought on New York Stock Exchange" are not in those paragraphs, but it's very clear that that is what happened here.

And while Your Honor, theoretically, may or may not be correct that it's possible these ADSs were bought

somewhere else, that's not what we're -- as the non-moving party on a motion to dismiss, we're --

THE COURT:  No.  It's in your complaint.

MR. APTON:  The very --

THE COURT:  I don't understand -- I just don't understand what the -- it's not like it's a heavy lift to ask your client to declare something which you're saying to me is abundantly true.

MR. APTON:  You're absolutely right, Your Honor.

And when we amend, those words will be, you know, in black and white on the page.

I just want to make sure that a decision like this is not used incorrectly in the future by defense counsel.

Only when ADSs are not traded on a domestic exchange, the cases that Your Honor cites come into play. So when you have ADSs traded over the counter, well, it's potentially a problem.

At that point, we need to get our clients to contact their brokers to find out who cleared the transaction to make sure both sides were in the United -- it's difficult.  And it's especially difficult when, given the PSLRA's discovery stay, we're not able to, you know, serve subpoenas at this point, so it creates a complication that plaintiffs in class action securities matters ordinarily do not need -- do not need to overcome so early

in the pleadings.

THE COURT:  Just to be clear, I'm just ruling on what's exactly in front of me in this case.  I'm not intending to opine on that case that you just raised.

MR. APTON:  Understood, Your Honor.

And just for the record -- and then this will be cleaned up when we amend -- these purchases were on the New York Stock Exchange, and, again, every piece of information in the record does support that.

THE COURT:  Okay.

MR. APTON:  I have to address Your Honor's second point about falsity.

THE COURT:  Yes.

MR. APTON:  I think it is clear that this defect, quote/unquote, existed.  Based on Your Honor's tentative ruling, it strikes me that there perhaps is a question as to how significant or pervasive this defect was.

Surely, a statement in an SEC filing concerning the safety or effectiveness of a particular feature does not guarantee that this feature works a hundred percent of the time.

But our case is not about a one-off failure to restart at a traffic light.  This is a pervasive defect that affected hundreds of thousands of vehicles, multiple models over multiple years.

9

THE COURT:  Wait.  Do we know that or you're hoping to determine that?  Because -- let me just clarify something.  I do think, although the tentative is not entirely based on the numerics that are contained in the complaint, certainly they have some influence.

If the, you know, two-hundred- -- I can't remember -- two-hundred-and-change complaints upon which the investigation was launched, if that represented a significant number of the cars that were on the road -- or sold I guess is probably more precise -- during that time, then -- I mean, if it's 1 percent of the cars, where's the line?

I think that there is some line.  Is it 1 percent of the cars?  Is it .1 percent of the cars?  Is it a hundredth or a thousandth of, you know -- of a percent of the number of cars that they sold?  Or is it, like, 10 percent of the cars that they sold?

I mean, that seems to me to be significant.

MR. APTON:  That's a very good point, Your Honor.

And, yeah, it's hard to draw a bright line, and I would submit that you can't really, because even if it was 10 percent, defendants could say, "Well, but no one got injured, so no harm, no foul."

Yes, it changes.  .1 percent, 1 percent, I think what might be helpful for amendment -- and perhaps Your

Honor would appreciate seeing this -- is some additional context as to what is the significance of a technical service bulletin -- of multiple technical service bulletins of service news articles.

How unlikely is it?

What is the significance of the fact that Toyota and Ford had zero issues -- or at least a number that you count on one hand?

I think it -- we could probably add more facts that would help underscore the materiality of the defect, which, when considered against the alleged false statements, perhaps may change Your Honor's opinion as to how false or perhaps misleading this was.  Because surely an investor who's going to invest in Honda is going to inquire as to the ability for Honda to sell its vehicles.  And by that I mean safety, quality, how desirable are these to the market.

THE COURT:  Yes.

MR. APTON:  And if there is a -- I'll be a little -- I'll use some hyperbole.

If there's a rampant defect affecting all the vehicles on the road, surely no one's going to want to invest in that.

Now, if there's -- on the other end of the spectrum, if there's only one Honda Odyssey somewhere in, I don't know, you know, southern New Jersey that fails to

start again after it comes to a stop at a stoplight, right, Your Honor's point is correct.

THE COURT:  I mean, I just -- I think that plays a significant role here, because what you're essentially -- my view on just -- if I were to distill your complaint to very simplistic terms that I could explain to a fifth grader -- right? -- in my view there's a very different sort of weight given to the complaint.

If on the one hand you're saying, Honda should have in each of these disclosures -- or each of these statements that you've alleged, should have added the caveat "unless there is a manufacturer's defect," that seems to me to be unrealistic given the way the world works, unless the manufacturing defect was so common that it really -- it was very material to each of those statements that they omitted that caveat to the statement.

So that is how, sort of, I view the -- you know, the crux of the lawsuit.

And so it seemed to me that absent some showing -- some greater showing that this was more prevalent than what has been alleged in the complaint, it's hard for me to sort of make that leap that that language was mandatory in order to comply with 10b-5.

MR. APTON:  I appreciate that, Your Honor.

And your use of the word "prevalent" is

interesting, because prevalence can be, you know, quantitative or qualitative in my opinion.

THE COURT:  Yes.

MR. APTON:  So that's something that we'll have to certainly consider.

Your Honor's suggestion -- or hypothetical as to the, quote, "unless there's a manufacturer's defect" language attached to it, I don't know that -- that had that language been in the statements, I don't know that that would have necessarily solved the issue.  Maybe it would have.

The issue arises similar to what you see in the LifeLock, Forescout, Apple cases that we cited in our brief. The issue arises when a defendant is speaking positively about a product of theirs or a service while knowing that there's something wrong with that product or that the service isn't being carried out as it's being portrayed to the public.

And to Your Honor's point, in each of those cases, there were facts showing the prevalence of that issue, and so -- I don't want to belabor the point.

I appreciate the opportunity for leave to amend, and I would ask that we receive -- I haven't spoken to defense counsel about this, but hopefully 45 days would be okay with everybody.

THE COURT:  Okay.

MR. APTON:  Thank you, Your Honor.

THE COURT:  I don't have any objection to that, so --

MR. APTON:  Thank you.

THE COURT:  All right.  Thank you.

Mr. Curran.

MR. CURRAN:  Thank you, Your Honor.  No objection to the 45 days.

THE COURT:  Okay.

MR. CURRAN:  And maybe -- just to tie a bow around some of the issues that have been discussed today, in my mind there is some question about the domesticity of the purchase by the plaintiffs here.

It is possible, notwithstanding the fact that these ADSs are traded on the New York Stock Exchange, that private parties can do a transaction in London.  Someone can go to Goldman Sachs in London and buy a Honda ADS, so that would be a foreign transaction.

And the reason why I'm kind of so attuned to these issues is I'm familiar with the details in that *Stoyas* case that the Ninth Circuit issued.

In that case, Your Honor will remember, the Ninth Circuit admonished plaintiffs' counsel in securities cases that they had to provide in their complaints specific

allegations showing the -- the domesticity of their purchases.

And because of that holding, in the meet and confers before filing our motion to dismiss here, we went to the plaintiffs and said, "Can you provide us with some elaboration on the circumstances of the plaintiffs' purchases here," and they said, "No," so -- and then they left alone their complaint.

So -- excuse me if I'm expressing a little frustration here, but -- but to me it's not a simple fix. It may require the plaintiffs to consult with their brokers, because their brokers, who are their agents, may have purchased the ADSs in ways that the plaintiffs aren't specifically knowledgeable about.

THE COURT:  I mean, look, I might view this differently if this was information that was uniquely in your client's hands, but because it's in the plaintiffs' hands, I have no problem with requiring them to amend to add those allegations.

MR. CURRAN:  Right.  Thank you, Your Honor.

And then as to prevalence, I think Your Honor was doing the math in your head while I was doing it at the same time, and from my head, I think it was 221 complaints with respect to a group of almost 200,000 vehicles.  So by our math, that's .1 percent.  So when we're talking about

prevalence, the existing complaint sure doesn't show that.

THE COURT:  Right.

MR. CURRAN:  So with that, I'll have a seat, Your Honor.  Thank You.

THE COURT:  Okay.  Thank you.

Anything else?

MR. APTON:  Yes, Your Honor.  I'm sorry.

THE COURT:  Okay.

MR. APTON:  With respect to the *Stoyas* case, again those were ADRs that were treated over the counter, not on the New York Stock Exchange.

And while counsel speculates it's possible our clients went to London to purchase an ADS, how is a retiree from Roseburg, Oregon actually going to do that?  Who is he meeting with?  How is that transaction done?

It's speculation.  And on a motion to dismiss at the pleading stage, I should not have to counter that.  It's not fair.  It's not what the standards require.  It's not what --

THE COURT:  Well, I think the standard requires that you allege it.  So that's all I'm saying, is that you need to allege it.

MR. APTON:  Absolutely, Your Honor.

THE COURT:  Okay.

MR. APTON:  I appreciate that.

16

I just want to point out that the *Stoyas* case is not applicable in our case where we have ADSs traded on the New York Stock Exchange, and that's the only venue in which they trade, outside of counsel's imaginary transaction in London somewhere.

THE COURT:  Sure.

MR. APTON:  And that is all I have to say about that.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you very much.

The matter is taken under submission.  We'll issue an order as soon as we can.

(At 10:19 a.m. proceedings were adjourned.)

--oOo--

17

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  January 21, 2024



/S/____WIL S. WILCOX_____

U.S. COURT REPORTER
CSR NO. 9178

MR. APTON: [20]
MR. CURRAN: [15]
THE CLERK: [1]  3/4
THE COURT: [35]

**-**

--oOo [1]  16/13

**.**

.1 [3]

**/**

/S [1]  17/14

**0**

00794 [1]  3/5

**1**

10 [2]
10:02 [2]
10:19 [1]  16/12
10b-5 [1]  11/23
148 [1]  6/19
149 [1]  6/19
154 [1]  6/19
19 [2]
1977 [1]  5/22

**2**

200,000 [1]  14/24
2024 [3]

21 [1]  17/11
212-363-7171 [1]  2/6
213-452-2329 [1]  2/11
213-620-7700 [1]  2/11
213-985-7290 [1]  2/5
221 [1]  14/23
2329 [1]  2/11
2433 [1]  2/10
2700 [1]  2/10
28 [1]  17/5
2:23-cv-00794-WL H-AGR [1]  1/9

**3**

31st [1]  2/4
350 [1]  1/24

**4**

4311 [1]  1/24
445 [1]  2/4
45 [2]

**5**

555 [1]  2/10

**7**

7171 [1]  2/6
7290 [1]  2/5
753 [1]  17/4
7700 [1]  2/11

**9**

90012 [1]  1/24
90071 [1]  2/5
90071-2433 [1]  2/10
9178 [2]

**A**

a.m [3]
aapton [1]  2/6
ability [1]  10/15
above [1]  17/7
above-entitled [1]  17/7
absent [1]  11/19
absolutely [2]
abundantly [1]  7/8
action [4]
ADAM [2]
add [3]
added [1]  11/11
address [1]  8/11
adjourned [1]  16/12
admonished [1]  13/24
ADRs [1]  15/10
ADS [2]
ADSs [12]
agents [1]  14/12
AGR [1]  1/9
al [1]  3/6
allegations [3]
allege [4]

## A

alleged [3]
almost [1]  14/24
alone [1]  14/8
although [1]  9/3
amend [4]
amended [3]
amendment [1]  9/25
AMERICAN [1]  1/10
ANGELES [5]
appearances [2]
Apple [1]  12/13
applicable [1]  16/2
appreciate [4]
APTON [4]
aren't [1]  14/13
arises [2]
articles [1]  10/4
assuming [1]  3/22
attached [1]  12/8
ATTORNEY [3]
attuned [1]  13/20

## B

bank [1]  5/19
BAYLOR [2]
belabor [1]  12/21
black [1]  7/11
bmerryman [1]  2/12
bow [1]  13/11

brief [1]  12/13
bright [1]  9/20
brokers [3]
BRYAN [2]
bulletin [1]  10/3
bulletins [1]  10/3

## C

CA [3]
calendar [1]  3/19
CALIFORNIA [3]
carried [1]  12/17
cars [6]
caveat [3]
ccurran [1]  2/12
CENTRAL [1]  1/2
CERTIFICATE [1]  16/15
certifications [2]
certify [1]  17/4
CHRISTOPHER [2]
Circuit [2]
circumstances [1]  14/6
cited [2]
cites [1]  7/15
citizens [1]  5/12
clarify [1]  9/2
class [4]
cleaned [1]  8/7
clear [4]
cleared [1]  7/19

client [2]
client's [2]
clients [4]
CO [2]
Code [1]  17/5
comment [2]
common [1]  11/14
COMPANY [1]  1/10
complaint [12]
complaints [3]
complication [1]  7/23
comply [1]  11/23
Conference [1]  17/9
confers [1]  14/4
conformance [1]  17/8
conjunction [1]  5/13
consult [1]  14/11
contained [1]  9/4
context [1]  10/2
counsel's [1]  16/4
count [1]  10/8
counter [3]
country [1]  6/5
COURT [3]
Courthouse [1]  1/23
creates [1]  7/23
crux [1]  11/18

## C

CSR [2]
CURRAN [4]
cv [2]

## D

decision [1]  7/12
declare [1]  7/7
defect [8]
defendant [1]  12/14
defendants [4]
defendants' [1]  3/20
defense [2]
depository [1]  5/19
desirable [1]  10/16
details [1]  13/21
difficult [2]
disclosures [1]  11/10
discovery [1]  7/22
dismiss [5]
distill [1]  11/5
DISTRICT [3]
DIVISION [1]  1/3
domestic [2]
domesticity [2]
don't understand [1]  7/5
drafted [1]  6/9
draw [1]  9/20
drawn [1]  6/8

## E

early [1]  7/25
effectiveness [1]  8/19
elaborate [1]  4/20
elaboration [1]  14/6
Email [3]
entirely [1]  9/4
entitled [1]  17/7
especially [1]  7/21
essentially [1]  11/4
et [1]  3/6
everybody [1]  12/25
evidence [1]  5/7
exchange [13]
exchanges [1]  4/13
excuse [1]  14/9
existing [1]  15/1
explanatory [1]  4/19
expressing [1]  14/9

## F

fact [3]
facts [2]
fails [1]  10/25
failure [1]  8/22
fairness [1]  6/20
false [2]
falsity [1]  8/12
Fax [2]

feature [2]
fifth [1]  11/6
Figueroa [1]  2/4
filings [1]  5/20
fix [1]  14/10
Floor [1]  2/4
Flower [1]  2/10
Ford [1]  10/7
foregoing [1]  17/5
foreign [2]
Forescout [1]  12/13
format [1]  17/8
foul [1]  9/23
FRIDAY [2]
front [1]  8/3
frustration [1]  14/10

## G

gmail.com [1]  1/25
Goldman [1]  13/18
grader [1]  11/6
greater [1]  11/20
group [1]  14/24
guarantee [1]  8/20

## H

HACHIGO [1]  1/11
handling [1]  4/2
harm [1]  9/23
heavy [1]  7/6
helpful [1]  9/25

## H

hereby [1]  17/4
historical [1]  5/17
holding [1]  14/3
HON [1]  1/4
HONDA [8]
Honda Motor Co [1]  3/6
Honda's [3]
Honor [25]
Honor's [6]
hopefully [1]  12/24
hoping [1]  9/2
HSU [2]
hundred [3]
hundreds [1]  8/24
hundredth [1]  9/15
hyperbole [1]  10/19
hypothetical [1] 12/6

## I

I'd [2]
I'll [4]
I'm [10]
imaginary [1]  16/4
INC [1]  1/10
incorporated [1] 5/14
incorrectly [1]  7/13
indication [2]
individually [1]  1/6
inferences [1]  6/8

influence [1]
information [3]
injured [1]  9/23
inquire [1]  10/14
intending [1]  8/4
invest [2]
investigation [1] 9/8
investor [1]  10/13
issue [5]
issued [2]
issues [3]
item [1]  3/5

## J

JANUARY [3]
Jersey [1]  10/25
joined [1]  3/15
JPMorgan [1]  5/20
JUDGE [2]
Judicial [1]  17/9

## K

knowing [1]  12/15
knowledgeable [1] 14/14
KOHEI [1]  1/11
KORSINSKY [2]

## L

LA [1]  3/5
LA-23-cv-00794 [1] 3/5
language [3]

launched [1]  9/8
LAW [3]
lawsuit [1]  11/18
lead [2]
leap [1]  11/22
LEVI [2]
LifeLock [1]  12/13
lift [1]  7/6
light [1]  8/23
LLP [1]  2/8
London [4]
LOS [5]
LTD [2]

## M

mandatory [1] 11/22
manufacturer's [2]
manufacturing [1] 11/14
market [1]  10/16
matches [1]  5/16
material [1]  11/15
materiality [1] 10/10
math [2]
matter [2]
matter's [1]  3/19
matters [1]  7/24
meeting [1]  15/15
MERRYMAN [3]
MIBE [1]  1/11
misleading [1]

## M

misleading... [1] 10/13
models [1] 8/24
motion [5]
motions [1] 5/14
MOTOR [3]
Mr [3]
Mr. [2]
Mr. Curran [2]
multiple [3]

## N

necessary [2]
news [1] 10/4
Ninth [2]
non [1] 7/1
non-moving [1] 7/1
notwithstanding [1] 13/15
number [4]
numerics [1] 9/4

## O

objection [2]
Odyssey [1] 10/24
offer [1] 4/6
Official [1] 1/23
Oh [1] 4/1
omitted [1] 11/15
one's [1] 10/21
one-off [1] 8/22
oOo [1] 16/13

opinions [1] 8/4
opinion [2]
opportunity [2]
orally [1] 3/24
order [3]
ordinarily [1] 7/25
Oregon [1] 15/14
overcome [1] 7/25

## P

page [3]
paragraph [1] 6/18
paragraphs [1] 6/22
parties [2]
partner [1] 3/16
party [1] 7/2
perhaps [4]
pervasive [2]
pick [1] 5/5
piece [2]
plaintiff [2]
plaintiffs [8]
plaintiffs' [3]
play [1] 7/15
plays [1] 11/3
pleading [1] 15/17
pleadings [1] 8/1
podium [1] 4/3
point [8]
points [1] 5/10
portrayed [1] 12/17
positively [1] 12/14

potentially [1] 7/17
precise [1] 9/10
PRESIDING [1] 1/4
prevalence [4]
prevalent [2]
pricing [3]
private [1] 13/17
problem [2]
proceedings [2]
product [2]
PSLRA's [1] 7/22
public [1] 12/18
purchase [3]
purchased [5]
purchases [6]
pursuant [1] 17/4
purview [1] 6/7

## Q

qualitative [1] 12/2
quality [1] 10/16
quantitative [1] 12/2
question [2]
quote [2]
quote/unquote [1] 8/15

## R

raised [2]
rampant [1] 10/20
record [5]

## R

referenced [1]  6/15
regulations [1]  17/9
rely [1]  6/8
Reporter [2]
REPORTER'S [1]  1/16
reserve [1]  4/24
restart [1]  8/23
retiree [1]  15/13
RHONDA [2]
Rhonda Baylor
versus [1]  3/6
road [2]
role [1]  11/4
Room [1]  1/24
Roseburg [1]  15/14
ruling [3]

## S

Sachs [1]  13/18
safety [2]
sales [1]  5/15
seat [1]  15/3
SEC [2]
second [1]  8/11
Section [1]  17/4
securities [2]
self [1]  4/19
self-explanatory [1]  4/19
sense [1]  4/22
sentence [2]

serve [1]  7/23
service [5]
sides [1]  7/20
significance [2]
simple [1]  14/10
simplistic [1]  11/6
situated [1]  1/7
solved [1]  12/10
soon [1]  16/11
South [2]
southern [1]  10/25
specific [1]  13/25
spectrum [1]  10/24
speculates [1]  15/12
speculation [1]  15/16
spoken [1]  12/23
stage [1]  15/17
standard [1]  15/20
standards [1]  15/18
starting [1]  3/7
state [2]
statement [2]
statements [4]
STATES [6]
stay [1]  7/22
stenographically [1]  17/6
stock [13]
stoplight [1]  11/1
Stoyas [3]
Street [4]
submission [1]

submit [1]  9/21
subpoenas [1]  7/23
suggestion [1]  12/6
Suite [1]  2/10
support [1]  8/9
surely [3]

## T

table [1]  3/15
TAKAHIRO [1]  1/11
TAKEUCHI [1]  1/11
technical [2]
tentative [4]
terms [1]  11/6
Thank [11]
theirs [1]  12/15
theoretically [1]  6/24
thousands [1]  8/24
thousandth [1]  9/15
tie [1]  13/11
time [3]
Title [1]  17/5
TOSHIHIRO [1]  1/11
Toyota [1]  10/6
traffic [1]  8/23
transaction [5]
transcript [3]
treated [1]  15/10

## T

two-hundred [1] 9/6

## U

U.S [2]
underscore [1] 10/10
uniquely [3]
UNITED [7]
unless [3]
unlikely [1] 10/5
unquote [1] 8/15
unrealistic [1] 11/13
us [1] 14/5

## V

vehicles [4]
venue [1] 16/3
versus [1] 3/6
vs [1] 1/9

## W

weight [1] 11/7
WESLEY [1] 1/4
West [1] 1/24
WESTERN [1] 1/3
where's [1] 9/11
white [3]
whitecase.com [2]
who's [1] 10/14
Wil [2]
wil.wilcox [1] 1/25

Wilcox [2]
WLH [1] 1/9
world [1] 11/13
would submit [1] 9/21

## Y

York [13]

## Z

zero [1] 10/7
zlk.com [1] 2/6